# In the United States Court of Appeals for the Tenth Circuit

ANTHONY DUNN, ET AL.,
*Plaintiffs-Appellants/Cross-Appellees,*

v.

SANTA FE NATURAL TOBACCO CO., INC., ET AL.,
*Defendants-Appellees/Cross-Appellants.*

On Appeal from the United States District Court,
for the District of New Mexico (Albuquerque) (Hon. James O. Browning)
No. 1:16-MD-02695-JB-LF

## RESPONSE AND REPLY BRIEF OF PLAINTIFFS-APPELLANTS/CROSS-APPELLEES

LEAH M. NICHOLLS
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600

HANNAH KIESCHNICK
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150

MATTHEW W.H. WESSLER
DEEPAK GUPTA
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

*(Additional counsel listed on inside cover)*

July 26, 2024          *Counsel for Plaintiffs-Appellants/Cross-Appellees*

SCOTT P. SCHLESINGER
JEFFREY L. HABERMAN
JONATHAN R. GDANSKI
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, FL 33316
(954) 467-8800

MATTHEW D. SCHULTZ
LEVIN, PAPANTONIO, ET AL.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
(850) 435-7140

MICHAEL R. REESE
REESE LLP
100 West 93rd Street, 16th Floor
New York, NY 10025
(212) 643-0500

NANCY R. LONG
LONG, KOMER & ASSOCIATES, P.A.
1800 Old Pecos Trail, Suite A
Santa Fe, NM 87505
(505) 982-8405

MELISSA S. WEINER
PEARSON WARSHAW, LLP
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
(612) 389-0600

DANIEL L. WARSHAW
PEARSON WARSHAW, LLP
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
(818) 788-8300

RONALD A. MARRON
LAW OFFICES OF RONALD A.
MARRON
651 Arroyo Drive
San Diego, CA 92103
(619) 696-9006

# TABLE OF CONTENTS

Table of authorities ................................................................................ iii

Introduction ........................................................................................... 1

Statement of the issues on cross appeal ................................................. 3

Summary of the argument ..................................................................... 4

Argument ............................................................................................... 7

I.  The elements of the plaintiffs' safer-cigarette and menthol
    claims are amenable to common proof ................................... 7

    A.  The plaintiffs' statutory claims brought under the safer-
        cigarette theory are subject to a reasonable consumer
        standard and amenable to common proof .................................. 8

    B.  For both theories, the plaintiffs' statutory claims raise
        common questions of causation amenable to common
        proof in the form of their price-premium damages model ......... 13

    C.  For both theories, the plaintiffs' unjust enrichment claims
        also raise common questions amenable to common
        proof in the form of their price-premium damages model ......... 18

II. The district court erred in concluding that the plaintiffs'
    proposed damages model was improper under *Comcast* ...................... 23

    A.  The plaintiffs' damages model fits their safer-cigarette
        theory ........................................................................................ 23

    B.  The plaintiffs' damages model fits their menthol theory ............ 33

III. The ease of identifying class members is not an extratextual
     threshold requirement or question of predominance, but instead
     a question of administrative feasibility that goes to superiority
     under Rule 23(b)(3) ............................................................................. 38

A.    Administrative feasibility concerns cannot, standing alone, defeat class certification.................................................39

B.    Questions about administrative feasibility should be considered only as part of the superiority analysis under Rule 23(b)(3)(D), and not also as part of the predominance analysis ........................................................................43

Conclusion .............................................................................55

# TABLE OF AUTHORITIES

## Cases

*Allegra v. Luxottica Retail North America*,
341 F.R.D. 373 (E.D.N.Y. 2022) ................................................................21

*Allen v. Conagra Foods, Inc.*,
331 F.R.D. 641 (N.D. Cal. 2019) ....................................................... 37, 38

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................... 45, 48, 49

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013) .............................................................................. 10

*Astiana v. Hain Celestial Group, Inc.*,
783 F.3d 753 (9th Cir. 2015) ..............................................................21

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013) ..........................................................21

*Black v. Occidental Petroleum Corp.*,
69 F.4th 1161 (10th Cir. 2023) ...........................................................10

*Bowring v. Sapporo U.S.A., Inc.*,
234 F.Supp.3d 386 (E.D.N.Y. 2017) ..................................................12

*Brickman v. Fitbit, Inc.*,
2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) ................................. 22

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ....................................... 42, 43, 44, 45, 52, 54

*Broomfield v. Craft Brew Alliance, Inc.*,
2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ................................ 22

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015) ...............................................................52

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ..................................................... 39, 40, 54

*Carriuolo v. General Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ...............................................13, 15, 26, 34

*CGC Holding Co. v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) ..................................................... 8, 10, 11

*Cherry v. Dometic Corp.*,
986 F.3d 1296 (11th Cir. 2021) ...............................................40, 41, 44, 46

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...........................................................................5, 32, 36

*Connick v. Suzuki Motor Co.*,
675 N.E.2d 584 (Ill. 1996) .................................................................... 16

*Davidson v. Apple, Inc.*,
2018 WL 2325426 (N.D. Cal. May 8, 2018)..................................29

*EQT Production Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ............................................................ 40

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018) ...................................................27, 38

*Goldemberg v. Johnson & Johnson Consumer Companies*,
317 F.R.D. 374 (S.D.N.Y. 2016)......................................................27, 35

*Gunaratna v. Dennis Gross Cosmetology LLC*,
2023 WL 5505052 (C.D. Cal. Apr. 4, 2023) ............................. 30, 35, 36

*Hadley v. Kellogg Sales Co.*,
324 F.Supp.3d 1084 (N.D. Cal. 2018) ...........................................37

*Hilsley v. Ocean Spray Cranberries, Inc.*,
2018 WL 6300479 (S.D. Cal. Nov. 29, 2018) ................................34, 35

*Howard v. Liquidity Services, Inc.,*
  322 F.R.D. 103 (D.D.C. 2017)........................................................ 33, 38

*In re ConAgra Foods Inc.,*
  302 F.R.D. 537 (C.D. Cal. 2014) ................................................................29

*In re Dial Complete Marketing & Sales Practices Litigation,*
  320 F.R.D. 326 (D.N.H. 2017).................................................34, 35, 38

*In re Hulu Privacy Litigation,*
  2014 WL 2758598 (N.D. Cal. June 17, 2014).......................................52

*In re Nexium Antitrust Litigation,*
  777 F.3d 9 (1st Cir. 2015) ..................................................40, 41, 51

*In re Petrobras Securities,*
  862 F.3d 250 (2d Cir. 2017)..................................................41, 42, 55

*In re POM Wonderful LLC,*
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014)................................. 28, 29

*In re Processed Egg Products Antitrust Litigation,*
  312 F.R.D. 171 (E.D. Pa. 2015) ................................................................32

*In re Urethane Antitrust Litigation,*
  768 F.3d 1245 (10th Cir. 2014).................................................................32

*In re Visa Check/MasterMoney Antitrust Litigation,*
  280 F.3d 124 (2d Cir. 2001).................................................................46

*In re: Syngenta AG MIR 162 Corn Litigation,*
  2016 WL 5371856 (D. Kan. Sept. 26, 2016) ......................................46

*Kelley v. Microsoft Corp.,*
  251 F.R.D. 544 (W.D. Wash. 2008) ........................................19, 20

*Kurtz v. Costco Wholesale Corp.,*
  768 F. App'x 39 (2d Cir. 2019) ..............................................................15

*Kurtz v. Costco Wholesale Corp.*,
818 F. App'x 57 (2d Cir. 2020) .................................................15, 25, 27, 34

*Kurtz v. Kimberly-Clark Corp.*,
321 F.R.D. 482 (E.D.N.Y. 2017) ...........................................................15

*Kurtz v. Kimberly-Clark Corp.*,
414 F.Supp.3d 317 (E.D.N.Y. 2019) .....................................................15

*Lectrodryer v. SeoulBank*,
91 Cal. Rptr. 2d 881 (Cal. Ct. App. 2000) ...........................................22

*Luna v. Marvell Technology Group*,
2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) .........................................33

*Lytle v. Nutramax Laboratories, Inc.*,
2022 WL 1600047 (C.D. Cal. May 6, 2022) .......................................24, 25

*Lytle v. Nutramax Laboratories, Inc.*,
99 F.4th 557 (9th Cir. 2024) ......................................8, 12, 24, 25, 30, 34

*McMorrow v. Mondelēz International, Inc.*,
2021 WL 859137 (S.D. Cal. Mar. 8, 2021) ............................................27

*Mednick v. Precor, Inc.*,
320 F.R.D. 140 (N.D. Ill. 2017) ...........................................................11

*Menocal v. GEO Group, Inc.*,
882 F.3d 905 (10th Cir. 2018) .............................................................19

*Miller v. Basic Research, LLC*,
285 F.R.D. 647 (D. Utah 2010) ...........................................................52

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ...........................40, 42, 44, 45, 46, 52, 53, 54

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ................................................................8

*Oliveira v. Amoco Oil Co.*,
    776 N.E.2d 151 (Ill. 2002) ................................................................15, 16

*Opperman v. Kong Technologies*,
    2017 WL 3149295 (N.D. Cal. July 25, 2017) ...........................................29

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) ............................................................16, 17

*Rikos v. Procter & Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015) ............................................................16, 42

*Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*,
    821 F.3d 992 (8th Cir. 2016) ..................................................................42

*Savaglio v. Wal-Mart Stores, Inc.*,
    2003 WL 25676640 (Cal. Super. Ct. Nov. 6, 2003) ..............................22

*Save the Colorado v. Spellmon*,
    50 F.4th 954 (10th Cir. 2022) ..................................................................28

*Shook v. Board of County Commissioners of County of El Paso*,
    543 F.3d 597 (10th Cir. 2008) ................................................................ 40

*Suchanek v. Sturm Foods, Inc.*,
    2017 WL 3704206 (S.D. Ill. Aug. 28, 2017) ..........................................37

*Townsend v. Monster Beverage Corp.*,
    303 F.Supp.3d 1010 (C.D. Cal. 2018) ....................................................29

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ..........................................................................9, 10

*United States v. Thomas*,
    939 F.3d 1121 (10th Cir. 2019) ..............................................................28

*Vanzant v. Hill's Pet Nutrition, Inc.*,
    934 F.3d 730 (7th Cir. 2019) ..................................................................16

*Vaquero v. Ashley Furniture Industries, Inc.*,
  824 F.3d 1150 (9th Cir. 2016)......................................................................38

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009)................................................................. 19

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ...................................................... 26, 32, 37

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*,
  725 F.3d 1213 (10th Cir. 2013) ..........................................................49, 50

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .............................................................................51

*Yokoyama v. Midland National Life Insurance Co.*,
  594 F.3d 1087 (9th Cir. 2010)................................................................. 13

## Rules

Fed. R. Civ. P. 23(b)(3) .........................................................................48

Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment .........................52

## Other Authorities

Newberg & Rubenstein on Class Actions (6th ed. 2023) .............................. 40, 46, 52

# INTRODUCTION

Santa Fe Natural Tobacco Company implemented an exceptionally successful campaign to drive sales, but that success depended on deceiving consumers about the contents and safety of its cigarettes. Capitalizing on a growing demand for less-dangerous cigarettes, Santa Fe messaged to consumers that its Natural American Spirit (NAS) cigarettes are less harmful than others because they are "natural" and "additive-free." This campaign paid off: Santa Fe was able to charge consumers a premium price for its cigarettes, and the company remains the only growing brand of cigarettes even as overall smoking has declined.

The plaintiffs' lawsuit here—which seeks to hold the defendants accountable for this deception—is tailor-made for certification under Rule 23. It is a case where a large group of people have been harmed in the same way by the same conduct but likely cannot bring suit individually. Indeed, the district court concluded that class treatment would be superior for both of the plaintiffs' proposed subclasses—the "menthol theory" subclasses, which focus on the false representation that NAS menthol cigarettes contain only "100% Additive-Free Natural Tobacco" even though the tobacco contains the additive menthol, and the "safer-cigarette theory" subclasses, which focus on the misleading implication that NAS cigarettes are less harmful than other brands because they are "natural" and "additive-free."

Although both theories of liability are governed by the same objective standards, the district court, however, reached divergent conclusions regarding whether individual issues would defeat predominance.

For the menthol subclasses, the court correctly recognized that liability would turn on the common question of whether a "reasonable consumer" would be deceived by the factually false representation that the tobacco in NAS menthol cigarettes is additive-free. Even if they disclaim liability, the defendants largely don't dispute that this is a common question that could be proven using common proof, including the plaintiffs' expert survey data and the defendants' internal records. The court reached the same conclusion about the plaintiffs' damages model, which could show on a classwide basis that the defendants were able to charge all consumers a uniform "price premium" because of their deceptive claim about additives. And although the district court questioned whether it would be administratively feasible to identify class members at the claims-administration stage (it will be), the court concluded that this one issue did not defeat predominance. For their part, the defendants push this Court to depart from the vast majority of circuits and conclude that issues of administrative feasibility alone can defeat class certification. The Court should reject that extreme position and affirm the district court's certification of the menthol subclasses.

The same can't be said for the district court's predominance analysis for the safer-cigarette subclasses. Even though the same objective "reasonable consumer" standard applies to the plaintiffs' claims under this theory, the district court concluded that these claims would turn on subjective and individualized inquiries. The court also mistakenly rejected the plaintiffs' damages model, even though it would be just as good a measure of damages for the plaintiffs' safer-cigarette claims as for their menthol claims. Coupling these flawed findings with its erroneous conclusion that it would be difficult to identify class members, the district court erred in holding that individual issues defeated predominance for the safer-cigarette subclasses. In urging this Court to affirm, the defendants muddle the elements of the plaintiffs' consumer protection and unjust enrichment claims and miss the point of the predominance analysis, which is to focus on *how* the plaintiffs propose proving their claims, not *whether* they'll be successful in doing so. Because the district court's denial of class certification for the safer-cigarette subclasses is inconsistent with Rule 23 and the nature of the plaintiffs' claims, this Court should reverse that decision.

## STATEMENT OF THE ISSUES ON CROSS-APPEAL

1. Was the district court correct in holding that the plaintiffs' menthol-theory claims are susceptible to common proof, including because their proposed damages model can be used as evidence of causation on a classwide basis?

2. Was the district court correct in holding, with respect to the plaintiffs' menthol-theory claims, that their proposed damages model can be used as evidence of damages on a classwide basis because of its ability to measure the damages that stemmed from the defendants' actions that created the legal liability?

3. Was the district court correct in holding that post-trial claims-administration issues, considered alone, cannot defeat class certification?

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's certification of the plaintiffs' menthol subclasses and reverse the denial of the safer-cigarette subclasses. The district court was correct to certify the menthol subclasses, concluding that liability would be judged by an objective reasonable consumer standard and could be established using classwide evidence of Santa Fe's literally false claim about additives in the tobacco of NAS menthol cigarettes, and the plaintiffs' damages model showing that that false claim caused all consumers to pay a premium price. The court also concluded that class treatment would be superior. The same reasons that supported certification of the menthol subclasses should have led the court to certify the plaintiffs' safer-cigarette subclasses as well. Instead, the district court denied certification based on the view that, while class treatment would be superior for those

claims too, individualized issues defeat predominance for the safer-cigarette subclasses. That was reversible error.

The district court concluded that three factors weighed against a finding that common questions predominated for the safer-cigarette subclasses, and one for the menthol subclasses. None do.

*First*, the defendants' liability for both the safer-cigarette and menthol subclasses will turn on common questions amenable to common proof and not, as the defendants say, individualized inquiries into the purchasing experiences or beliefs of each class member. The plaintiffs' claims are based on the defendants' uniform false and misleading claims, a reasonable consumer's perception of those claims, and the premium all consumers paid as a result. In analyzing the safer-cigarette classes, the district court lost sight of the predominance inquiry by prematurely deciding the persuasive value of the common evidence the plaintiffs put forth below. Applying the correct standard, however, makes clear that the deception, causation, and unjustness elements of the plaintiffs' claims under both theories can be demonstrated on a classwide basis.

*Second*, because the plaintiffs' damages model adequately "fits" the plaintiffs' safer-cigarette and menthol theories of liability, individual issues about damages do not defeat predominance under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The district

court correctly concluded that the model worked for the menthol theory but failed to apply the same reasoning when it rejected the model for the safer-cigarette theory. Contrary to what the district court thought—and the defendants repeat here—the plaintiffs' damages model does not need to calculate the price premium associated with consumers' individual understandings of allegedly false and misleading statements. Instead, it need only accurately measure the price premium associated with the statements the plaintiffs contend are false and misleading. The damages model does that for both of the plaintiffs' theories, foreclosing any *Comcast* problem.

*Third*, concern about administrative feasibility—how easy it will be to identify class members—is not a question of liability that belongs in the predominance analysis but a question of claims administration relevant only to the superiority inquiry's manageability analysis. The district court correctly determined that, notwithstanding any administrative feasibility issues (to the extent there are any), class treatment would be superior for the plaintiffs' subclasses. The district court went wrong, however, in also considering those issues as part of predominance, which should be limited to questions of liability, defenses to liability, and damages.

The defendants go further, also arguing that anticipated difficulties in identifying class members should alone defeat class certification. The majority of circuits to have considered this question reject the defendants' extreme and atextual

position that administrative feasibility is a threshold requirement, and most of those courts also confine questions of administrative feasibility to superiority. Consistent with the plain language of Rule 23(b)(3), this Court should join that majority. As a result, the Court should affirm the district court's conclusion that class treatment is superior here and reverse its conclusion that questions of administrative feasibility weigh against common issues predominating.

## ARGUMENT

## I.   The elements of the plaintiffs' safer-cigarette and menthol claims are amenable to common proof.

The district court correctly certified six of the plaintiffs' menthol-subclass claims. It concluded that common questions predominate in part because the plaintiffs' damages model supplies common proof—relevant to the causation and unjustness elements of the plaintiffs' claims—that Santa Fe's false claim that NAS menthol cigarettes contain only "100% Additive Free, Natural Tobacco" enabled it to charge each consumer a uniform price premium. But the district court was wrong in concluding that the same was not true for the plaintiffs' safer-cigarette subclasses. Although those claims are governed by the same objective standards and amenable to similar common proof, the district court concluded that individual issues—such as what each consumer believed and saw when purchasing NAS cigarettes—predominate instead. The defendants urge this Court to affirm that analysis and then

apply it to the menthol subclasses too. But in doing so, the defendants focus largely on the persuasive value of the plaintiffs' common evidence. That is improper. At this stage, the plaintiffs have done more than enough to show that the elements of all of their claims raise common questions that are capable of being answered by common evidence.

### A. The plaintiffs' statutory claims brought under the safer-cigarette theory are subject to a reasonable consumer standard and amenable to common proof.

To support their claim that individual issues predominate for the plaintiffs' statutory claims brought under their safer-cigarette theory, the defendants insist that the district court was correct to conclude that the disclaimer "No additives in our tobacco does NOT mean a safer cigarette" cured any misunderstandings consumers had. *See* Defs.' Principal/Resp. Br. (Resp. Br.) 34-35 (citing 5 App. 18). But that conclusion is premature at this stage. The predominance inquiry is about "how" the class intends "to prove its claim[s]," not whether it will prevail on them. *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014); *see also Lytle v. Nutramax Lab'ys, Inc.*, 99 F.4th 557, 569 (9th Cir. 2024) (to evaluate predominance, courts "must evaluate the method or methods by which plaintiffs propose to use the class-wide evidence to prove the common question in one stroke"); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022) (predominance asks

whether "essential elements of the cause of action" are "capable of being established through a common body of evidence, applicable to the whole class").[1] As a result, the district court should have focused on whether the plaintiffs had shown they'd be able to use "generalized, class-wide evidence" of the disclaimer's effect (there isn't one) as part of its overall consideration of whether the plaintiffs would be able to satisfy the "deception" element of their claims using common proof. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

They did. The plaintiffs identified significant common proof—which the district court found admissible—in the form of expert testimony, the defendants' internal documents, and an FDA consumer study and report demonstrating both that a reasonable consumer would understand Santa Fe's labeling and marketing to imply (falsely) that NAS cigarettes are less harmful than other cigarettes, and that the NAS disclaimer does not cure that misunderstanding. *See* Opening Br. 31-32. Should the plaintiffs ultimately show at trial that the no-additives disclaimer does not work, it won't matter one way or the other whether some class members saw the disclaimer before purchasing NAS cigarettes—Santa Fe's representations would be misleading to a reasonable consumer either way. And, likewise, if the plaintiffs' common

---

[1] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout.

evidence fails to show that the no-additives disclaimer does not work, it won't matter whether some class members saw the disclaimer because their claims will fail classwide. That question is a common one that can be shown through common proof and that should have been the end of the inquiry. *See CGC Holding*, 773 F.3d at 1093 (explaining that it "is enough to satisfy the predominance prong" where "claims will prevail or fail in unison").

The defendants counter (at 36 n.13) that they "refuted" this evidence. In their view, the district court could decide "as a matter of law" that the disclaimer was "effective" at dispelling any alleged deceptive messages. *Id.* Instead of providing contrary evidence, the defendants just disputed whether the plaintiffs' studies accurately evaluated real-world market conditions. *See id.* (citing 3 App. 129). But a "challenge[] [to] the persuasiveness" of "common, expert evidence" does not raise an individualized issue that defeats predominance. *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1186 (10th Cir. 2023). Instead, it raises a "fatal similarity" across class members going to a "failure of proof as to an element . . . properly addressed at trial or in a ruling on a summary-judgment motion" rather than at class certification. *Id.* at 1178-79 (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013)); *see also Tyson Foods*, 577 U.S. at 453, 459 (explaining that "[o]nce a district court finds evidence [relating to a common question] to be admissible," it cannot decline class

certification on predominance grounds simply because it questions the "persuasiveness" of that evidence). That is, a fatal similarity (to the extent there is one) is itself a common issue and, at this stage in the litigation, it "is enough to satisfy the predominance prong." *CGC Holding*, 773 F.3d at 1093. As such, the district court should not have decided the persuasive value of the plaintiffs' evidence regarding the disclaimer because the disclaimer's effect raises a merits question that itself will have a common answer.

The defendants also cite cases (at 36 n.13) in which courts were able to determine, "as a matter of law," that a disclaimer mitigated consumer misperceptions. But in their words, those cases involved "*clear* disclaimer[s]," *id.* (emphasis added), and so have no bearing here given the ample classwide evidence that the double-negative, no-additive disclaimer did *not* clearly and unambiguously dispel the defendants' misleading health reassurances. Opening Br. 16. Instead, under these circumstances, the "effect of the disclaimer[] is properly left to the merits stage of the case." *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 152 (N.D. Ill. 2017).[2]

---

[2] None of this is to say that the disclaimer should be "ignored" or deemed "ineffective as a matter of law" at this stage in the case. *See* Resp. Br. 38. What it shows is that the district court should have conducted the proper Rule 23 inquiry by focusing on whether the disclaimer's impact on a reasonable consumer raises a common question amenable to classwide evidence. As we have explained, it does.

Without the district court's premature finding regarding the disclaimer, the rest of the defendants' arguments fall apart. In particular, it's legally irrelevant whether "each consumer" personally saw the no-additives disclaimer, *see* Resp. Br. 33, or what each consumer "believe[d]" about the disclaimer, *id.* at 36-37. The plaintiffs' consumer protection claims turn on the element of deception, which is judged by an objective, reasonable consumer standard. *See* Opening Br. 29. And, as previously explained, "disclaimers inform the inquiry into whether a reasonable consumer would be misled by the defendant's conduct." *Id.* at 30 (quoting *Bowring v. Sapporo U.S.A., Inc.*, 234 F.Supp.3d 386, 390 (E.D.N.Y. 2017)). So, the "liability question," Resp. Br. 35, that actually matters is whether a "reasonable consumer" would be misled by the defendants' health reassurances about "additive-free," "natural," and, where relevant, "organic" NAS cigarettes, including the presence of the disclaimer.[3]

Under this kind of "objective test ... there is no reason to look at the circumstances of each individual purchase in this case[.]" *Yokoyama v. Midland Nat'l*

---

[3] Part of this question will be whether a disclaimer addressing only "additive-free" cigarettes would also cure misperceptions about "natural" cigarettes. The defendants claim (at 35) that the district court's conclusion about the effect of the additive-free disclaimer also applies to health reassurances about natural tobacco because consumers view those terms as "synonymous." But again, the disclaimer's effect, if any, on a reasonable consumer's understanding of Santa Fe's claims is a common question for the jury, not for a court now.

*Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010) (describing reasonable-consumer standard under Hawaii's consumer protection act). That is because an "objective" inquiry *only* requires evidence of what a "reasonable consumer" saw and whether "a reasonable consumer would have been misled." *Lytle*, 99 F.4th at 580-84. By arguing instead (at 33-34, 37) that it's "imperative to know what messages each consumer saw" or "believe[d]," the defendants improperly inject a subjective, reliance-like requirement into the deception element. *Contra Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) (rejecting argument that, under Florida law, "the plaintiffs must prove that every class member saw the sticker and was subjectively deceived by it"). In concluding that individual inquiries would be necessary to determine which consumers saw the NAS disclaimer (5 App. 17), the district court likewise strayed from the objective standard applicable to the plaintiffs' claims. Its decision denying class certification for the safer-cigarette claims should be reversed.

**B.     For both theories, the plaintiffs' statutory claims raise common questions of causation amenable to common proof in the form of their price-premium damages model.**

The defendants again attempt to inject a subjective reliance requirement into the causation and injury elements of the plaintiffs' consumer protection claims, presumably because, at first blush, reliance sounds more individualized. But *all* of the elements of the plaintiffs' consumer protection claims are judged by objective

standards amenable to common proof, including the element that Santa Fe's deception caused class members' injuries. Indeed, for most of the plaintiffs' claims, the defendants agree (at 39, 59) with the district court's correct conclusion that payment of a price premium can provide classwide proof of causation. *See also* 5 App. 49-50, 68-70, 75-77, 85-88, 96-97, 106-107, 121. They go wrong, however, in arguing that payment of a price premium can't constitute classwide proof of causation under Illinois law (it can) and that the plaintiffs' price-premium damages models aren't common proof of causation for both their safer-cigarette and menthol classes (they are). The district court correctly concluded that individual issues of causation do not defeat predominance with respect to the plaintiffs' menthol claims because it accepted the plaintiffs' offer of common proof, and that conclusion should be applied to the plaintiffs' safer-cigarette claims too.

The defendants inaccurately claim (at 39, 59) that "[m]ost of Plaintiffs' statutory consumer-protection claims require proving reliance[.]" To the contrary, *none* do, at least not in the subjective way the defendants suggest. The defendants do note (at 39) that what they term "reliance" is "sometimes framed as causation," which more accurately captures the applicable element. And none of the plaintiffs' claims require showing that specific class members relied on Santa Fe's misrepresentations or purchased NAS cigarettes "because of" those misrepresentations. *See, e.g.,*

*Carriuolo*, 823 F.3d at 985-87 (Florida). Instead, they need only show a causal link between the defendants' deceptive conduct and class members' injuries regardless of any one consumer's "subjective reliance on the alleged inaccuracy." *Id.* at 986-87. Florida is not an outlier. *See, e.g.*, *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482 (E.D.N.Y. 2017) (New York);[4] *see also* Opening Br. 34 n.6 (listing cases). And, the defendants agree, this link can be "amenable to class-wide resolution," *Carriuolo*, 823 F.3d at 986, based on evidence that "a fraudulent representation" led to the "payment of a price premium." Resp. Br. 39.

That's true for the plaintiffs' Illinois claims too. The plaintiffs do not dispute that, under Illinois law, a plaintiff must show "that he was, *in some manner*, deceived" to show proximate cause. *See Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 155 (Ill. 2002) (emphasis added) (quoted at Resp. Br. 41). But the defendants are wrong to claim this

---

[4] The defendants criticize (at 41 n.15) the plaintiffs for citing *Kurtz* because the Second Circuit remanded the grant of class certification. The court did so for the plaintiffs' expert to demonstrate, not just allege, that he could use his proposed regression analysis "to establish on a classwide basis [that] the class members paid a price premium for Defendants' products attributable to the [challenged] 'flushable' representation." *Kurtz v. Costco Wholesale Corp.*, 768 F. App'x 39, 40 (2d Cir. 2019). Once the expert conducted that analysis, the district court again concluded the plaintiffs' claims were susceptible to classwide proof under the plaintiffs' price-premium theory. *Kurtz v. Kimberly-Clark Corp.*, 414 F.Supp.3d 317, 333 (E.D.N.Y. 2019). Then, the Second Circuit affirmed that conclusion, rejecting the defendants' criticism—similar to what is advanced here—that the analysis "fail[ed] to account for other possible sources of a price premium" and thus ran "afoul of *Comcast*." *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 61-62 (2d Cir. 2020).

requirement raises "inherently an individual question" into why each class member purchased the product. *See* Resp. Br. 41.

A consumer protection claim under Illinois law does not "necessarily require individualized proof of causation" when, as here, the challenged statements were "made to all putative class members" and would be "material" to a reasonable consumer. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 514 (6th Cir. 2015) (analyzing Illinois law) (cleaned up). And because the Illinois Supreme Court has specifically rejected a "reliance" element, *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996), a plaintiff need only show that the deceptive act proximately caused their "damage," not their decision to "purchase" the product, *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739 (7th Cir. 2019) (quoting *Oliveira*, 776 N.E.2d at 160) (plaintiffs adequately pled causation under Illinois law where they "paid a higher price" for "prescription" pet food that did not require prescription). Common proof by way of a price-premium model draws the necessary causal link by showing that the challenged misrepresentations inflated the price of a product for *all* purchasers.

The defendants don't grapple with *Vanzant*; instead, they look (at 41-42) to an earlier Seventh Circuit case, *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006). But that case focused on a different theory of harm. In *Oshana*, the Seventh Circuit affirmed the denial of class certification under Illinois law where the proposed class

"could include millions who were not deceived." 472 F.3d at 514-15. There, the plaintiffs alleged that consumers were harmed by purchasing a product different than what they had intended (Diet Coke sweetened with saccharin), not by paying a price premium for that product. *Id.* That deception-based theory of harm is why the court concluded that members of the class would "have no grievance" under the statute if they had not, in fact, been deceived. *Id.*

Moving to the evidence at issue, the defendants say the district court should have rejected the plaintiffs' offer of common proof for both their menthol and their safer-cigarette claims. Not so. The plaintiffs' damages model is common evidence that Santa Fe's false claim that NAS menthol cigarettes contain only "100% Additive Free, Natural Tobacco" enabled it to inflate the price of those cigarettes for all consumers. As the district court explained, "to the extent that consumers believed that [NAS] menthol cigarettes did not contain additives based on the additive-free label's assertion to that effect, Dr. Dubé's model is designed to calculate the price premium associated with that label." 5 App. 4. Relying on this conclusion, the district court correctly determined that individualized issues of causation do not defeat predominance with respect to the plaintiffs' menthol claim. The defendants' sole argument to the contrary goes to whether this model comports with *Comcast*. It does. *See infra* Part II.A.

With respect to the plaintiffs' safer-cigarette theory, however, the district court rejected the plaintiffs' damages model. That was error. Just as with the model for their menthol theory, the model for their safer-cigarette theory calculates the price premium attributable to Santa Fe's misleading label claims. That's common proof of the causal link between Santa Fe's deceptive health reassurances and the damage of paying too much. As such, the district court's conclusion that individual causation issues defeat predominance for the plaintiffs' safer-cigarette claims should be reversed. And, as with the menthol claims, the defendants' only argument to the contrary goes to whether this model comports with *Comcast*, and, as with the menthol claims, it does. *See infra* Part II.

### C. For both theories, the plaintiffs' unjust enrichment claims also raise common questions amenable to common proof in the form of their price-premium damages model.

The plaintiffs' price-premium damages model also serves as common proof for the plaintiffs' unjust enrichment claims under both their safer-cigarette and menthol theories. The district court agreed for the plaintiffs' California claim (5 App. 23-24), but nonetheless determined that individual issues would predominate for the remaining unjust enrichment claims.

Unsurprisingly, the defendants agree with the district court on all but the California unjust enrichment claim. They emphasize that courts have suggested that

"common questions will rarely, if ever, predominate [in] an unjust enrichment claim." Resp. Br. 42 (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009)). But *this Court* has said they *do* predominate when, as here, the "theory of unjustness" focuses on the defendant's "common course of conduct." *Menocal v. GEO Group, Inc.*, 882 F.3d 905, 925-26 (10th Cir. 2018); *see also, e.g.*, *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 559 (W.D. Wash. 2008) (emphasizing plaintiffs' price-premium "theory of the case" in concluding that unjust-enrichment claim was amenable to common proof). And here, the unjust enrichment claims brought under both theories are premised on Santa Fe's "common course of conduct" (Santa Fe's misleading representations) that caused injustice to all NAS consumers (paying a premium price).

The defendants fail to distinguish *Menocal* and cases like it. In *Menocal*, immigration detainees claimed that a private detention facility was unjustly enriched by its "voluntary" work program. 882 F.3d at 911. Because the class sought to establish unjustness based on the facility's "uniform" program and "uniform" payment to detainees in the program, their "theory of unjustness depend[ed] on shared rather than individualized circumstances." *Id.* at 925. Here, too, the plaintiffs are focused on a "common course of conduct," seeking to establish unjustness based on Santa

Fe's uniform label misrepresentations that caused NAS consumers to experience the "shared" circumstance of paying a premium price for NAS cigarettes. *See id.*

The defendants' footnoted discussion of *Kelley* and *Allegra* (at 44 n.18) prove the point. Both cases distinguished between price-premium theories of harm (as the plaintiffs advance here) and deception-based theories of harm (which the defendants wrongly imply the plaintiffs advance here), allowing the claims based on the price-premium theory to proceed as a class. In *Kelley*, the plaintiffs asserted two theories—one where the defendant deceived consumers into purchasing a specific computer, and one where the defendant's deception inflated the cost of the computer. 251 F.R.D. at 559. The court allowed the class to proceed on its unjust enrichment claim based on the latter "price inflation theory" that all consumers "paid more than they should have." *Id.* That is the theory the plaintiffs advance here: *All* consumers of NAS cigarettes "paid more than they should have" because the defendants' false and misleading statements "artificially inflated the demand for and price of" NAS cigarettes. *See id.* It's therefore beside the point that *Kelley* did not allow the class to go forward based on a "deception-based theory." *See id.* at 558; Resp. Br. 44 n.18 (citing *id.*).

The defendants' reliance on *Allegra v. Luxottica Retail North America* fares no better. Like the defendants here, the defendant there "misconstrue[d]" the plaintiffs'

"theory of unjust enrichment" to be one based on the worthlessness of the product to each specific consumer rather than the "price premium commanded by [the defendant] due to its allegedly deceptive practices." *Allegra*, 341 F.R.D. 373, 460-61 (E.D.N.Y. 2022). The court certified the unjust enrichment class under an "overpayment" theory because the plaintiff's "proof as to [the defendant's] deceptive practices and the resulting price premium will rise or fall together for all class members." *Id.* at 461. Here, too, the plaintiffs' price-premium damages model will rise or fall together for all class members, and the district court should have concluded that common issues predominate for the plaintiffs' unjust enrichment claims.

The same goes for the plaintiffs' California unjust enrichment claims. The defendants don't offer much in response. First, they say (at 60) the court erred in relying on *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) to certify those claims because *Astiana* involved "quasi-contract and breach of express warranty claims," "not [] an unjust-enrichment claim." But that case reflects well-established California law that claims for unjust enrichment be treated as quasi-contract claims. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). And, like the other unjust enrichment claims, this requires a plaintiff to show both the defendant's "receipt of a benefit" and "unjust retention of th[at] benefit" at the plaintiff's expense. *See*

*Lectrodryer v. SeoulBank*, 91 Cal. Rptr. 2d 881, 883 (Cal. Ct. App. 2000). Moreover, as with the other unjust enrichment claims, courts have certified California unjust enrichment classes based on evidence of uniform conduct by the defendant and common proof of unjustness in the form of a price-premium model of damages. *See, e.g.*, *Broomfield v. Craft Brew All., Inc.*, 2018 WL 4952519, at *14 (N.D. Cal. Sept. 25, 2018) (certifying statutory, common law, and quasi-contract class claims based on a "theory of liability and damages" that "consumers paid excess money, i.e., a price premium, for Kona Beers under the mistaken belief that the beers were brewed in Hawaii"); *Brickman v. Fitbit, Inc.*, 2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) (similar).

The defendants do cite (at 60) an unpublished case in which the California superior court denied class certification of an unjust enrichment claim because unjustness there would "depend on individual circumstances." But that case involved individual issues with rest breaks and meal periods, not a uniform price premium paid by all consumers of a product, and so does not support denying class certification here. *See Savaglio v. Wal-Mart Stores, Inc.*, 2003 WL 25676640, at *26 (Cal. Super. Ct. Nov. 6, 2003).

Under both of the plaintiffs' theories, it would be unjust for the defendants to retain the price premium they charged consumers as a result of their false and misleading statements, and the plaintiffs' damages model represents common proof

of this price premium. So, as with their statutory claims, all of the plaintiffs' unjust enrichment claims raise common questions subject to common proof. The district court's conclusion regarding California should be affirmed and its contrary conclusions regarding the other unjust enrichment claims should be reversed.

## II.  The district court erred in concluding that the plaintiffs' proposed damages model was improper under *Comcast*.

The defendants do not dispute that the plaintiffs' damages model will accurately measure the price premium associated with the defendants' misleading label claims. That conclusively forecloses the defendants' *Comcast*-based challenge. The plaintiffs claim—and the defendants' internal business records conclusively establish—that the misleading label claim inflated the price of NAS cigarettes. The plaintiffs' damages model will calculate the price attributable to those unlawful statements. It's hard to imagine a better fit than that. Although the district court correctly concluded that the damages model worked for the menthol theory, it failed to apply that same reasoning when it held that the model did not work for the safer-cigarette theory.

### A.  The plaintiffs' damages model fits their safer-cigarette theory.

The defendants' lone argument (at 45-51) against the safer-cigarette damages model is that it "does not fit" the plaintiffs' theory of liability because it measures the

price premium associated with the misleading *statements*, not any particular meaning consumers associate with those statements. According to the defendants (at 40), because the "damages model cannot provide common evidence" that consumers paid more "because of" a particular *meaning* associated with the statements, the relevant common inquiries do not predominate over individualized ones.

That argument fundamentally misunderstands the Supreme Court's decision in *Comcast*. Courts have—over and over again—recognized that *Comcast* does not require a plaintiff to disassemble a price premium in this way. At the class certification stage, all that's required is a damages model measuring the price premium associated with a misleading "statement on a package" that fits a theory of liability that consumers paid more than they otherwise would have as a result of the misleading statements. *Lytle*, 99 F.4th at 565-67.

**1.** Those circuits that have addressed this issue are in accord on this basic point. For example, in the Ninth Circuit's recent decision in *Lytle*, consumers argued that certain statements on pet health supplements that "promot[ed] healthy joints in dogs" were misleading because the product "provided no such health benefits." *See Id.* at 556; *Lytle v. Nutramax Lab'ys, Inc.*, 2022 WL 1600047, at *1 (C.D. Cal. May 6, 2022). As here, those consumers had Dr. Dubé design a damages model using a conjoint analysis to measure the price premium associated with the misleading statements. 99

F.4th at 567. That model *only* measured the price premium associated with the misleading statements; it did not measure the price premium associated with consumers' various possible understandings of those statements—even though the defendant argued that consumers did not "uniform[ly] interpret[]" the statements. *See Lytle*, 2022 WL 1600047, at *15; *see* 2022 WL 17365838, at *74-75. That approach, the Ninth Circuit explained, satisfied *Comcast* because "the structure of the conjoint analysis allows a damages figure to be associated with each challenged statement." *Lytle*, 99 F.4th at 574.

The Second Circuit, in *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57 (2d Cir. 2020), also expressly rejected the exact argument the defendants make here. There, a class of consumers argued that Costco's cleaning wipes were misleadingly labeled "flushable," and they proposed a damages model that calculated the price premium associated with that statement. 818 F. App'x at 59, 61. Just like the defendants here, Costco argued that the model failed to satisfy *Comcast* because it did not "distinguish between the value of the multiple possible interpretations of the flushable claim." 2020 WL 1983624, at *13. The Second Circuit rejected this over-read of *Comcast*. All that *Comcast* requires, the Second Circuit held, is that a damages model "measure the price premium attributable to the 'flushable' label." 818 F. App'x at 62. It does not require, in addition, that a damages model disaggregate that premium into the

statement's various meanings. *Id.*; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (holding that damages model measuring stock drop attributable to misleading statement satisfied *Comcast* "notwithstanding" that some of the drop "may have been the result of" other factors). And the only other circuit to have addressed this issue, the Eleventh Circuit, has likewise held that a damages model measuring the price premium associated with an allegedly misleading statement satisfies *Comcast*. *See Carriuolo*, 823 F.3d at 988-89; *see* Opening Br. 43.

In an attempt to write off this consensus against their position, the defendants argue (at 50) that "[n]early all" of these cases "addressed representations that were plausibly subject to only a single interpretation." That is demonstrably wrong. To begin, the alleged misrepresentation at issue in *Carriuolo* involved a statement that a certain car had received a "five-star safety rating." *Carriuolo*, 823 F.3d at 981-83, 987. And the Eleventh Circuit recognized that the statement could have meant multiple things to consumers—including that the car was safer than it actually was or that a federal agency had assigned a specific rating to the car. *See Carriuolo*, 823 F.3d at 987 (noting that the car's five-star rating could convey "the risk of injury to passengers"); *id.* at 981-82 (recognizing that the statement could also be understood "to provide safety ratings assigned by the National Highway Traffic Safety Administration").

The same was true for the "flushable" misrepresentation in *Kurtz*. There, the district court certified the damages class over the defendant's argument that "consumers can understand 'flushability' differently." 2018 WL 1029914, at *28 (noting that even the named plaintiff, "his witnesses, and his counsel could not muster a consistent definition of 'flushable'"); *see Kurtz*, 818 F. App'x at 62-63. And the same is true in other cases that have approved similar price-premium damages models. The defendants specifically point (at 50) to the statement in *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018), that ginger ale is "Made From Real Ginger" to support their assertion. But that statement also suggested multiple things, depending on whether a consumer interpreted "real ginger" as meaning only ginger root, or as including ginger oil or ginger extract. *See Fitzhenry-Russell*, 326 F.R.D. at 600 (noting that the plaintiff's theory turned on an interpretation of the statement that the soda included ginger oil or extract, not ginger root). [5]

---

[5] The defendants' attempts to distinguish other cases fare no better. In *McMorrow*, the defendant submitted evidence that "consumers associate the term 'nutritious' with a variety of attributes including calorie content, whole grains, and vitamins and minerals," but that did not matter to the determination of whether the damages model was consistent with *Comcast*. *McMorrow v. Mondelēz Int'l, Inc.*, 2021 WL 859137, at *12 (S.D. Cal. Mar. 8, 2021). And the defendants' insistence (at 51 n.23) that the "[a]ctive [n]aturals" claim at issue in *Goldemberg* "could reasonably be understood only one way" is surprising, considering their view that the term "natural" in *this* case has multiple meanings. *See Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374, 382 (S.D.N.Y. 2016).

Given all this, the defendants are left to argue that the circuits have misread *Comcast*. As they see it (at 50-51), to be consistent with *Comcast*, a damages model must "isolate[]" the relevant misrepresentation from any and all other possible interpretations. But no circuit has ever adopted such a cramped understanding of *Comcast*, and doing so here would create a circuit split without any "sound reason." *United States v. Thomas*, 939 F.3d 1121, 1130-31 (10th Cir. 2019); *see also Save the Colo. v. Spellmon*, 50 F.4th 954, 971 n.9 (10th Cir. 2022) (recognizing that this Court is "reluctant to create a circuit split" even if a panel "think[s] the contrary arguments are marginally better").

**2.** Left without any circuit precedent in their favor, the defendants rely on district court decisions to make their case. Although they insist (at 46 n.19) that there are "many" decisions that support their position, most of the cases they cite do not. For starters, the settled understanding adopted by the circuits has also been adopted by the vast majority of district courts. *See* Opening Br. 44-45, 47-48 (collecting cases).

The remaining cases the defendants rely on do not contradict this understanding. In *In re POM Wonderful LLC*, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014), the plaintiffs' damages model calculated the difference between the price of the defendant's pomegranate juice and the average price of entirely different juices—orange, grape, apple, and grapefruit. *Id.* at *5. The model made no attempt "to

explain how [the] alleged misrepresentations caused any amount of damages"—it simply "assumed that 100% of that price difference" between pomegranate and other juices "was attributable to [those] alleged misrepresentations." *Id.* In *Opperman v. Kong Techs.*, 2017 WL 3149295 (N.D. Cal. July 25, 2017), which involved cellphone technology, rather than measure the price premium associated with the "two allegedly misrepresented security features" specifically, the plaintiffs proposed a model that would "measure the value to consumers of privacy generally." *Id.* at *12. And *Davidson v. Apple, Inc.*, 2018 WL 2325426 (N.D. Cal. May 8, 2018), didn't involve a misrepresentation at all. The court simply held that the damages model failed to accurately measure the price premium resulting from an undisclosed product defect. *Id.* at *22-23.

That leaves *ConAgra* and *Townsend*. *See* Resp. Br. 46. But the damages models in both cases were rejected because the plaintiffs had failed to "establish" that the allegedly misleading statements were susceptible to "a common meaning." *See Townsend v. Monster Beverage Corp.*, 303 F.Supp.3d 1010, 1045, 1051 (C.D. Cal. 2018); *In re ConAgra Foods Inc.*, 302 F.R.D. 537, 577 (C.D. Cal. 2014) ("[T]he plaintiffs adduce no survey evidence concerning the actual reaction of consumers to the [challenged representation].''); Opening Br. 48-49. That deficiency is not present here—the plaintiffs have offered common proof that overwhelmingly demonstrates that the

challenged label claims lead consumers to believe that NAS cigarettes are less harmful than other cigarettes. *See* Opening Br. 14-18, 32-33; *Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 5505052, at *20 (C.D. Cal. Apr. 4, 2023) (distinguishing *ConAgra* on this basis and noting that, "to the extent *ConAgra*" stands for something broader, "it is out-of-step" and would "take *Comcast* at least one step too far"). In any event, to the extent that either case stands for the proposition that a damages model measuring the price premium associated with an allegedly misleading statement fails *Comcast*, that proposition is no longer good law in the Ninth Circuit after *Lytle*. *See* 99 F.4th at 567.

**3.** Even taking the defendants' theory on its own terms, this Court should reject it. The defendants' core submission is that the plaintiffs cannot measure damages without relying on individualized inquiries about the meaning of the statements at issue. But contrary to their assertion (at 47), the record does not support the view that the challenged terms have "many possible meanings" in this context, 4 App. 287.

In fact, the district court's own "findings of fact" directly contradict that notion. The district court made a specific factual finding that "[c]onsumers perceive cigarettes marketed as 'natural' . . . as less harmful." 4 App. 2, 34. That is, notwithstanding the other potential meanings consumers *could* prescribe to the word

"natural," the court specifically found that consumers understand the term in this context to operate in a particular way—it indicates the cigarette is "health[ier]." 4 App. 29 (finding that the brand's "[n]atural . . . labeling increases consumers' health benefit perception"); 4 App. 31 (finding that "[d]escriptors like . . . natural . . . in Natural American cigarettes' marketing reduce [consumers'] perceived harm associated with the cigarette brand"); 4 App. 35 (finding that "[t]he tobacco industry uses descriptors like natural" for their "campaign of health reassurance"). That factual finding is in line with the unrebutted evidence that the plaintiffs introduced demonstrating that, in the context of cigarettes, consumers overwhelmingly interpret statements of the sort at issue here to suggest that NAS cigarettes are safer than others. *See* Opening Br. 14-18, 32.[6]

---

[6] The excerpts that the defendants cherry pick from the record (at 47) do not suggest otherwise. Dr. Cummings noted only that "[t]here are many reasons that people give for choosing different brands of cigarettes." 1 Supp. App. 163. And Dr. Dewhirst's observation that terms like "natural" can, in certain contexts, "be associated with being earthy" doesn't undermine the fact that, in the context of NAS cigarettes, the unrebutted record evidence established that consumers associated the term with health and safety. 2 Supp. App. 201-05; *see* Dewhirst Depo. Dkt. 317-3 at 17 [sealed] (explaining "if you look in dictionaries, there's multiple meanings for given words. But, again, in terms of doing marketing communication, things like what gets emphasized . . . give preferred meaning [to a word]."). And, in any event, the record also demonstrated that, in the context of cigarette marketing, suggestions of planetary health and environmentalism are themselves linked to personal health. *See* Weiner Decl. Ex. 30, Dkt. 281-015, at 2-3; Weiner Decl. Ex. 31, Dkt. 281-016, at 3. Beyond that, the defendants' cites are padded with references to documents that

But even if the defendants were right that "natural" has many meanings in this context and that the plaintiffs must eventually "isolat[e] the meaning specifically attributable to [] safety perception," that is not a *Comcast* problem. *See* Resp. Br. 50. The damages model in *Comcast* could not be used on a classwide basis because, by incorporating the impact of actions by the defendant that were no longer at issue in the case, it overstated individual class members' damages. 569 U.S. at 37-38; *see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1257 n.10 (10th Cir. 2014). That posed a predominance problem because "an individualized inquiry would have been necessary to untangle the class's theory from the other three theories"—that had been rejected—"in order to actually determine whether any particular class member was affected by the class's theory," "and by how much." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 192 (E.D. Pa. 2015).

Here, by contrast, to the extent the damages model overstates the plaintiffs' damages, it does so consistently across the class. So the defendants' objection, even if valid (it's not), does not raise *any* individualized damages issues and so cannot defeat predominance. *See Waggoner*, 875 F.3d at 106 (holding that model's supposed "fail[ure] to account for variations in inflation over time" was not a *Comcast* problem). Whether

---

can't support their position, like their own proposed findings of fact. *See* Resp. Br. at 47 (citing 3 App. 106-107).

the damages model is "inflat[ed] . . . with respect to all class members" is instead a merits question, and therefore only relevant after "certifi[cation]." *Howard v. Liquidity Servs., Inc.*, 322 F.R.D. 103, 140 (D.D.C. 2017); *Luna v. Marvell Tech. Grp.*, 2017 WL 4865559, at *6 (N.D. Cal. Oct. 27, 2017) (argument that model would not "disaggregate price inflation attributable to confounding events" was not a question for the class certification stage). The district court's decision denying certification of the safer-cigarette subclasses should therefore be reversed.

**B.      The plaintiffs' damages model fits their menthol theory.**

When it comes to the menthol theory, the defendants' arguments fall even further afield. To reiterate: The plaintiffs' menthol-theory claim is that the defendants' representation that NAS menthol cigarettes contain "100% Additive-Free, Natural Tobacco" is literally false. That's because, as the defendants well knew, the tobacco in those cigarettes actually contains menthol—an additive. The plaintiffs' proposed damages model would calculate the price premium associated with the defendants' literally false label claim. And it does so with common evidence—their damages model. The defendants respond that this model over calculates the damages because it "measures the entire value of excluding" all chemical additives, even though additives other than menthol were actually excluded. Resp. Br. 4, 62-63. But, as the district court held, this model "aligns" with

the models used in many other cases that also "do not rely on the consumers' interpretation of the label," and do not "worry about different categories of harm." 5 App. 3. Again, *Comcast* requires nothing more. *See Kurtz*, 818 F.App'x at 62; *Lytle*, 99 F.4th at 572-74, 580; *Carriuolo*, 823 F.3d at 988-89; *supra* Part II.A.1; Opening Br. 41-45.

The defendants don't even attempt to argue that caselaw supports their position. In fact, they effectively admit that it doesn't. As the defendants are quick to point out (at 50), the challenged claim in *Carriuolo* was literally false: "[T]he defendants had labeled a car as having perfect five-star safety ratings when in fact it had never received *any* safety ratings." That's this case as well. The defendants labeled NAS menthol cigarettes as containing additive-free tobacco when in fact the tobacco contains an additive. Adopting the defendants' view here would therefore require rejecting the Eleventh Circuit's view in *Carriulo*—a fact the defendants do not acknowledge, let alone attempt to justify.

*Carriuolo* is not alone. Courts consistently hold that a damages model measuring the price premium associated with a literally false representation satisfies *Comcast*. *See, e.g.*, *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 334-36 (D.N.H. 2017) (claiming soap "Kills 99.99% of Germs" when it does not); *Hilsley v. Ocean Spray Cranberries, Inc.*, 2018 WL 6300479, at *15-16 (S.D. Cal. Nov. 29, 2018) (claiming juice contained "no artificial flavors" when it did); *Goldemberg*, 317 F.R.D. at

394-95 (claiming products were natural when they were not); *Gunaratna*, 2023 WL 5505052, at *21 (claiming skincare products contained collagen when they did not).

The defendants' attempt to distinguish some of these decisions is puzzling. According to the defendants (at 64), in each of the cases on which the district court relied, the "consumers did not receive *any* value associated with the challenged representations." That's just not true. In *Dial Complete Marketing*, for example, the plaintiff purchased soap that killed *some* germs—just not the 99.99% that was promised. 320 F.R.D. at 328. Under the defendants' theory (at 63-64), the plaintiffs there should have proposed a damages model comparing the price of the soap as represented with the price of soap informing the consumer of the actual percentage of germs it would kill. The court disagreed. A damages model measuring the price premium associated with the literally false statement was enough.

Similarly, in *Hilsley v. Ocean Spray Cranberries, Inc.*, the juices did not contain dozens and dozens of "artificial flavors"—they just contained a few synthetic acids that the plaintiffs claimed made the statement "no artificial flavors" literally false. 2018 WL 6300479, at *1-2. And in *Goldemberg*, the skincare products contained the "natural" ingredients that they promised, just not *only* natural ingredients. 317 F.R.D. at 382.

In fact, the defendants do not cite a single case where *any* court has *ever* held that *Comcast* prevents plaintiffs from relying on a damages model that calculates the price premium associated with a literally false statement. As we explained in our opening brief, the proper starting point for any damages model is to assume that the plaintiffs' theory of liability is true. Opening Br. 47-48; *see Comcast*, 569 U.S. at 36-37. And here, if the plaintiffs prevail on their claims under the menthol theory, that means a jury concluded that the defendants falsely represented that the tobacco in their menthol cigarettes was additive-free. To measure the "damages resulting from" that false claim, the plaintiffs' model calculates the price of the cigarettes in a but-for world in which the defendants never made that false statement. That's exactly what *Comcast* requires. *See Gunaratna*, 2023 WL 5505052, at *18 ("[T]o satisfy *Comcast*, the but-for world advanced by a damages model must only assume the absence of the particular wrongful conduct upon which the plaintiffs' theory of liability is premised.").

Given the absence of any authority in support of their view, the defendants resort (at 63) to "common sense." If milk were falsely marketed as "fat free," they say, *Comcast* would forbid the plaintiffs from proposing any damages model other than a model that calculated the difference between fat free-milk and milk with the fat content actually contained. But they have not identified a single case that supports

their view. And in fact, courts have come out the other way on nearly this exact fact pattern in a case involving butter. *See Allen v. Conagra Foods, Inc.*, 331 F.R.D. 641, 671 (N.D. Cal. 2019) (damages model measuring price premium associated with false "fat free" claim on butter satisfied *Comcast*).

The defendants' position ultimately boils down to a complaint that the plaintiffs' conjoint analysis fails to account for all relevant attributes—such as the *number* of additives in the tobacco, rather than just the *existence* of additives. But that objection goes to the merits, not class certification. That is because whatever the alleged flaw in the model, it is the same across the class. *See Waggoner*, 875 F.3d at 106 (holding that a model's supposed "fail[ure] to account for variations in inflation over time" is not a *Comcast* problem). "[I]t is well-established that these types of critiques merely go to the weight, but not to the admissibility, of survey-based analyses." *Hadley v. Kellogg Sales Co.*, 324 F.Supp.3d 1084, 1106, 1108 (N.D. Cal. 2018) (failure of conjoint analysis to consider certain product differences did not impact *Comcast* analysis) (collecting cases); *see also Suchanek v. Sturm Foods, Inc.*, 2017 WL 3704206, at *20 (S.D. Ill. Aug. 28, 2017) ("Determining whether [the] model is accurate as it stands, or whether it needed to include more variables in order to be accurate . . . [is] the province of the jury."). At trial, the defendants will be free to argue that the plaintiffs' damages model overstates the price premium. *See Dial Complete Marketing*, 320 F.R.D.

at 337 (approving a damages model under *Comcast* while recognizing that the model would be "subject to challenges on cross-examination"); *Allen*, 331 F.R.D. at 674 (similar); *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 140 (D.D.C. 2017) (similar); *Fitzhenry-Russell*, 326 F.R.D. at 603-04.

Moreover, the defendants' complaint, even if correct, does not go to the question whether common questions predominate. "[E]ven if the measure of damages proposed here is imperfect, it cannot be disputed that the damages (if they are proved) stemmed from *Defendants'* actions," and are therefore common to the class. *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016). *Comcast* requires nothing more. The district court's conclusion that individual issues do not predominate with respect to damages under the plaintiffs' menthol theory should be affirmed.

## III. The ease of identifying class members is not an extratextual threshold requirement or question of predominance, but instead a question of administrative feasibility that goes to superiority under Rule 23(b)(3).

The administrative ease of identifying class members at the claims-administration stage is best considered as part of Rule 23(b)(3)'s superiority analysis, where any difficulties in the logistics of identification must be weighed against the alternatives, including the alternative of no claims at all. In an attempt to avoid that conclusion—reached by most courts of appeals to have addressed it—the defendants

obliquely argue that questions of class membership and administrative feasibility should actually be treated as an atextual threshold requirement before consideration of the requirements of Rule 23 and contend that administrative feasibility should be considered part of the predominance analysis. The defendants' arguments should be rejected.

### A. Administrative feasibility concerns cannot, standing alone, defeat class certification.

The defendants first urge this Court to hold that concerns about determining class membership, alone, can defeat class certification. Even while claiming (at 56) to hew to the text of Rule 23, they suggest that the rule contains an implicit threshold requirement that a class be administratively feasible—by which they mean that it be administratively easy to identify class members—and refer the Court, repeatedly, to cases embracing such a test. *See, e.g.*, Resp. Br. 25-26, 32, 53, 55-57 (citing *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013)). But the substantial majority of courts have rejected that extratextual threshold requirement and this Court should, too.

The extratextual threshold requirement the defendants seek traces back to a heightened-ascertainability requirement first articulated by the Third Circuit. Because Rule 23(c)(1)(B) requires a class certification order to "define the class," courts agree that a Rule 23(b)(3) class must be "clearly ascertainable" in the sense that the class definition contains definite and objective criteria for identifying class members.

*See, e.g.*, *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021); *Shook v. Bd. of Cnty.*

*Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 611 (10th Cir. 2008); 1 Newberg & Rubenstein

on Class Actions § 3.30 (6th ed. 2023). The Third Circuit purported to build on this

existing requirement when articulating an additional, threshold requirement that

there be an easy way to determine who is in the class at the time of certification—

often called "heightened ascertainability," *see Mullins v. Direct Digit., LLC*, 795 F.3d

654, 663 (7th Cir. 2015) (discussing *Carrera*, 727 F.3d at 307), and the defendants explain

as the principle that "the need for individual inquiries into class membership entirely

forecloses certification," Resp. Br. 56. At its high-water mark in *Carrera*, the Third

Circuit took a particularly stringent view of what could satisfy this new requirement,

going so far as to reject the idea that class-member affidavits attesting, for example,

that they purchased the product at issue in the litigation could establish class

membership. *Carrera*, 727 F.3d at 306.

    Immediately following the Third Circuit's articulation of heightened

ascertainability, two circuits, the First and Fourth, repeated the language of the

standard the Third Circuit had laid out. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 20

(1st Cir. 2015); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). But the First

Circuit's version is substantially less stringent, treating questions of class membership

as a threshold issue but not barring the use of affidavits. *In re Nexium*, 777 F.3d at 20 (cited at Resp. Br. 57).

Since those early cases were decided, a majority of circuits has expressly rejected engrafting a "heightened ascertainability" threshold requirement for class certification because it has no basis in the text or structure of Rule 23. An administrative feasibility requirement cannot be found in the "enumerated elements" of Rule 23(a), *see Cherry*, 986 F.3d at 1303, and adding such a requirement "would upset the careful balance of competing interests codified in the explicit requirements of Rule 23," *In re Petrobras Sec.*, 862 F.3d 250, 265 (2d Cir. 2017). "Nor does a *requirement* of administrative feasibility follow from Rule 23(b)" even if potential challenges with identifying class members can be relevant to whether the class mechanism is superior under the "manageability criterion of Rule 23(b)(3)." *Cherry*, 986 F.3d at 1303 (emphasis added). That is, Rule 23(b) does not "permit district courts to make administrative feasibility a requirement . . . in an absolute sense." *Id.* at 1304. Because courts "lack discretion to add requirements to the Rule," the Eleventh Circuit declined to follow the Third Circuit and imply a threshold administrative feasibility requirement into Rule 23. *Id.* at 1303. The Second, Sixth, Seventh, Eighth, and Ninth Circuits similarly have declined to treat questions of class membership as a threshold requirement that can alone defeat certification. *See In re Petrobras Sec.*, 862

F.3d at 265; *Rikos*, 799 F.3d at 525; *Mullins*, 795 F.3d at 662; *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995-96 (8th Cir. 2016); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017).

Despite this overwhelming authority, the defendants claim (at 56) that a "majority" of courts actually support their position. That's wrong. To make that argument, the defendants cobbled together the few courts that have nominally adopted a heightened ascertainability requirement (i.e., the First, Third, and Fourth Circuits) with those that have suggested "that the need for individual inquiries into class membership . . . bears on whether common questions predominate" (the Second and Sixth Circuits). *Id.* at 56-57 (citing *In re Petrobras Secs.*, 862 F.3d at 273 and *Sandusky Wellness Ctr.*, 863 F.3d at 473-74). But both the Second and the Sixth Circuits expressly *rejected* the view that class member identification issues impose a threshold bar to class certification. That is because there is a "key difference" between treating questions of administrative feasibility as an "absolute standard," like the Third Circuit does, and as one consideration in Rule 23(b)(3)'s comparative analysis.[7]

---

[7] The defendants claim (at 26 & n.8) that "courts regularly deny certification" when class member identification may cause administrative concerns. But the cases they list are either from the Third Circuit—and thus bound by *Carrera*—or are no longer good law after the Second and Eleventh Circuits rejected the Third Circuit's heightened ascertainability standard in *Petrobras* and *Cherry*, respectively.

**B. Questions about administrative feasibility should be considered only as part of the superiority analysis under Rule 23(b)(3)(D), and not also as part of the predominance analysis.**

Administrative feasibility concerns implicate only Rule 23(b)(3)'s superiority requirement and should not *also* be considered as part of Rule 23(b)(3)'s predominance requirement. *See* Opening Br. 49-57. The defendants do not dispute that administrative feasibility concerns are part of the superiority analysis and devote most of their energy to arguing that a court must also consider questions about class membership in the predominance inquiry. This Court should reject that argument. Under the text and purpose of Rule 23, questions about class membership are best considered *only* as part of the balancing analysis called for by the rule's superiority requirement—that is why the majority of circuits to have considered this question agree.

**1. Administrative feasibility implicates Rule 23(b)(3)'s superiority requirement, and class treatment is superior for both the safer-cigarette and menthol classes.**

Considering administrative feasibility only as a part of the superiority analysis's comparative assessment of the costs and benefits of class adjudication is not, as the defendants quip (at 31), a mere "generic policy argument[]" that a court can disregard. It is required by the text of Rule 23(b)(3)(D)'s "manageability criterion," which is part of superiority. *See Briseno*, 844 F.3d at 1127. That subsection

"instructs the district court, in deciding whether a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy, to consider the likely difficulties in managing a class action." *Cherry*, 986 F.3d at 1303. That's the natural, text-based home for questions about determining class membership during the claims-administration phase. *See id.*; *Mullins*, 795 F.3d at 663 ("[The] concern about administrative inconvenience is better addressed by the explicit requirements of Rule 23(b)(3), which requires that the class device be 'superior[.]'"); *Briseno*, 844 F.3d at 1127. Given the text of Rule 23(b)(3)(D), the majority of courts to consider the question have housed considerations of administrative feasibility in the superiority analysis, and only the superiority analysis. *See Cherry*, 986 F.3d at 1303-04; *Mullins*, 795 F.3d at 663; *Briseno*, 844 F.3d at 1128.

Confining considerations of administrative feasibility to the superiority analysis is also consistent with the overall text and purpose of Rule 23—any other consideration threatens to undermine the role the superiority requirement fulfills. Allowing administrative feasibility concerns to also be considered outside of the superiority analysis "would invite courts to consider the administrative burdens of class litigation," including any questions about proving class membership, "in a vacuum." *Briseno*, 844 F.3d at 1128. Without the counterbalance of the benefits of class litigation, manageability concerns could become outcome determinative. "[I]f courts

look only at the cost side of the equation . . . courts will err systematically against certification." *Mullins*, 795 F.3d at 664. That is exactly the result the superiority requirement is designed to prevent and one that is contrary to the text of Rule 23, which a court may not amend on its own. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Courts are not free to amend [the Federal Rules of Civil Procedure] outside the process Congress ordered.").

So, as the defendants don't dispute and as the district court correctly found, the safer-cigarette and menthol classes easily satisfy the superiority requirement. 5 App. 25-26. Even assuming the defendants are correct that there are manageability concerns here, *but see infra* Part III.B.2, the unsurprising fact that class members may not have documentation of their purchase of NAS cigarettes must be weighed against the fact that the alternative—as with most small-dollar consumer claims—is that there will be no claims brought at all because the damages are too small to justify bringing individual claims. *See Briseno*, 844 F.3d at 1128.

When, as here, there is no realistic alternative to class actions, courts generally conclude that the class claims should go forward so long as the other requirements of Rule 23 are met (and here, they are). Indeed, just as the majority of circuits have rejected a stand-alone requirement that class members be easy to identify, so too have courts, including within this Circuit, rejected denying class certification solely

because of manageability concerns. *See id.*; *Cherry*, 986 F.3d at 1304; *Mullins*, 795 F.3d at 663; *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.) (refusal to certify a class "on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule"); 2 Newberg & Rubenstein on Class Actions § 4:72 (6th ed. 2023) ("[C]ourts within almost every circuit have held that there is a presumption against dismissing a class action on manageability grounds or that such dismissals are disfavored."); *see also In re: Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856, at *12 (D. Kan. Sept. 26, 2016) (similar).

### 2. Administrative feasibility is not relevant to predominance but, even if it were, both the safer-cigarette and menthol subclasses should have been certified.

The district court erred in considering administrative feasibility as part of predominance, but even if it could be, the classes here should be certified. Opening Br. 56-57. Even while faulting the district court for not giving dispositive weight to issues of administrative feasibility, the defendants agree with its erroneous decision to consider administrative feasibility as part of predominance. According to the defendants (at 27-29), whether an individual consumer purchased the product at issue must be treated as an element of any claim they bring. And because the predominance inquiry starts with the elements of the claim, the need for

individualized inquiries into whether each class member bought NAS cigarettes is relevant to, and can alone defeat, predominance. Anything else, they say (at 23-24), would allow the plaintiffs "a shortcut to proving" their claims without actually proving all the elements of their claims. Not so. Questions about claims administration do not go to predominance, which is focused instead on questions of liability and damages and takes as a given the class as defined.

To start, not only would considering administrative feasibility as part of the predominance inquiry contradict the plain text and purpose of Rule 23's superiority prong, it would also be inconsistent with the way the Supreme Court has interpreted and applied the predominance prong. As we explained in our opening brief (at 55-58), the predominance inquiry focuses on whether, given the class as defined, there are common questions of liability, defenses to liability, and damages, and whether that class is sufficiently coherent. It is not, as the defendants decry (at 31), an "exception" to the "plain language" of Rule 23(b)(3)'s predominance requirement to consider those liability-based questions and exclude questions about how class members will file claims with the class fund; those latter questions are simply not part of the predominance inquiry in the first place.

The "plain language" the defendants cite simply asks whether "questions of law or fact common *to class members* predominate over any questions affecting only

individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added). The inquiry takes the existence of the class members as a given. Put another way, in this case, the predominance inquiry starts from the premise that class members are purchasers of NAS cigarettes or NAS menthol cigarettes—that's the clearly defined and objective class definition. It then asks, not how we figure out whether any individual is a member of that class, but rather assuming those individuals are in a class, whether individual issues impacting liability and damages would predominate.

*Amchem* demonstrates this principle. The predominance analysis in *Amchem* started from the premise that all class members had been exposed to asbestos because that was how the class was defined. *See* 521 U.S. at 623. The analysis then asked whether there were common questions of liability and damages and whether the class—that is, those who fell within the class definition of people exposed to asbestos by the defendants' products—was sufficiently cohesive. *Id.* at 623-25. It was because "significant questions, not only of damages but of liability and defenses of liability" would "affect[] the individuals in different ways," that the *Amchem* Court concluded that common questions did not predominate over individual ones. *Id.* at 625. Notably, what the Supreme Court did *not* do in conducting its predominance analysis was consider whether it would be feasible or easy to identify class members. And it was not as if there wouldn't be challenges in identifying class members. There was

no "master list" of those exposed to asbestos, including those with second-degree exposure from living in the same household with workers exposed to defendants' asbestos products on the job. *See id.* at 602 n.5.

The defendants rely heavily on this Court's decision in *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013), for the uncontroversial proposition that individual issues defeat predominance when liability depends on individual inquiries. *See* Resp. Br. 20, 21, 23, 24, 26, 39, 58, 59. Of course that's true—that's the gravamen of the predominance inquiry.

But just as in *Amchem*, *XTO* did not consider questions about identifying class members in its predominance analysis. Instead, as in *Amchem*, it started from the premise that everyone who falls within the class definition is a member of the class— there, all royalty owners of XTO from gas wells in Kansas—and then considered whether common questions of liability and damages predominated over individual ones. 725 F.3d at 1215. In particular, this Court highlighted an individual issue that went to the very heart of the liability question: whether each of the 650 lease contracts, which contained substantial and material variations, included an implied duty of marketability. *Id.* at 1216, 1218. There were other individual issues too, including, critically, whether XTO's actions breached the implied duty of marketability because that answer depended on the gas quality of each individual

well. *Id.* at 1219. Because core liability questions in the case were not amenable to common proof, this Court remanded for the district court to consider whether *those* individual liability questions defeated predominance. *Id.* at 1220. *XTO* is a paradigmatic example of the types of individual inquiries that go to liability and are properly considered as part of the predominance analysis.

In stark contrast to *XTO*, there are common answers to the liability questions in this case. For example, whether a reasonable consumer—not each individual consumer—would find Santa Fe's health reassurances misleading, regardless of whether they saw the disclaimer prior to purchase, has a common answer because it does not depend on the individual circumstances of any particular purchaser. *Supra* Part I.A. As another example, the reasons why any individual purchased NAS cigarettes, menthol or otherwise, is irrelevant to the common proof of causation because the plaintiffs rely on a price-premium theory for both types of classes. *Supra* Part I.B.

Confining the predominance inquiry to questions of liability and damages and allowing consumers to demonstrate their membership in the claims-administration phase does not, as the defendants complain (at 29), "change what must be proved at trial" or otherwise impermissibly allow class members to circumvent the legal requirements for proving they are entitled to relief in contravention of the Rules

Enabling Act. Their real beef appears to be with the fact that consumers may need to rely on affidavits stating that they purchased NAS cigarettes or NAS menthol cigarettes. But the defendants' quibbles get it exactly backwards.

The plaintiffs don't dispute that any class member would need to demonstrate that they purchased NAS cigarettes to receive damages. But, in the absence of documentary evidence, an affidavit is a perfectly permissible way to demonstrate entitlement to damages in individual cases. It would be problematic to *not* allow absent class members to use the same type of proof they could have used in an individual case: Where "consumer testimony would be sufficient to establish injury in an individual suit, it follows that similar testimony in the form of an affidavit or declaration would be sufficient in a class action." *In re Nexium*, 777 F.3d at 20; *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) ("[T]he Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge, or modify any substantive right[.]'"). Of course, the defendants remain free to challenge the veracity of any particular affidavit submitted in support of a claim on the fund and so does not lose any rights in that sense. *See Mullins*, 795 F.3d at 671. The need for affidavits does not transform anticipated concerns about identifying class members into a matter for predominance.

And even if it could be considered part of predominance, the fact that establishing class membership requires some level of individual inquiry does not mean predominance is defeated. That's true in every case. *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 164, 170-71 (3d Cir. 2015) ("There will always be some level of inquiry required to verify that a person is a member of a class[.]"). Indeed, Rule 23 itself contemplates the need for some individualized claim determinations after a finding of liability. Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment (explaining that certification may be proper "despite the need, if liability is found, for separate determination[s] of the damages suffered by individuals within the class"). So while the defendants claim that the entire class proceeding will be upended by thousands of "mini trials" if consumers can submit affidavits stating that they purchased NAS cigarettes or NAS menthol cigarettes, affidavits are the normal way class members in small-dollar consumer class actions like this one seek funds for purchases for which they are unlikely to keep receipts.[8] They offer no real-life example of a class action

---

[8] *See, e.g.*, *Briseno*, 844 F.3d at 1124 (purchasers of cooking oil); *Mullins*, 795 F.3d at 674 (purchasers of dietary supplement); *Miller v. Basic Rsch., LLC*, 285 F.R.D. 647, 661 (D. Utah 2010) (purchasers of dietary supplement). *See also In re Hulu Priv. Litig.*, 2014 WL 2758598, at *15 (N.D. Cal. June 17, 2014) (collecting cases); 1 Newberg & Rubenstein on Class Actions § 3:3 (6th ed. 2023) ("[A] number of courts have held that a simple statement or affidavit may be sufficient where claims are small or not amenable to ready verification.").

that devolved into mini-trials in this way. On the contrary, unless there is some particular reason to think class-member affidavits will be especially unreliable, "[w]hether putative class members self-identify by affidavits simply does not matter." *Mullins*, 795 F.3d at 671.[9]

The only remaining individual inquiry identified by the defendants (at 29-30) is the unremarkable fact that their overall damages can be calculated on an aggregate basis and then individuals will make claims on the class fund and some determination of their legitimacy will need to be made. But as we explained in our opening brief (at 57-58), that basic fact does not impact the defendants' total liability in terms of damages or otherwise relieve the plaintiffs of their burden to prove their claims. That is because in cases involving sales of consumer products, "[t]he defendant will generally know how many units of a product it sold in the geographic area in question, and if the defendant is ultimately found to have charged, for example, 10 cents more per unit than it could have without the challenged sales practice, the aggregate amount of liability will be determinable even if the identity of all class

_____

[9] To be sure, there has been a very recent rise in bot-driven fraudulent claims. However, as the Western Alliance Bank report demonstrates, claims administrators can and do successfully identify which claims are fraudulent by screening for dozens of red-flag characteristics. *See* 1 SA 171-77. The existence of technology-based fraudulent claims should not be a bar to class certification where expert claims administrators are able to identify them, and such fraudulent claims do not see any payout.

members is not." *Briseno*, 844 F.3d at 1132; *see Carrera*, 727 F.3d at 310 (acknowledging the argument that defendants' "total liability" would not be "affected by unreliable affidavits").

The defendants offer two responses. Neither has merit.

*First*, they suggest (at 30-31 n.11) that even if "aggregate damages" were permissible, their total liability will not simply be a "simple function of the total number of cigarettes sold multiplied by the allegedly unlawful price premium." But the reason they give is that individual consumers may have had different purchasing experiences or thought different things about the challenged statements—i.e., the same flawed arguments about why individual issues predominate over questions of deception, causation, and "unjustness." *See supra* Parts I.A, B.

*Second*, they complain (at 30) that an example given in *Mullins*, 795 F.3d 654, which we cited in our opening brief (at 57), involved conversion by the defendants of an amount certain from the class. But while this case has different facts, the same principle applies: If the total liability can be calculated without regard to individual claims, then individual claims do not impact total damages, and should not be considered a part of the predominance inquiry.[10]

_____

[10] The Second Circuit has suggested that concerns about identifying class members could be considered under both the superiority and predominance

In short, back-end claims administration issues are simply not part of the predominance analysis. But even if the defendants were correct that concerns about identifying class members should be addressed in predominance, any individual inquiries at the claims administration stage would not predominate over the common questions of liability and damages in this case.

## CONCLUSION

The district court's decision denying certification of the safer-cigarette classes should be reversed and its decision granting certification of the menthol classes should be affirmed.

July 26, 2024

Respectfully submitted,

MATTHEW W.H. WESSLER
DEEPAK GUPTA
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111

---

analyses. But in that case, unlike here, the defendants' total liability turned on individual issues, including whether the transactions in question were domestic—a question that would require potential class members to present extensive individual "facts concerning the formation of contracts, the placement of purchase orders, … or the exchange of money." *In re Petrobras*, 862 F.3d at 272.

(415) 573-0336

Leah M. Nicholls
Public Justice
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600

Hannah Kieschnick
Public Justice
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150

Melissa S. Weiner
Pearson Warshaw, LLP
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
(612) 389-0600

Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
Schlesinger Law Offices, P.A.
1212 SE Third Avenue
Ft. Lauderdale, FL 33316
(954) 467-8800

Daniel L. Warshaw
Pearson Warshaw, LLP
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
(818) 788-8300

Matthew D. Schultz
Levin, Papantonio, et al.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502

(850) 435-7140

MICHAEL R. REESE
REESE LLP
100 West 93rd Street, 16th Floor
New York, NY 10025
(212) 643-0500

RONALD A. MARRON
LAW OFFICES OF RONALD A.
 MARRON
651 Arroyo Drive
San Diego, CA 92103
(619) 696-9006

NANCY R. LONG
LONG, KOMER & ASSOCIATES, P.A.
1800 Old Pecos Trail, Suite A
Santa Fe, NM 87505
(505) 982-8405

*Counsel for Plaintiffs-Appellants/Cross-Appellees*

**CERTIFICATE OF COMPLIANCE**

This answer brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2) because it contains 12,921 words. It complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

July 29, 2024

_/s/ Matthew W.H. Wessler_
Matthew W.H. Wessler

_Counsel for Plaintiffs-Appellants/Cross-Appellees_

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2024, I electronically filed the foregoing brief with Clerk of the Court for the U.S. Court of Appeals for the Tenth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler