**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**July 29, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

ANTHONY DUNN; CEYHAN
HAKSAL; MICHAEL ROBINSON;
HARRY VARTANYAN; MICHAEL
YANG; DOUG PYLE; NICK VADIS;
THEODORE ROTHMAN; JUSTIN
SPROULE; PATRICK SCOTT;
RUSSELL BRATTAIN; SHANNON
WHITE; C. M. LECOMPTE; DANAE
GRANDISON; MICHAEL LABOON;
DAVE MOYER; VICTORIA
CUEBAS; ASHLEY WALDO; STEVE
OKSTAD; MICHAEL ANDERSON;
BROOKE BALOCCA; ELIJAH
BENT; CHARLENE BLEVINS; SAM
BOWMAN; MATOKIE BRIM;
TERRY CLIVER; CHRISTOS
CHRISTOLOW; GEORGE COON;
GARY CRUSE; MARGIE HARRIS;
CHARLES HONSE; CLINTON
HORTON; COLLIN JASS;
CRISTOPHER JENSEN; SHEREEN
KEITH; KELLY KEISER; ASHER
KING; MARILYN KOMARINSKI;
JODI KUMPULA; TOM KURTZ;
RICHARD KUSICK; MIKE LAIR;
TRACY LEE; KATHLEEN LELLI;
ROBERT LITWIN; LINDA
MACDONALD-LEWIS; RUDOLPH
MILLER; RICHARD MORELOCK;
DEBORAH ORRTIM PAULSON;
RICHARD PEAVY; CONCETTA
SCHULTZ; JUDY SELL; HARRISON
THOMAS; DANI WEIR; TOM WEIR;
KYLE WIEBE; VICKI WILSON;

TIMOTHY RUGGIERO; DESIRE GUDMUNDSON; SCOTT JOHNSTON; JASON COLE; RACHAEL KING; JACQUES-RENE HEBERT; SARA BENSON; CAROL MURPHY; FRANCISCO CHAVEZ; JOSHUA HORNE; ALBERT LOPEZ; ABIGAIL EMMONS,

Plaintiffs - Appellants/Cross-Appellees,

v.

SANTA FE NATURAL TOBACCO COMPANY, INC.; REYNOLDS AMERICAN, INC.; R.J. REYNOLDS TOBACCO COMPANY

Defendants - Appellees/Cross-Appellants.

------------------------------

PUBLIC CITIZEN; NATIONAL CONSUMER LAW CENTER; GERARD HANSHE, Esq.; THE PUBLIC HEALTH ADVOCACY INSTITUTE; WASHINGTON LEGAL FOUNDATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

Amici Curiae.

_____

ANTHONY DUNN; CEYHAN HAKSAL; MICHAEL ROBINSON; HARRY VARTANYAN; MICHAEL YANG; DOUG PYLE; NICK VADIS;

Nos. 23-2180 & 23-2181

THEODORE ROTHMAN; JUSTIN
SPROULE; PATRICK SCOTT;
RUSSELL BRATTAIN; SHANNON
WHITE; C. M. LECOMPTE; DANAE
GRANDISON; MICHAEL LABOON;
DAVE MOYER; VICTORIA
CUEBAS; ASHLEY WALDO; STEVE
OKSTAD; MICHAEL ANDERSON;
BROOKE BALOCCA; ELIJAH
BENT; CHARLENE BLEVINS; SAM
BOWMAN; MATOKIE BRIM;
TERRY CLIVER; CHRISTOS
CHRISTOLOW; GEORGE COON;
GARY CRUSE; MARGIE HARRIS;
CHARLES HONSE; CLINTON
HORTON; COLLIN JASS;
CRISTOPHER JENSEN; SHEREEN
KEITH; KELLY KEISER; ASHER
KING; MARILYN KOMARINSKI;
JODI KUMPULA; TOM KURTZ;
RICHARD KUSICK; MIKE LAIR;
TRACY LEE; KATHLEEN LELLI;
ROBERT LITWIN; LINDA
MACDONALD-LEWIS; RUDOLPH
MILLER; RICHARD MORELOCK;
DEBORAH ORRTIM PAULSON;
RICHARD PEAVY; CONCETTA
SCHULTZ; JUDY SELL; HARRISON
THOMAS; DANI WEIR; TOM WEIR;
KYLE WIEBE; VICKI WILSON;
TIMOTHY RUGGIERO; DESIRE
GUDMUNDSON; SCOTT
JOHNSTON; JASON COLE;
RACHAEL KING; JACQUES-RENE
HEBERT; SARA BENSON; CAROL
MURPHY; FRANCISCO CHAVEZ;
JOSHUA HORNE; ALBERT LOPEZ;
ABIGAIL EMMONS,

  Plaintiffs - Appellees,

3

v.

SANTA FE NATURAL TOBACCO
COMPANY, INC.; REYNOLDS
AMERICAN, INC.; R.J. REYNOLDS
TOBACCO COMPANY,

  Defendants - Appellants.

-----------------------------

PUBLIC CITIZEN; NATIONAL
CONSUMER LAW CENTER;
GERALD HANSHE, Esq.; THE
PUBLIC HEALTH ADVOCACY
INSTITUTE; WASHINGTON
LEGAL FOUNDATION; THE
CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA,

  Amici Curiae.

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:16-MD-02695-JB-LF)**

_____

Matthew W.H. Wessler of Gupta Wessler LLP, Washington, District of
Columbia (Deepak Gupta and Stefanie Ostrowski of Gupta Wessler LLP,
Washington, District of Columbia; Leah M. Nicholls of Public Justice,
Washington, District of Columbia; Hannah Kieschnick of Public Justice,
Oakland, California; Scott P. Schlesinger, Jeffrey L. Haberman, and Jonathan
R. Gdanski of Schlesinger Law Offices, P.A., Ft. Lauderdale, Florida; Matthew
D. Schultz of Levin, Papantonio, et al., Pensacola, Florida; Michael R. Reese of
Reese LLP, New York, New York; Ronald A. Marron of Law Offices of Ronald
A. Marron, San Diego, California; Nancy R. Long of Long, Komer & Associates,
P.A., Santa Fe, New Mexico; Melissa S. Weiner of Pearson Warshaw, LLP,
Wayzata, Minnesota; Daniel L. Warshaw of Pearson Warshaw, LLP, Sherman

Oaks, California; D. Greg Blankinship of Finkelstein, Blankinship, Frie-Pearson & Garber, LLP, White Plains, New York; Caleb Marker of Zimmerman Reed LLP, Manhattan Beach, California; James W. Gustafson, Jr. of Searcy Denney Scarola Barnhart & Shipley, P.A., Tallahassee, Florida; Charles J. LaDuca of Cuneo Gilbert & LaDuca, LLP, Washington, District of Columbia; Jessica Garland of Gupta Wessler LLP, San Francisco, California, with him on the briefs), for Plaintiffs-Appellants/Cross-Appellees.

Noel J. Franciso, Jones Day, Washington, District of Columbia (William D. Coglianese of Jones Day, Washington, District of Columbia; Melanie B. Stambaugh of Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New Mexico; David M. Monde of Jones Day, Atlanta, Georgia; Meir Feder and Sharyl A. Reisman of Jones Day, New York, New York, with him on the briefs), for Defendants-Appellees/Cross-Appellants.

Glenn E. Chappell and Spencer S. Hughes of Tycko & Zavareei LLP, Washington, District of Columbia, filed an amicus curiae brief for Gerard Hanshe, in support of Plaintiffs-Appellants/Cross-Appellees.

Mark A. Gottlieb and Andrew A. Rainer of Public Health Advocacy Institute, Boston, Massachusetts, and Alexander Hood of Towards Justice, Denver, Colorado, filed an amicus curiae brief for the Public Health Advocacy Institute, in support of Plaintiffs-Appellants/Cross-Appellees.

Wendy Liu and Allison M. Zieve of Public Citizen Litigation Group, Washington, District of Columbia, filed an amicus curiae brief for Public Citizen, in support of Plaintiffs-Appellants/Cross-Appellees.

Roger N. Heller, Melissa Gardner, and John Maher of Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, California, filed an amicus curiae brief for the National Consumer Law Center, in support of Plaintiffs-Appellants/Cross-Appellees.

John M. Masslon II and Cory L. Andrews, Washington Legal Foundation, Washington, District of Columbia, filed an amicus curiae brief for Washington Legal Foundation, in support of Defendants-Appellees/Cross-Appellants.

Frederick R. Yarger, Galen D. Bellamy, and Kate Fletcher of Wheeler Trigg O'Donnell LLP, Denver, Colorado, filed an amicus curiae brief for the Chamber of Commerce of the United States of America, in support of Defendants-Appellees/Cross-Appellants.

_____

Before **TYMKOVICH**, **EBEL**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

Plaintiffs are consumers of Natural American Spirit (NAS) cigarettes. They sued the manufacturers of NAS cigarettes—Defendants Santa Fe Natural Tobacco Company, Inc., Reynolds American Inc., and R.J. Reynolds Tobacco Company (collectively, Santa Fe)—in federal district court, alleging Santa Fe misled consumers into believing NAS cigarettes were less harmful than other cigarettes and charged consumers a "premium" price for their product. Based on these allegations, Plaintiffs asserted consumer-protection claims and other causes of action under state law. At the motion-to-dismiss stage, the district court allowed most of the claims to proceed.

These interlocutory appeals concern class-action certification proceedings under Federal Rule of Civil Procedure 23(b)(3). Plaintiffs sought to certify two classes: (1) anyone who purchased NAS cigarettes in each of twelve states (NAS classes), and (2) anyone who purchased NAS menthol cigarettes in each of eight states (menthol classes).[1] The central question at

---

[1] The twelve states with proposed NAS classes are California, Colorado, Florida, Illinois, Massachusetts, Michigan, New Jersey, New Mexico, New York, North Carolina, Ohio, and Washington. The eight states

the certification stage concerned the "predominance" prerequisite of Rule 23, which requires Plaintiffs to show "questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). The district court refused to certify the NAS classes but granted certification of the menthol classes. Both parties requested and received leave to appeal under Rule 23(f).

Exercising jurisdiction under 28 U.S.C. § 1292(e), we affirm the certification of the menthol classes but reverse the denial of certification of the NAS classes. Accordingly, we vacate the certification order in part and remand to the district court for further proceedings consistent with this opinion.

## I

### A[2]

This case is about a particular aspect of Santa Fe's marketing and advertising: the labeling on cigarette packaging. For years NAS cigarette

---

with proposed menthol classes are California, Colorado, Florida, Illinois, New Jersey, New Mexico, New York, and North Carolina. The district court refused to certify the Ohio NAS class after Plaintiffs said they were no longer seeking its certification. On appeal, Plaintiffs do not press any arguments that the district court erred as to the proposed Ohio class. We thus find any such argument as to Ohio waived. *See McNellis* v. *Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1136 n.11 (10th Cir. 2024).

[2] Our factual recitation comes from the operative complaint; the district court's class certification order, where the district court elected to make findings of fact; and the record developed before the district court. We accept

7

packaging featured the terms "Natural" and "100% Additive-Free," with some packs also including the term "Organic." RI.145, 159. Santa Fe's cigarette marketing "has helped the brand increase sales by 86 percent from 2009 to 2014," Plaintiffs say, "even as overall cigarette sales in the United States fell by 17 percent during the same period." RI.179.

In 2015, Plaintiffs sued in federal district courts, alleging Santa Fe's marketing misled consumers. *See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*, 288 F. Supp. 3d 1087, 1133 (D.N.M. 2017) (MTD Order). The cases were consolidated in the District of New Mexico as part of multidistrict litigation. *See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. Litig.*, 178 F. Supp. 3d 1377, 1378–79 (J.P.M.L. 2016). The operative complaint, filed in November 2018, alleged Santa Fe uniformly labeled every pack of NAS cigarettes to "intentionally and successfully convey to reasonable consumers that [NAS] cigarettes are safer and healthier to smoke than other competing cigarettes." RI.145, 249. The packaging had a disclaimer: "No additives in our tobacco does NOT mean a safer cigarette." RI.160–62, 164 (bolding omitted). According to Plaintiffs, the disclaimer was ineffective in correcting consumer misperceptions about the cigarette's health effects. Plaintiffs asserted consumer-protection and unjust-enrichment claims

---

these facts "as true solely for the purposes of this appeal." *Black* v. *Occidental Petrol. Corp.*, 69 F.4th 1161, 1169 n.1 (10th Cir. 2023).

under state law and sought damages based on the "price premium" consumers paid to Santa Fe as a result of its alleged misrepresentations.[3] RI.179; Plaintiffs' Motion for Class Certification, *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*, No. 1:16-MD-02695-JB-LF (D.N.M. July 23, 2020), Dkt. No. 278, at 3 (Cert. Mot.).

Santa Fe moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). In relevant part, the motion was denied. Although the order denying the motion to dismiss is not before us on appeal, two of the district court's rulings are pertinent to its subsequent certification decision.

*First*, the district court concluded the "reasonable consumer standard" governs Plaintiffs' state consumer-protection claims. *See* MTD Order, 288 F. Supp. 3d at 1227–30. Under that standard, the district court held, Plaintiffs plausibly alleged Santa Fe's use of "natural," "organic," and "additive free" deceived a reasonable consumer into "erroneously believ[ing] that Natural American cigarettes are safer or healthier than other cigarettes." *Id.* at 1230.

*Second*, endorsing an argument made by Santa Fe, the district court held the disclaimer on the packages partially cured the alleged deception. In the

---

[3] In the time since the complaint was filed, the district court dismissed certain consumer-protection and unjust-enrichment claims, and Plaintiffs have abandoned others. The upshot is not every proposed state class brings both consumer-protection *and* unjust-enrichment claims. In this opinion, we do not specify the specific claims in a given class or state unless necessary.

district court's view, "a reasonable consumer would understand from the [disclaimer] that the lack of additives does not make Natural American cigarettes healthier[.]" *Id.* at 1233. But the "disclaimer says nothing about the natural or organic descriptors." *Id.* at 1233. Those terms were "deceptive to a reasonable consumer," the district court reasoned, notwithstanding the disclaimer. *Id.* at 1234.

Plaintiffs then moved to certify twenty state classes under Rule 23(b)(3). Plaintiffs proposed two classes. One class consisted of "all persons who have purchased Natural American cigarettes" in California, Colorado, Florida, Illinois, Massachusetts, Michigan, New Jersey, New Mexico, New York, North Carolina, Ohio, and Washington. RIV.7; *see* RI.182–84. These proposed NAS classes premised liability on what Plaintiffs call the "safer-cigarette theory," which alleged the terms on cigarette packaging falsely implied NAS cigarettes were less harmful than competitors' cigarettes. The other class consisted of "all persons who have purchased Natural American menthol cigarettes" in each of California, Colorado, Florida, Illinois, New Jersey, New Mexico, New York, and North Carolina.[4] RIV.7. According to what Plaintiffs dub the "menthol theory"

---

[4] The district court referred to these classes as state "Menthol Subclass[es]" because they were pleaded in the alternative to a proposed "Nationwide Menthol Subclass"—the twenty-first proposed class. That nationwide class is no longer a part of the proceedings, so we refer to these as the menthol classes.

of liability, Santa Fe falsely labeled NAS menthol cigarettes as "additive-free" even though the tobacco actually contains menthol—an additive. RIV.267–68 (citing Cert. Mot. at 83).

A key issue in the certification proceedings was whether Plaintiffs could show "the questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). Plaintiffs maintained their "case is perfectly suited for class certification" under Rule 23(b)(3) because "each element" of their consumer-protection and unjust-enrichment claims can be established using "common proof." Cert. Mot. at 3, 5.

Plaintiffs said they would first address whether Santa Fe's "marketing and labeling of the NAS Cigarettes was uniform and commonly presented to class members." Cert. Mot. at 4. Expert testimony would provide classwide proof Santa Fe "prominently labeled and advertised all NAS Cigarettes with representations that the cigarettes were 'natural' and '100% Additive-Free'" and that "[t]he labels did not . . . vary from state to state." Cert. Mot. at 10. Plaintiffs would then show "reasonable consumers were misled that the NAS Cigarettes may be less harmful than other cigarettes." Cert. Mot. at 4. Using Santa Fe's "internal studies and analyses," Plaintiffs would provide common proof that the "'natural' and 'additive-free' attributes are the main driver of NAS Cigarette sales[.]" Cert. Mot. at 5–6. They alleged "peer-reviewed

11

scientific studies, expert testimony, and industry documents" would also show "reasonable consumers were misled" into believing "NAS Cigarettes may be less harmful[.]" Cert. Mot. at 4, 6. And they would provide additional common evidence that NAS cigarettes are "not less harmful than other cigarettes" and "may be more harmful because . . . they deliver more nicotine and certain carcinogenic compounds than most other cigarettes." Cert. Mot. at 5.

Plaintiffs claimed "consumers suffered a quantifiable economic injury . . . in the form of . . . a price premium[.]" Cert. Mot. at 53. That is, "consumers overpay for NAS Cigarettes as a direct result of [Santa Fe's] misrepresentations[.]" Cert. Mot. at 6. On this front, Plaintiffs offered expert testimony from Dr. Jean-Pierre Dubé, an economist at the University of Chicago. Dr. Dubé's proposed damages model uses "conjoint analysis"—a marketing research methodology relying on surveys to estimate "how consumers value a product's individual attributes"—to identify whether "class members suffered an ascertainable loss" resulting from Santa Fe's alleged "misrepresentations." Cert. Mot. at 46; RIV.57, 60. Plaintiffs also asserted, for their consumer-protection claims, the model provided common proof on the element of causation.

Santa Fe opposed certification, arguing individual questions "overwhelm" those common to the class. Defendants' Opposition to Plaintiffs' Motion for Class Certification, *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales*

*Pracs. & Prods. Liab. Litig.*, No. 1:16-MD-02695-JB-LF (D.N.M. Oct. 8, 2020), Dkt. No. 315, at 16, 24 (Cert. Opp.). Santa Fe insisted, *first*, "the need for individual proof of whether each class member bought the product will predominate over common questions." Cert. Opp. at 25 (heading formatting omitted). Because Plaintiffs offered only affidavits but no purchase records, Santa Fe maintained, "the most fundamental element of class members' claims—that they purchased the product for which they are seeking to recover damages—would have to be proved individually[.]" Cert. Opp. at 26.

*Second*, even if a consumer could prove purchase, liability would still require individualized proof that a consumer saw the disclaimer before purchasing the product. Such "claimant-by-claimant inquiries," Santa Fe insisted, "would overwhelm any common issues." Cert. Opp. at 35.

*Third*, as to Plaintiffs' unjust-enrichment claims, Santa Fe contended individual inquiries were required to determine an essential element of the claim—whether retention of benefits was "unjust." Cert. Opp. at 42–43, 50–51 (citing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 995 (C.D. Cal. 2015)).

*Finally*, Santa Fe argued Dr. Dubé's model failed to "measure *only* those damages attributable to" the class's theory of liability. Cert. Opp. at 73 (emphasis added) (quoting *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 35 (2013)). Because Dr. Dubé's model calculated the price premium for *all* interpretations

13

of the product labels, Santa Fe maintained, it would be impossible to isolate the premium attributable just to the alleged "safer-cigarette" theory.

**B**

The court held a five-day evidentiary hearing in December 2020. In a 423-page order, the district court granted in part and denied in part Plaintiffs' motion for class certification under Rule 23(b)(3). The court refused to certify any NAS class but granted certification for menthol classes as to consumer-protection claims in California, Florida, Illinois, New Jersey, New Mexico, and New York. The court also certified a menthol class in California on an unjust-enrichment claim. We now describe the district court's certification order, detailing the portions relevant to the appeal and cross-appeal.

The district court first identified a reason not to certify the consumer-protection claims for the NAS classes. The elements of consumer-protection claims are "generally similar from State to State," the district court acknowledged, and require Plaintiffs to prove "Defendants' marketing is likely to mislead a reasonable consumer."[5] RIV.62. But, the district court reasoned,

---

[5] On appeal, no one challenges the district court's conclusions that the elements of Plaintiffs' consumer-protection claims and unjust-enrichment claims are essentially the same in every state (with the exception of California as to unjust enrichment). Plaintiffs cite Florida law as representative of their consumer-protection claims, which Santa Fe does not dispute. For purposes of this opinion, we make the same assumptions, and we do not distinguish between the law of particular states unless necessary.

a consumer who saw the disclaimer would understand "a lack of additives does not make Natural American cigarettes healthier" and so would not be misled. RV.18. The district court agreed with Santa Fe that whether each consumer *saw* the disclaimer was an individual inquiry not amenable to common proof.

The district court found Dr. Dubé's damages model presented another problem. Damages is "an element which must be satisfied for the Court to certify the proposed class," the district court reasoned, and found unpersuasive Plaintiffs' assurances that this element could be satisfied with common proof. RIV.55 n.15. In the district court's view, the model could not "isolate the specific belief that the [NAS] cigarettes were *safer*" from other, non-misleading interpretations of the packaging. RIV.288 (emphasis added). The district court thus agreed with Santa Fe that Plaintiffs' proposed model violated *Comcast*. For similar reasons, the district court concluded Plaintiffs could not prove causation with common evidence for their consumer-protection claims. As to claims Plaintiffs brought under the Illinois Consumer Fraud Act (ICFA), 815 Ill. Comp. Stat. 505/10a (2005), the district court determined causation "require[d] proof of deception for each plaintiff." RV.62. Ultimately, the district court concluded individual inquiries overwhelmed those common to the class and denied certification for each state-specific NAS class consumer-protection claim.

The district court then turned to the NAS classes bringing unjust-enrichment claims. The court explained Plaintiffs had to show (i) the Defendants received a benefit; (ii) at the Plaintiffs' expense; (iii) under circumstances that would make it unjust for the Defendants to retain the benefit without commensurate compensation. The court ruled it would take individual inquiries under state law to determine if Santa Fe's retention of the price premium was "unjust."[6] Ultimately, none of the NAS classes survived the certification motion.

The menthol classes fared differently. The district court determined the "additive-free label" misleads even reasonable consumers who saw the disclaimer, so it was not necessary to conduct individual inquiries into whether a consumer viewed the disclaimer before making a purchase. RV.18. As to the damages model, the district court held it "aligns more closely" with the menthol theory of liability, which does "not rely on the consumers' interpretation[.]" RV.3. That left only issues with identifying class members. The court concluded, on balance, that issue did not defeat predominance. The court then

---

[6] The exception was the California class. Because California law relied "wholly on objective standards" to determine if the packaging was deceptive, common evidence could establish the "unjust" element. RV.23. Still, other individualized issues with class-member identification and the damages model overwhelmed questions common to the California class. In the end, the district court denied certification for all NAS classes' unjust-enrichment claims.

16

certified the menthol classes for consumer-protection claims and the California menthol class's unjust-enrichment claim.

These timely appeals followed.

## II

Plaintiffs and Santa Fe each appeal a different aspect of the district court's class-certification order. But the appeals share a common standard of review, implicate the same principles under Rule 23, and each focus on the predominance requirement of Rule 23(b)(3).

Plaintiffs challenge the district court's denial of certification for the NAS cigarette class. They advance five arguments for reversal, contending the district court, *first*, erroneously rejected Dr. Dubé's proposed model; *second*, improperly decided at the class-certification stage what effect the disclaimer on the package had on consumers; *third*, misinterpreted the ICFA as requiring individual proof of causation; *fourth*, mistakenly concluded individual inquiries were necessary to determine whether Santa Fe unjustly retained the price premium; and *fifth*, improperly analyzed class-member identification under Rule 23(b)(3) as a question of predominance rather than superiority.

Santa Fe cross-appeals, urging reversal on three grounds: *first*, Plaintiffs' damages model is unsuitable for the menthol theory; *second*, the district court erroneously certified the California menthol class's unjust-

enrichment claims; and *third*, difficulties in identifying class members should have prevented certification of both the safer-cigarette and menthol classes.

We begin by describing the relevant legal background and then discuss each appeal individually.

## A

"We review de novo questions of whether the district court applied the correct legal standard in its class certification analysis." *Sherman* v. *Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1192 (10th Cir. 2023). "When the district court has applied the proper standard in deciding whether to certify a class, we may reverse that decision only for abuse of discretion." *Black* v. *Occidental Petrol. Corp.*, 69 F.4th 1161, 1173 (10th Cir. 2023) (internal quotation marks omitted); *see CGC Holding Co., LLC* v. *Broad & Cassel*, 773 F.3d 1076, 1085 (10th Cir. 2014) ("The scope of our review under Rule 23(f) is limited to whether the district court abused its discretion in its certification of the putative class."). "The district court abuses its discretion when it misapplies the Rule 23 factors—either through a clearly erroneous finding of fact or an erroneous conclusion of law—in deciding whether class certification is appropriate." *Id.* at 1085–86. Ultimately, "[a]s long as the district court applies the proper Rule 23 standard, we will defer to its class certification ruling provided that decision falls within the bounds of rationally available choices given the facts and law

18

involved in the matter at hand." *Vallario* v. *Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009).

## B

Class actions permit representative litigation on behalf of absent parties, "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano* v. *Yamasaki*, 442 U.S. 682, 700–01 (1979)). "In order to justify a departure from that rule," Rule 23 mandates the party seeking class certification satisfy certain threshold requirements. *Id.* Specifically, the party must show the proposed class satisfies the four "[p]rerequisites" listed in Rule 23(a) and one of three alternatives listed in Rule 23(b).[7] FED. R. CIV. P. 23(a)–(b); *see Black*, 69 F.4th at 1173. This is "more than a mere pleading standard." *Id.* (internal quotation marks omitted). "A party seeking class certification must affirmatively demonstrate" that Rule 23's requirements "are *in fact*" satisfied. *Wal-Mart*, 564 U.S. at 350. And courts must undertake a "rigorous analysis" to ensure those requirements are met.

---

[7] The four Rule 23(a) requirements applicable to all class actions are: (1) numerosity: "the class is so numerous that joinder of all members is impracticable;" (2) commonality: "there are questions of law or fact common to the class;" (3) typicality: "the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and (4) adequacy: "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(1)–(4); *see Wal-Mart*, 564 U.S. at 345 (listing Rule 23(a)'s requirements).

*Comcast*, 569 U.S. at 33–34 (internal quotation marks omitted); *see CGC Holding*, 773 F.3d at 1086 (acknowledging "the requirements of Rule 23 are heavily scrutinized and strictly enforced"). The district court concluded Plaintiffs' proposed classes satisfied Rule 23(a), and nobody contends otherwise.

Plaintiffs moved to certify under Rule 23(b)(3). This provision permits a class action if "the court finds that the questions of law or fact common to class members *predominate over* any questions affecting only individual members, and that a class action is *superior to* other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3) (emphasis added). The requirements in Rule 23(b)(3) are known as "predominance" and "superiority." *Wal-Mart*, 564 U.S. at 362–63. Rule 23(b)(3) lists four broad "matters" that a court may consider "pertinent to these findings" of predominance and superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A)–(D).

The leading explanation of Rule 23(b)(3) comes from *Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591 (1997). There the Supreme Court said "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* at 617 (internal quotation marks omitted). By "adding predominance and superiority to the qualification-for-certification list," the Supreme Court explained, "the Advisory Committee sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* at 615 (alteration in original) (internal quotation marks omitted). Rule 23(b)(3) thus entails a tradeoff, "allow[ing] class certification in a much wider set of circumstances but with greater procedural protections." *Wal-Mart*, 564 U.S. at 362.

The district court concluded superiority was satisfied for all classes, and Santa Fe does not challenge that determination. This appeal, then, centers on Rule 23(b)(3)'s predominance requirement.

## C

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Put differently, the predominance prong 'asks whether the

common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *CGC Holding*, 773 F.3d at 1087 (quoting 2 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 4:49 (5th ed. 2012)). Predominance is a demanding standard that "regularly presents the greatest obstacle to class certification[.]" *Id.*

To satisfy Rule 23(b)(3), plaintiffs must show "common questions subject to generalized, classwide proof *predominate* over individual questions." *Id.* "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 577 U.S. at 453 (alteration in original) (quoting NEWBERG & RUBENSTEIN, *supra* § 4:50). A plaintiff need not show "all . . . questions of fact and law [] are common to the class" or "that the answers to those common questions [are] dispositive." *CGC Holding*, 773 F.3d at 1087. "So long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)— even if there remain individual issues, such as damages, that must be tried separately." *Brayman* v. *KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 838 (10th Cir. 2023) (quoting *Naylor Farms, Inc.* v. *Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019)). Simply put, "Rule 23(b)(3) requires predominance, not

perfection[.]" *Cline* v. *Sunoco, Inc. (R&M)*, 159 F.4th 1171, 1187 (10th Cir. 2025).

We have explained courts evaluate predominance through a two-step process: (1) a *characterization* step, and then (2) a *weighing* step. *See Brayman*, 83 F.4th at 838. At the first step, the court must characterize "every issue related to the claim" as either "common or individual." *Id.* This requires identifying "the elements of the underlying cause of action," *Black*, 69 F.4th at 1175, and then discerning which "elements are susceptible to generalized proof," *CGC Holding*, 773 F.3d at 1087; *see Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 809 (2011) (explaining predominance inquiry begins "with the elements of the underlying cause of action"). The district court must "carefully examine what facts are required to prove Plaintiffs' claims and then determine whether Plaintiffs have shown that they could establish those facts through common evidence" applicable to the entire class. *Brayman*, 83 F.4th at 839.

Once the court has characterized the issues, the second step is to "weigh the issues to determine whether the common issues predominate." *Id.* at 838. Weighing involves a "qualitative assessment" of the "relative importance" of the issues. *Butler* v. *Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (Posner, J.); *see id.* (rejecting the argument that "predominance is determined simply by counting noses," since "common issues need only predominate, not

outnumber individual issues" (internal quotation marks omitted)). When "it is clear that the class's claims will 'prevail or fail in unison' . . . [t]hat is enough to satisfy the predominance prong of Rule 23." *CGC Holding*, 773 F.3d at 1093 (quoting *Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013)).

Critically, Rule 23(b)(3)'s predominance inquiry is not a "determination on the merits." *Id.* at 1087. To be sure, the predominance analysis might involve "some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal-Mart*, 564 U.S. at 351. But "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. "[M]erits questions may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Black*, 69 F.4th at 1174 (quoting *Amgen*, 568 U.S. at 466). Relevant here, a court's peek at the merits at this stage is cabined to whether individual questions outweigh those common to the class. *See Amgen*, 568 U.S. at 466, 477. Predominance under Rule 23(b)(3) thus focuses on *how* plaintiffs will prove their claims, not *whether* they will prove their claims.

### III

With the legal framework established, we now turn to the appeals before us. We begin with Santa Fe's argument "the district court should have denied certification of *all* of the proposed classes—including the menthol classes—

because liability cannot be determined without an overwhelming number of individual inquiries" into identifying purchasers of NAS cigarettes. Resp. Br. at 54.[8]

Santa Fe's argument implicates two related concepts: ascertainability and administrative feasibility. Ascertainability refers to whether "the putative class members can be readily identified based on the class definition." *Tarrify Props., LLC* v. *Cuyahoga County*, 37 F.4th 1101, 1106 (6th Cir. 2022). Within ascertainability, some courts have found a further condition of "[a]dministrative feasibility"—*i.e.*, "that identifying class members is a manageable process that does not require much, if any, individual factual inquiry." 1 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 3:3 (6th ed. 2025). Santa Fe's argument touches all claims and all classes; if Santa Fe is correct, then reversal would dispose of both appeals. But, as we explain, we discern no error.

**A**

We begin with Rule 23(b)(3), which "includes a nonexhaustive list of [four] factors pertinent to a court's 'close look' at the predominance and

---

[8] We refer to the briefing as follows: the Opening Brief of Plaintiffs-Appellants/Cross-Appellees (Op. Br.); the Principal and Response Brief of Defendants-Appellees/Cross-Appellants (Resp. Br.); the Response and Reply Brief of Plaintiffs-Appellants/Cross-Appellees (Reply Br.); and the Reply Brief of Defendants-Appellees/Cross-Appellants (Cross-Appellant Reply).

superiority criteria[.]" *Amchem*, 521 U.S. at 615–16. Relevant here is the fourth factor: "the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3)(D). "Commonly referred to as 'manageability,' this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen* v. *Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). The "practical problem" at issue in this case is identifying class members, often referred to as "ascertainability." *See* NEWBERG & RUBENSTEIN, *supra* § 4:50.

In *Cline* v. *Sunoco*, we recognized "ascertainability" is not in the text of Rule 23 but is an "implied prerequisite to class certification." 159 F.4th at 1194 (quoting *Freund* v. *McDonough*, 114 F.4th 1371, 1378 (Fed. Cir. 2024)). Ascertainability requires the movant seeking certification to "show that class members can ultimately be identified (*i.e.*, they are ascertain-*able* but not necessarily ascertained at the time of class certification) using reasonable—but not perfect—accuracy." *Id.* at 1196 (internal quotation marks omitted). To make sure class members are ascertainable, "the class definition must (1) be defined clearly and cannot be defined too vaguely, and (2) be defined objectively and cannot be based on subjective criteria, such as by a person's state of mind." *Id.*

*Cline* also addressed administrative feasibility. We held administrative feasibility is not "a required element" of ascertainability. *Id.* Instead,

administrative feasibility is one of many considerations attendant to manageability under Rule 23(b)(3)(D). *See id.*; *see also Shook* v. *El Paso County*, 386 F.3d 963, 972 (10th Cir. 2004) (observing "the lack of identifiability is *a factor* that may defeat Rule 23(b)(3) class certification" (emphasis added)); *Rensel* v. *Centra Tech, Inc.*, 2 F.4th 1359, 1369 (11th Cir. 2021) ("Administrative feasibility may be relevant to the manageability criterion of Rule 23(b)(3)(D)[.]" (internal quotation marks omitted)). We thus consider issues of administrative feasibility under Rule 23(b)(3)(D), as part of the weighing required by the rigorous two-step predominance analysis.

## B

The district court determined that identifying who purchased NAS cigarettes would create "substantial administrative difficulties at the claims administration stage." RIV.258. These difficulties were due in part to Plaintiffs' trial plan, which the court found wanting:

> The Plaintiffs, other than asserting that proposed class members will be able to demonstrate their class membership by use of sworn affidavits, claim forms, receipts, or purchase records, have not demonstrated that any class members have retained receipts or purchase records. Similarly, they have not identified a method or model which would allow the Defendants or the Court to screen affidavits for authenticity, and have not suggested that such a method or model even exists. Additionally, the Court concludes that it is unlikely that the proposed class members will have retained purchase records[.]

27

RIV.257–58. Despite these concerns, the district court decided administrative feasibility would not defeat class certification. Instead, the court "continue[d] its predominance analysis [for both claims and liability theories] to identify whether individualized questions predominate over common inquiries." RIV.258.

The district court took this approach to administrative feasibility before we issued our decision in *Cline*. But the district court correctly predicted we would adopt the view that "administrative feasibility is a part of the [R]ule 23(b)(3)(A)-(D) considerations[.]" RIV.252. Under this view—which, the district court pointed out, has been adopted by a majority of circuits—a court must "weigh administrative feasibility in its analysis of [R]ule 23(b)(3)'s predominance and superiority [inquiries], but not view administrative feasibility as a prerequisite the failure of which dooms a proposed class." RIV.252–53. In other words, the district court held administrative feasibility is not a separate and distinct threshold requirement for certification. Rather, a court must "balance its manageability finding against other considerations." RIV.254 n.65 (quoting *Cherry* v. *Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021)). And in the district court's view, "manageability problems will 'rarely, if ever, be in [themselves] sufficient to prevent certification.'" RIV.254 n.65 (alteration in original) (quoting *Cherry*, 986 F.3d at 1304).

Applying these principles, the district court denied certification for all NAS classes, identifying issues that would require individual inquiries—the disclaimer; the damages model; and for the unjust-enrichment claims, the "unjust" element. As to the menthol classes, the district court's "only concern" was with "administrative feasibility." RV.24. On balance, the court found the menthol classes satisfied Rule 23(b)(3)'s predominance requirement. The court granted certification for the menthol classes as to their consumer-protection claims and for the California menthol class as to its unjust-enrichment claim.

## C

On appeal, Santa Fe maintains that the administrative feasibility problems identified by the district court should have defeated class certification for *all* classes under Rule 23(b)(3). In Santa Fe's view, Plaintiffs cannot maintain a class action because they cannot even identify the members of their classes. In support, Santa Fe presses several arguments, which we now consider and reject.

## 1

Santa Fe first argues the district court made a legal error by holding problems with identifying class members can "*never* alone 'doom the proposed class.'" Resp. Br. at 57 (quoting RIV.258). That categorical rule "contravenes" the "plain text" of Rule 23(b)(3), Santa Fe insists, "by exempting from the predominance inquiry one type of question affecting only individual

members—whether claimants in fact purchased the product in a consumer class action[.]" Resp. Br. at 57.

This court reviews *de novo* whether the district court applied the correct legal standard in its certification analysis. *See Sherman*, 84 F.4th at 1192. Santa Fe attempts to elevate administrative feasibility into a threshold requirement under Rule 23(b)(3), but we readily reject that argument. Administrative feasibility is not mentioned in Rule 23. And *Cline* settles that administrative feasibility "should not operate as a trump card that outweighs all other factors under Rule 23." 159 F.4th at 1196 (quoting *Freund*, 114 F.4th at 1378); *see Rider* v. *OXY USA, Inc.*, 175 F.4th 1214, 1232 (10th Cir. 2026) (applying *Cline* in the predominance inquiry and concluding difficulties identifying "who can recover and precisely how much" did not defeat predominance). The district court correctly understood administrative feasibility is not a threshold barrier for certification, but one factor to be "balance[d] . . . against other considerations" under Rule 23(b)(3). RIV.254 n.65 (quoting *Cherry*, 986 F.3d at 1304).

To the extent Santa Fe suggests the district court erroneously created a categorical rule that administrative infeasibility on its own can "never" defeat certification, Resp. Br. at 57, Santa Fe misreads the record and misunderstands the law. The district court acknowledged "manageability problems will *'rarely*, if ever, be in [themselves] sufficient to prevent

certification.'" RIV.254 n.65 (emphasis added) (quoting *Cherry*, 986 F.3d at 1304 (alteration in original)). "Rarely" is not "never." It is neither incorrect nor surprising to observe that any single factor in a balancing test will "rarely" control the outcome. *Cf. Carpenter* v. *Boeing Co.,* 456 F.3d 1183, 1191 (10th Cir. 2006) (discussing a district court's discretion over "the multifactor analysis that courts must apply in deciding the propriety of class certification").

In any event, nothing in Rule 23 suggests one factor, standing alone, is inherently dispositive. The rule mandates a court determine whether common or individual proof can be adduced for "any questions" of law or fact. *See* FED. R. CIV. P. 23(b)(3). "The rule does not indicate the weight to be given to each factor or require that the action be dismissed if particular conclusions are reached as to any or all of them. Clearly, no single element is determinative." 7AA C. WRIGHT, A. MILLER, M. KANE & R. KLONOFF, FEDERAL PRACTICE & PROCEDURE § 1780 (3d ed. 2025). We reject Santa Fe's atextual argument to the contrary.

**2**

Santa Fe next argues the district court did not put enough weight on the administrative feasibility problems it identified. As to this argument, our review is "highly deferential." *Naylor Farms*, 923 F.3d at 790. "[D]istrict courts possess significant latitude in deciding whether or not to certify a class[,]" and "[a]s long as the district court applies the proper Rule 23 standard, we will

defer to its class certification ruling provided that decision falls within the bounds of rationally available choices given the facts and law involved in the matter at hand." *Vallario*, 554 F.3d at 1264.

We see no abuse of discretion. Santa Fe contends the district court "never analyzed the effect of these extensive individual determinations on the predominance inquiry," Resp. Br. at 56, but the record shows otherwise. The district court methodically "*characterize*[d] the issues in the case as common or not, and then *weigh*[ed] which issues predominate[d,]" as required by our law. *Naylor Farms*, 923 F.3d at 789 (internal quotation marks omitted); *see, e.g.*, RV.81, 94, 104, 112. Although the court found concerns about class-member identification "tilt against a conclusion that common questions predominate[,]" RV.19, the court determined this alone did not defeat class certification, RIV.258. As to the menthol theory, the district court found it adequately fit with the damages model, held the model sufficed to show common proof of causation and damages, and ultimately found multiple common issues predominate in the menthol class. *See Brayman*, 83 F.4th at 838 ("So long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)[.]" (quoting *Naylor Farms*, 923 F.3d at 789)). Because the court's only concern counseling against predominance was administrative feasibility, the court reasonably could have concluded the menthol class satisfies Rule 23(b)(3)'s predominance requirement. *See* RIV.234; RV.24. We can hardly

32

find error where the court gave such "careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods*, 577 U.S. at 453.[9]

Our holding reflects the "highly deferential" review of decisions over class certification. *Naylor Farms*, 923 F.3d at 790. For example, in *Davoll* v. *Webb*, we affirmed a district court's denial of class certification, holding "it was within the district court's discretion to decide that determining class membership under the proposed definition would be administratively infeasible." 194 F.3d 1116, 1146 (10th Cir. 1999). But we also observed our "deferential" review meant "the district court *could have certified* the class in its discretion, or could have modified the proposed definition so that it was sufficiently definite." *Id.* at 1146 n.20 (emphasis added). Similarly, in *Sandusky Wellness Ctr., LLC* v. *ASD Specialty Healthcare, Inc.*, which Santa Fe has relied on, the Sixth Circuit affirmed a district court's denial of class certification in part due to difficulties identifying class members. 863 F.3d 460,

---

[9] At oral argument, Santa Fe pointed us to the Second Circuit's decision in *In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017) as an exemplar of what it claims to be a proper predominance analysis. We fail to see how the case helps Santa Fe. The Second Circuit reversed class certification because the district court failed to examine whether determinations surrounding the purchase of securities would create a predominance issue. *See id.* at 271, 274–75. By comparison, the district court here conducted a thorough inquiry, carefully fulfilling its duties under Rule 23 to characterize the issues as common or individual and then to weigh those issues. *Petrobras*, in our view, supports the district court's approach. *See id.* at 268 ("[P]redominance is a comparative standard[.]").

466 (6th Cir. 2017). But, as the court of appeals explained, the "procedural posture is important given the 'substantial discretion' we afford district courts in choosing whether to certify a class and our subsequent 'very limited' review of that decision." *Id.* at 473 (first quoting *Rikos* v. *Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015); and then quoting *Young* v. *Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012)).

The lesson is both outcomes—certification or denial—might fall within the range of a district court's permissible options. In certain circumstances, individualized inquiries as to administrative feasibility *will* overwhelm common questions. In both *Davoll* and *Sandusky*, the district courts reasonably found the administrative issues insurmountable. Here, the district court in its discretion found the opposite: The administrative difficulties did not defeat certification in light of the strong showing of common questions. These decisions "fall[] within the bounds of rationally available choices." *Vallario*, 554 F.3d at 1264.

**3**

Santa Fe also insists the district court should have prohibited Plaintiffs from using affidavits to identify class members. The district court failed to recognize that using affidavits alone—without purchase records—would result in "thousands of mini-trials" to identify each purchaser, Santa Fe insists, and "would 'overwhelm those questions common to the class' and thereby 'destroy[]'

34

predominance." Resp. Br. at 59 (alteration in original) (quoting *Roderick*, 725 F.3d at 1220). Here, too, we review the district court's decision for an abuse of discretion. *See Sandusky Wellness Ctr.*, 863 F.3d at 473 (discussing a district court's discretion to "rely on affidavits to identify class members").

We appreciate Santa Fe's concern, but we are not persuaded the district court erred. "[A] district judge has discretion to allow class members to identify themselves with their own testimony and to establish mechanisms to test those affidavits as needed." *Mullins* v. *Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015); *see Gascho* v. *Global Fitness Holdings, LLC*, 822 F.3d 269, 287 (6th Cir. 2016) (stating "a sworn statement attesting to the purchase may often be sufficient documentation" in "consumer class actions"). After all, "if such consumer testimony would be sufficient to establish injury in an individual suit, it follows that similar testimony in the form of an affidavit or declaration would be sufficient in a class action." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 20 (1st Cir. 2015).[10] We agree with the First Circuit that the "'[r]igorous analysis' of Rule 23 requirements does not require raising the bar for plaintiffs *higher* than they would have to meet in individual suits." *Id.* (quoting *Gen. Tel. Co. of Sw.* v. *Falcon*, 457 U.S. 147, 161 (1982)). Of course, to the extent

---

[10] Only conviction for treason requires two witnesses, U.S. CONST. art. III, § 3, cl. 1, and we agree with the Seventh Circuit "[t]here is no good reason to extend that rule to consumer class actions." *Mullins*, 795 F.3d at 669.

affidavits raise concerns about veracity, "defendants surely will be entitled to a fair opportunity to challenge self-serving affidavits from plaintiffs." *Mullins*, 795 F.3d at 669; *see Briseno* v. *ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) ("Defendants will have similar opportunities to individually challenge the claims of absent class members if and when they file claims for damages.").

We also agree with our sister circuits that "refusing to certify on manageability grounds alone should be the last resort." *Mullins*, 795 F.3d at 664; *see Klay* v. *Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004) (stating in its predominance analysis that although "the need for individualized assessments of damages is enough to preclude 23(b)(3) certification . . . we emphasize that such cases rarely, if ever, come along"), *abrogated in part on other grounds by Bridge* v. *Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Briseno*, 844 F.3d at 1128 (observing the "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns" (quoting *Mullins*, 795 F.3d at 663)); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 140 (2d Cir. 2001) ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." (internal quotation marks omitted)); *Byrd* v. *Aaron's Inc.*, 784 F.3d 154, 175 (3d Cir. 2015) (Rendell, J., concurring) ("Imposing a proof-of-purchase requirement

36

does nothing to ensure the manageability of a class or the 'efficiencies' of the class action mechanism; rather, it obstructs certification by assuming that hypothetical roadblocks will exist at the claims administration stage of the proceedings."). Any number of well-established mechanisms—including "claim administrators," "audit[s]," and "sampling for fraud detection"—can address concerns about administrative feasibility. *See Mullins*, 795 F.3d at 667; *see* Brief for Gerard Hanshe as Amicus Curiae Supporting Plaintiffs-Appellants, at 9 (discussing how claims-administration programs can be structured "to account for the absence of receipt or proof of purchase and to maximize the chances of paying claims only to bona fide class members"). If the manageability problem is ultimately unsolvable, "the district court may revisit its decision and choose to decertify the class should [the defendant] eventually produce individualized rebuttal evidence." *Menocal*, 882 F.3d at 921 (internal quotation marks omitted).

In sum, the district court's discretionary determination that manageability issues did not defeat predominance at class certification is supported by the record and owed deference on appeal. Because we reject Santa Fe's contrary argument, we proceed to consider the individual issues raised by the appeal and cross-appeal.

37

IV

We now consider Plaintiffs' challenge to the district court's refusal to certify the NAS classes. Recall, the NAS classes were premised on the "safer-cigarette theory," alleging Santa Fe's marketing falsely implied NAS cigarettes are less harmful than other brands. Plaintiffs' appellate challenges center on predominance—specifically the first step, where the court characterizes "every issue related to the claim" as allowing for either common or individual proof. *Brayman*, 83 F.4th at 838. We address Plaintiffs' arguments in turn.

A

Plaintiffs argue the district court erred by rejecting their proposed damages model as common proof of damages and causation for their consumer-protection claims under the safer-cigarette theory. Before resolving the argument, we must first describe the Supreme Court's decision in *Comcast* v. *Behrend*, 569 U.S. 27 (2013), which is essential to understanding the error alleged. We then discuss Plaintiffs' proposed damages model and the reasons the district court rejected it. Finally, we analyze the district court's ruling and explain how it misread *Comcast*.

1

In *Comcast* v. *Behrend*, the Supreme Court considered whether plaintiffs' damages model in an antitrust class action was sufficiently

38

"consistent with [plaintiffs'] liability case" to satisfy Rule 23. 569 U.S. at 35. The proposed class had initially advanced "four theories of antitrust impact": "decreased penetration by satellite providers, overbuilder deterrence, lack of benchmark competition, and increased bargaining power." *Id.* at 37. The plaintiffs insisted damages "could be calculated on a classwide basis" using their proposed damages model. *Id.* at 31–32. That model constructed a hypothetical market that would have existed if the defendant had not engaged in the four types of anticompetitive conduct alleged. The model, in other words, "calculated damages resulting from the alleged anticompetitive conduct as a whole and did not attribute damages to any one particular theory of anticompetitive impact." *Id.* at 36–37 (internal quotation marks omitted). Before trial, the district court rejected three of the four antitrust theories as incapable of classwide proof. Yet plaintiffs did not update their model, which continued to measure aggregate damages based in part on three rejected theories irrelevant to the lone theory approved for class action. That meant plaintiffs' model calculated damages for injuries not resulting from the conduct alleged to be unlawful.

Under these circumstances, the Supreme Court concluded the model fell "far short of establishing that damages [were] capable of measurement on a classwide basis." *Id.* at 34. The Court observed the damages model "might have produced commonality of damages, if all four of those alleged distortions

39

remained in the case." *Id.* at 37. But untangling which theory applied to which plaintiff required individual inquiries that would "inevitably overwhelm questions common to the class." *Id.* at 34. "The permutations involving four theories of liability and 2 million subscribers located in 16 counties," the Court lamented, "are nearly endless." *Id.* at 38. Accordingly, the Court rejected the proposed model as common proof of damages.

2

We now describe the proceedings at the district court and the arguments about *Comcast*.

In their motion for class certification, Plaintiffs contended they satisfied the predominance requirement of Rule 23(b)(3) because they had demonstrated a methodology common to the class for assessing causation and damages. In support, Plaintiffs submitted an expert report and declaration from Dr. Dubé proposing a conjoint-analysis damages model.

To calculate the increase in price associated with the labels, Dr. Dubé's model relied on consumer surveys to measure the "Price Premium associated with the [terms] on the labels" of the NAS cigarettes—specifically, the premium associated with "Natural" and "100% Additive-Free." RII.184, 192–93, 195–96. The surveys presented consumers with several different "competing brands" at varying price points using different marketing

40

descriptors.[11] RII.194–95. The price premium calculated by Dr. Dubé's model, Plaintiffs asserted, would serve as classwide proof of the actual damage suffered by purchasers and the causal relationship between the misrepresentation and the injury.[12]

Santa Fe opposed certification, insisting individualized inquiries into damages would overwhelm common questions. At core, Santa Fe argued the safer-cigarette theory was, as its moniker suggested, about safety. But Dr. Dubé's model measured the total price premium associated with *all interpretations* of "Natural" and "100% Additive-Free," without isolating the "value consumers placed on the alleged belief that NAS cigarettes are *safer*."[13]

---

[11] For example, a consumer might be presented with a choice between Camel Blue cigarettes labeled "Natural" for $7.00, a pack of NAS Blues labeled "100% Additive-Free" for $8.00, and a pack of Marlboro Regulars for $6.50. From there, Dr. Dubé would analyze the preferences of the consumers "to implement a market-place simulation to measure the price premium" associated with each allegedly misleading term. RII.184.

[12] "Damages" can refer either to an element of a claim, *e.g.*, *Renfro* v. *Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1301 (10th Cir. 2022), or a remedy, *see Damages*, BLACK'S LAW DICTIONARY (12th ed. 2024). The focus here is on damages as an element of a claim. To that end, we consider whether Plaintiffs' model adequately described the theory of liability—what the district court describes as the model's "fit." RIV.287.

[13] There is no dispute Dr. Dubé's proposed model does not attempt to disaggregate the various meanings of terms like "Natural." Dr. Dubé admitted as much in his deposition. Supp.RI.157 ("I have not made any assumptions about what people specifically believe when they read these descriptors."). The question before us is whether the model's failure to disaggregate various

Cert. Opp. at 75 (emphasis added). In Santa Fe's view, a consumer might value the cigarettes being "Natural" for reasons unrelated to health, such as "quality, taste, or eco-conscious farming practices[.]" Cert. Opp. at 75. These "other, perfectly permissible" interpretations were actually different theories of liability, in Santa Fe's view. Cert. Opp. at 75. That created a problem because *Comcast* requires a "model purporting to serve as evidence of [classwide] damages" to "measure *only* those damages attributable to [that] theory[.]" Cert. Opp. at 72 (quoting *Comcast*, 569 U.S. at 35).

The district court agreed with Santa Fe, endorsing its reading of *Comcast*. A damages model, the district court explained, must be "tailored" to the Plaintiffs' theories of liability. RV.50. And "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*." RIV.185 n.42 (quoting *Butler*, 727 F.3d at 799). The district court understood Plaintiffs' "legal theory of the harmful event," RIV.185 n.42 (quoting *Butler*, 727 F.3d at 799), as Santa Fe's use of "misleading" cigarette labels that suggested NAS cigarettes "are safer than other cigarettes when they are not," RIV.287. As the district court understood it, to satisfy *Comcast*, the model needed to "ascertain the price premium associated with the belief that the challenged labels imply *health* benefits."

---

meanings of label terms necessarily means the model cannot serve as common proof of causation and damages in this case.

RV.121 (emphasis added). But Plaintiffs' model did not isolate the value of health benefits from other possible interpretations of the descriptors "Natural" and "Organic." *See* RIV.287. If a consumer construes "Natural" as meaning "ecologically friendly," the district court reasoned, then that consumer was not "injured in the same way as [a] consumer[] who believed the cigarettes were safer." RIV.287–88. The model's failure to differentiate between meanings of the package descriptors meant the model was not "an adequate fit with the Plaintiffs' Safer-Cigarette liability theory[.]" RIV.287. Accordingly, the court ruled Dr. Dubé's model did not satisfy *Comcast* and could not serve as common proof of the damages element, weighing against a finding of predominance for the NAS classes.

The district court relied on the same reasoning to reject Dr. Dubé's model as common proof for the causation element. Recall, Plaintiffs argued the damages model also served as common proof of the "causal relationship between the misrepresentation and the injury to the plaintiff." *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*, No. 1:16-MD-02695-JB-LF (D.N.M. Oct. 8, 2020), Dkt. No. 331, at 22 (Reply Mot. Cert.). The district court agreed that, in theory, the payment of a price premium could establish classwide proof of causation for Plaintiffs' claims. The court already determined the model failed *Comcast*, so it concluded "the Plaintiffs have not demonstrated that they can prove class-wide causation based on their price-

premium theory." RV.121. "Accordingly," the court held, Plaintiffs' claims are "subject to individualized inquiries which tilt against a determination of predominance." RV.121.

3

Plaintiffs argue the district court abused its discretion in rejecting their proposed damages model as common proof of damages and causation for their safer-cigarette theory. We agree.

Plaintiffs' damages model tracks the safer-cigarette theory: Santa Fe's liability flows from its misleading statements on cigarette packaging, and the loss calculated by the model flows from the price premium associated with those statements. *See Comcast*, 569 U.S. at 35; *Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015) (analyzing the fit between damages model and liability case). Plaintiffs' methodology thus translates the "harmful event" (*i.e.*, Santa Fe's unlawful use of misleading terms) into the "economic impact of that event" (*i.e.*, the price premium resulting from the misleading terms). *Comcast*, 569 U.S. at 38 (emphasis omitted).

As we have explained, "predominance is often satisfied when a defendant has implemented a class-wide scheme, policy, or practice." *Rider*, 175 F.4th at 1231 (quoting *Cline*, 159 F.4th at 1187–88). We see "no possibility in this case that damages could be attributed to acts of the defendants that are not

challenged on a class-wide basis[.]"[14] *Butler*, 727 F.3d at 800. Plaintiffs' damages model corresponds to just one theory of liability—the use of misleading labels on cigarette packaging that allowed Santa Fe to charge a price premium. We are therefore satisfied there is an adequate "fit" between the plaintiffs' theory of liability and their theory of classwide damages. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1259 (10th Cir. 2014); *see In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013) (explaining that, under *Comcast*, the proposed damages methodology must be "consistent with the classwide theory of liability and capable of measurement on a classwide basis").

Resisting this conclusion, Santa Fe insists the damages model is "overinclusive" and thus violates *Comcast*. Cross-Appellant Reply at 26. We do not agree. In *Comcast*, the plaintiffs' model measured damages "caused by factors unrelated to an accepted theory of antitrust harm" and irrelevant to the lone theory approved for class action. *Id.* at 38. No surprise, the Court rejected that model because it did "not even attempt" to "measure only those damages attributable to" the unlawful conduct at issue. *Id.* at 35. As this court has explained, such a model is effectively "useless." *In re Urethane Antitrust Litig.*, 768 F.3d at 1258. No such mismatch exists here, as we have explained.

---

[14] Notably, the dissent does not dispute that Plaintiffs challenge Santa Fe's conduct exclusively on a class-wide basis.

We acknowledge the district court's concern: Other, non-safety-based interpretations of the label "may allow for an inflated damage amount[.]" RIV.292. But that possibility does not defeat predominance. At this stage, the predominance inquiry asks whether "damages are susceptible of measurement across the entire class," not whether the measure is absolutely precise. *Comcast*, 569 U.S. at 35 (stating "[c]alculations need not be exact" at certification). As Plaintiffs acknowledge, if a factfinder concludes a reasonable consumer would not think the labels implied healthier cigarettes, "that will not mean individualized damages calculations are necessary. It will just mean the plaintiffs lose." Op. Br. at 47 (internal citation omitted). To the extent Dr. Dubé's model does not accurately capture how the reasonable consumer would view the NAS cigarette labels, the model does so "in unison" for all class members, *Amgen*, 568 U.S. at 460, which "is enough to satisfy the predominance prong of Rule 23," *CGC Holding*, 773 F.3d at 1093.

The only decision to have addressed *Comcast* in this context rejected the argument Santa Fe presses here. In *Kurtz* v. *Costco Wholesale Corp.*, plaintiffs alleged defendants falsely represented their cleaning wipes were "flushable" and that purchasers of the wipes "paid a price premium attributable to that [flushable] misrepresentation." 818 F. App'x 57, 59 (2d Cir. 2020) (unpublished). Defendants appealed class certification, arguing the model violated *Comcast*. *See id.* at 62. The Second Circuit dismissed defendants'

46

challenge, holding the model satisfied *Comcast* because "it purports to measure the price premium attributable to the 'flushable' label." *Id.* "The fact that [the] model may fail to account for other possible sources of a price premium," the court explained, "simply means that his model may not ultimately prove Plaintiff's claim. But it still serves as common evidence of plaintiffs' theory of injury and does not run afoul of *Comcast*." *Id.* The same is true here.[15]

At bottom, Santa Fe's problem with the model is that it fails to measure *Defendants'* theory—that consumers paid premium price for reasons unrelated

---

[15] Santa Fe also relies on *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014), but we find that case unhelpful. There, plaintiffs sought to certify a class based on allegations that cooking oil was deceptively and misleadingly marketed as "100% Natural" when the oil was actually derived from "genetically modified organisms." *See id.* at 547. Plaintiffs offered a damages model that calculated the price premium based on "all of the meanings consumers ascribe to" the "100% Natural" label. *Id.* at 579. Relying on *Comcast*, the court rejected the model, holding it failed "to isolate the price premium associated with misleading consumers" about whether the oil "contained no genetically modified organisms or GMO ingredients." *Id.*

The reasoning in *ConAgra* is unpersuasive. As district courts in the Ninth Circuit have recognized, *ConAgra* "seems to take *Comcast* at least one step too far in requiring Plaintiffs to prove liability twice over." *Gunaratna* v. *Dennis Gross Cosmetology LLC*, No. 20-CV-2311, 2023 WL 5505052, at *20 (C.D. Cal. Apr. 4, 2023); *see McMorrow* v. *Mondelēz Int'l, Inc.*, No. 17-CV-2327, 2021 WL 859137, at *15 (S.D. Cal. Mar. 8, 2021) ("The [p]laintiffs' damages model need not isolate and test the various possible interpretations of the term 'nutritious.'"); *Krommenhock* v. *Post Foods, LLC*, 334 F.R.D. 552, 576 (N.D. Cal. 2020) (concluding the defendant's "many arguments regarding [the expert's] methodology" such as the "fail[ure] to account for or otherwise test unchallenged or truthful statements" "go to weight and not admissibility"); *cf. Black*, 69 F.4th at 1178 (explaining a defense "common to the claims made by all class members" does not destroy predominance (quoting *Tyson Foods, Inc.*, 577 U.S. at 457)).

to health. But what matters at the class-certification stage is whether the model captures *Plaintiffs'* theory. *See Comcast*, 569 U.S. at 36. Whether a reasonable consumer would have interpreted the labels to mean something other than health benefits is a factual dispute about how and whether the label was misleading—*i.e.*, the first element of Plaintiffs' statutory claims, which require a deceptive act or unfair practice. *See Hadley* v. *Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1117 (N.D. Cal. 2018) (Koh, J.) (explaining defendant's "argument about consumers having a variety of reasons for purchasing" the product "is a merits dispute . . . that can be resolved classwide" (internal quotation marks and brackets omitted)). This merits issue is "a question for a different day." *Ludlow*, 800 F.3d at 686 (internal quotation marks omitted); *see id.* at 688 ("[Q]uestions 'common to the class' need not be proved at the class certification stage, so long as they are capable of common resolution." (quoting *Amgen*, 568 U.S. at 470)).

**4**

The dissent concludes Plaintiffs' damages model "does not pass muster" under *Comcast*. Dissent at 1. In the dissent's view, every possible interpretation of the label terms "Natural" and "Additive-Free" represents a

48

different theory of liability. The dissent fundamentally misunderstands Plaintiffs' case against Santa Fe.

Unlike *Comcast*, which involved multiple theories of liability, this case involves a single theory of liability.[16] "Based on Defendants' misleading and deceptive representations," Plaintiffs allege in their complaint, "Defendants were able to, and did, charge a premium price for the Natural American Spirit cigarettes over the cost of competitive products not bearing a 'Natural' label." RI.178. As Plaintiffs reiterated when moving for class certification, "consumers are willing to, and do, pay more for cigarettes that may be less harmful," and so "NAS Cigarettes sell at a substantially higher price than they would but for Defendants' misleading use of the terms 'natural' and 'additive-free.'" Class Cert. Mot. at 5. Here, where "there is only one theory" of injury based on a "single scheme" of unlawful conduct and that lone theory of injury "corresponds to a theory of liability," the damages model poses no *Comcast*

---

[16] In *Comcast*, plaintiffs conceded class certification required a method to prove classwide damages through a common methodology. *See* 569 U.S. at 42 (Ginsburg & Breyer, JJ., dissenting); *Cline*, 159 F.4th at 1191 ("[I]ndividualized damages in class actions typically do not defeat predominance under Rule 23(b)(3)."). This court has suggested "*Comcast* does not control" where, as here, plaintiffs do not make that same concession. *In re Urethane Antitrust Litig.*, 768 F.3d at 1258. And some courts have read *Comcast* as not "creating a broad-based rule applicable to Rule 23(b)(3)." *Neale* v. *Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015). We do not purport to settle today when *Comcast* applies. The district court and parties assumed *Comcast* applies to this matter, so we do the same and resolve this case based on that shared understanding.

problem. *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 271 n.11 (3d Cir. 2020); *see Butler*, 727 F.3d at 801 (finding no *Comcast* problem where "[t]here is a single, central, common issue of liability").

The dissent claims "consumers may have many takeaways from the word 'natural,' but Plaintiffs' theory of liability objects to none of those beyond the implication that the cigarettes are safer and healthier." Dissent at 2. That is not the right way to think about this case. The possible meanings of "Natural" are not alternative theories of liability, like the three rejected theories in *Comcast*. Instead, interpretations of the label unrelated to health are factual rebuttals to the deception element of Plaintiffs' claims under their single theory.[17] Imagine that at trial a jury concludes a reasonable consumer would have associated "Natural" not with health benefits but with other interpretations. In that scenario, Santa Fe will not have defeated some different theory of liability; rather, Santa Fe will have defeated *Plaintiffs' own*

---

[17] Notably, the dissent says a damages model "need not isolate and test each possible interpretation of the allegedly deceptive terms" where "the theory of liability was that the product did not satisfy the terms' meanings." Dissent at 4 (emphasis omitted). We agree. And that is precisely what Plaintiffs' theory alleges: The terms "Natural" and "Additive-Free" are misleading because these terms convey health benefits to a reasonable consumer, when in fact the cigarettes are not healthier than competitor cigarettes.

theory of liability. No "windfall" will result, Dissent at 8, because Plaintiffs will lose. That fundamentally distinguishes this case from *Comcast*.

Underlying the dissent's *Comcast* concern is its assumption that Plaintiffs are wrong about how the reasonable consumer will—or could—interpret the challenged terms.[18] But that approach misunderstands the relevant inquiry at the certification stage, where courts must focus on how—not whether—plaintiffs will prove their claims. *See Amgen*, 568 U.S. at 466; *Ludlow*, 800 F.3d at 686. Whether a reasonable consumer would conclude the label terms carry non-health meanings is a fact that has not yet been adjudicated. For purposes of predominance at class certification, what matters is whether Plaintiffs have common proof to support their claims. *CGC Holding*, 773 F.3d at 1087. They do.

---

[18] As an example of a damages model that would properly "align" with a theory of liability, the dissent describes a situation in which food is labeled as "nutritious" and a plaintiff alleges the food is in fact "not nutritious." Dissent at 4–5. But this example does not solve the dissent's problem with Plaintiffs' model. After all, even the "nutritious" label in the hypothetical is susceptible to multiple meanings, including that the food is organic, or higher quality, or more luxurious, or more eco-friendly. *Cf. K Mart Corp.* v. *Cartier, Inc.*, 486 U.S. 281, 319 (1988) (Scalia, J., concurring in part and dissenting in part) ("Words, like syllables, acquire meaning not in isolation but within their context."). Even if Plaintiffs here had alleged "Natural" is misleading because a reasonable consumer would erroneously view the term as suggesting naturalness—*i.e.*, what the dissent suggests would be permissible—Plaintiffs would *still* be relying on common evidence. That is what matters for predominance at class certification. *See Amgen*, 568 U.S. at 466.

* * *

We hold the district court made an erroneous conclusion of law about the application of *Comcast* and therefore abused its discretion. Because the district court also rejected the damages model as classwide proof of the causation element for the state consumer-protection claims, we reverse those determinations to the extent they were based on the court's misinterpretation of *Comcast*.[19]

**B**

Plaintiffs' next challenge implicates the deception element of their consumer-protection claims brought under the safer-cigarette theory. The district court concluded "reasonable consumers who saw the disclaimer" on NAS cigarette packaging "would understand that a lack of additives does not make Natural American cigarettes healthier[.]" RV.18. In Plaintiffs' view, the district court "put the cart before the horse"—impermissibly resolving a merits

---

[19] After oral argument, the parties submitted letters of supplemental authority under Rule 28(j) about *Noohi* v. *Johnson & Johnson Consumer Inc.*, 146 F.4th 854 (9th Cir. 2025). Each party claims *Noohi* supports its respective position, but we do not find *Noohi* instructive. The expert in *Noohi* measured two types of damages: (1) damages related to a price premium stemming from an alleged misrepresentation, and (2) so-called "softer" damages "such as changes to overall consumer satisfaction, brand loyalty, [and] willingness to recommend [the Product]." *Id.* at 865–66 (second alteration in original). The Ninth Circuit concluded the model survived a *Comcast* challenge because it adequately separated the two types of damages. *See id.* at 866. Here, as discussed, there is only a single theory of liability and damages.

question rather than evaluating whether Plaintiffs offered forth common proof of the disclaimer's ineffectiveness. Op. Br. at 31 (quoting *Amgen*, 568 U.S. at 460). We agree. As we will explain, the court impermissibly resolved a merits question at the certification stage.

1

Recall, to defeat Plaintiffs' consumer-protection claims, Santa Fe pointed to its packaging disclaimers, which read: "No additives in our tobacco does **NOT** mean a safer cigarette." RI.161. Santa Fe maintained those disclaimers "cure[d]" any consumer deception about the risks of smoking NAS cigarettes. Cert. Opp. at 85–86. Plaintiffs insisted otherwise. At the class-certification stage, they introduced evidence—in the form of expert testimony, consumer surveys, and peer-reviewed studies—that "the disclaimer did not change reasonable consumers' perceptions" about the safety of NAS cigarettes.[20] Cert. Mot. at 28 (heading format omitted). Plaintiffs argued this evidence "can be

---

[20] For example, Plaintiffs provided testimony from Dr. Jennifer Pearson, a researcher of U.S. federal tobacco regulation, that the disclaimer statement on the NAS pack does not correct consumer "misperceptions" about "the harmfulness of NAS Cigarettes." Cert. Mot. at 2. Plaintiffs also cited a 2015 study of NAS cigarettes from the Food and Drug Administration reaching the same conclusion. As summarized by Dr. Pearson, the "FDA concluded that the disclaimer had no effect on . . . consumer perceptions" that NAS cigarettes "were less risky, less harmful, and entailed lower exposure to harmful chemicals." RII.14.

applied across the classes as a whole," thereby satisfying Rule 23(b)(3)'s predominance standard. Cert. Mot. at 29.

The district court acknowledged Plaintiffs' evidence but did not pass merely on whether it serves as common proof under Rule 23. Reprising its conclusion from the order denying the motion to dismiss, the district court determined "reasonable consumers who saw the ['Additive-Free'] disclaimer would understand that a lack of additives does not make [NAS] cigarettes healthier[.]" RV.18. The district court then concluded the question of "whether an individual consumer saw [that] disclaimer before purchasing" NAS cigarettes was "individualized." RV.17, 19. In the court's view, the need for such individualized inquiries "tilt[s] against a conclusion that common questions predominate." RV.19.

**2**

At the certification stage, a district court "must consider, without passing judgment on whether plaintiffs will prevail on the merits, whether remedying the harm alleged can be done on a class-wide basis in conformity with Rule [23]." *Shook*, 543 F.3d at 613; *CGC Holding*, 773 F.3d at 1087 (explaining the predominance inquiry merely "ensure[s] that the requirements of Rule 23 are satisfied"). "In assessing [an] element's susceptibility to class-wide proof, [a court] take[s] no position on whether the class would ultimately succeed on such proof at trial." *Menocal*, 882 F.3d at 922.

54

Applying these principles here, we must conclude the district court mistakenly reached the merits of the disclaimer's effectiveness. Plaintiffs' theory of liability claims the labels on NAS cigarettes deceived reasonable consumers "notwithstanding the disclaimer." RI.168. Deception "is an essential element" of the class members' claims. *See Amgen*, 568 U.S. at 460. Thus, if the disclaimer *is* effective, the result is not individual inquiries, it is a win on the merits for Santa Fe. Put differently, Plaintiffs' "failure of proof on the issue . . . would end the case" for all class members. *Id.* at 461, 469. Because the class "will prevail or fail in unison," *id.* at 460, that alone "is enough to satisfy the predominance prong of Rule 23," *CGC Holding*, 773 F.3d at 1093. Instead of assessing whether "each class member could have relied on" the evidence of the disclaimer's ineffectiveness "to establish liability if he or she had brought an individual action[,]" *Tyson Foods*, 577 U.S. at 455, the district court ruled the disclaimer was effective at curing consumer deception. Such a merits determination was inappropriate at the class-certification stage.

Santa Fe's arguments to the contrary are unavailing. Santa Fe suggests the district court did not "definitively rule[] one way or the other on the effectiveness of the disclaimer." Resp. Br. at 37. But the court's categorical language belies such an assertion. The court held "reasonable consumers who saw the disclaimer *would understand* that a lack of additives does not make [NAS] cigarettes healthier[.]" RV.18 (emphasis added). The court made no

allowance for the possibility that the disclaimer might be ineffective. And the court never addressed common proof.

Santa Fe further defends the court's approach as a product of the "rigorous analysis" required by Rule 23. Resp. Br. at 38 (quoting *Wal-Mart*, 564 U.S. at 351). Santa Fe explains a district court's hard look "[f]requently . . . entail[s] some overlap with the merits of the plaintiffs' underlying claim." Resp. Br. at 38 (quoting *Wal-Mart*, 564 U.S. at 351). That is true—but only so far as Rule 23 allows. We do not expect district courts "to construct an impermeable wall that will prevent the merits from bleeding into the class certification decision to some degree." *Menocal*, 882 F.3d at 915 (quoting *CGC Holding*, 773 F.3d at 1087). But interrogating the merits at the certification stage is proper only as needed to determine which elements of a plaintiff's claim are "amenable to common proof." *Id.*

Of course, Plaintiffs' liability theory might be difficult to prove at trial. But that is irrelevant to class certification.[21] "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the

---

[21] Not every case involving a disclaimer will require proof of the disclaimer's ineffectiveness. Here, the proof required reflects the path chosen by Plaintiffs. Given their litigation strategy, Plaintiffs opted not to pursue other mechanisms like bifurcation or additional subclasses that might "remedy [] the obstacles preventing a finding of predominance." *Black*, 69 F.4th at 1188 (alteration in original) (internal quotation marks omitted).

'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'"

*Amgen*, 568 U.S. at 460 (alteration in original) (quoting FED. R. CIV. P. 23(b)(3)). "The chance, even the certainty, that a class will lose on the merits does not prevent its certification." *Howard* v. *Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 602 (7th Cir. 2021) (internal quotation marks omitted). The district court should have asked only whether common evidence *could* prove the disclaimer's ineffectiveness—not whether the evidence actually did so. On remand, the court must determine only whether the evidence presented by Plaintiffs can serve as common proof of their liability theory.

## C

Plaintiffs next advance a state-specific argument, contending the district court abused its discretion in denying certification of the Illinois classes bringing claims under the ICFA. We disagree. The district court did not abuse its discretion in holding ICFA's proximate-causation requirement demands individual inquiries that defeat predominance.

Our predominance inquiry once again begins with the elements of the underlying claims. *See Erica P. John Fund*, 563 U.S. at 809. An ICFA claim requires:

> (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception.

57

*De Bouse* v. *Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). The district court denied class certification for the ICFA claims because "the ICFA requires proof of deception for each plaintiff [which] means that each class member will have to demonstrate deception to substantiate his or her ICFA claim." RV.62.

The district court anchored its reasoning to *Oshana* v. *Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006). There, plaintiff brought an action alleging advertising deceived consumers into believing bottled Diet Coca-Cola was sweetened only with aspartame when in fact the fountain drink version was sweetened with aspartame and saccharin. The Seventh Circuit affirmed the denial of class certification. The court of appeals explained plaintiff's broad class definition might include "millions who were not deceived" if they "bought fountain Diet Coke *because* it contained saccharin" or if they "bought fountain Diet Coke *even though* it had saccharin." *Id.* at 514. Applying *Oshana*, the district court concluded the Illinois classes similarly "include[d] individuals whom the labels did not deceive, because they knew that the cigarettes were not safer or knew that menthol was an additive, or who did not purchase [NAS] cigarettes based on the challenged labels." RV.61.

Plaintiffs argue the district court misread Illinois law by requiring "actual deception." Op. Br. at 37. They point to *Connick* v. *Suzuki Motor Co.*, where the Illinois Supreme Court stated, "reliance is not an element of

58

statutory consumer fraud," and instead the statute requires "that the consumer fraud proximately caused plaintiff's injury." 675 N.E.2d 584, 593 (Ill. 1996). For its part, Santa Fe responds that *Connick* is not the appropriate authority because a subsequent Illinois Supreme Court decision, *Oliveira* v. *Amoco Oil Co.*, made clear that "a plaintiff must allege that he was, in some manner, deceived." Resp. Br. at 41 (quoting 776 N.E.2d 151, 164 (Ill. 2002)).

We agree with Santa Fe and the district court. True, before *Oliveira*, there might have been "ambiguity regarding the relationship between causation and reliance" for purposes of ICFA claims. *Oliveira*, 776 N.E.2d at 163. But the Illinois Supreme Court has since clarified "a plaintiff must prove that he or she was *actually deceived* by the misrepresentation in order to establish the element of proximate causation." *Avery* v. *State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 861 (Ill. 2005) (emphasis added); *see Shannon* v. *Boise Cascade Corp.*, 805 N.E.2d 213, 218 (Ill. 2004) (acknowledging "proof of actual deception is required" under the ICFA and stating "[i]t is enough that the statements by the defendant be made with the intention that it reach the plaintiff . . . and that he does rely upon it, to his damage" (alteration in original)). The Illinois Supreme Court recently stated as much—and unequivocally:

> In order to establish the element of proximate causation, a plaintiff must prove that it was *actually deceived* by the misrepresentation. If the plaintiff has neither seen nor heard a deceptive statement,

59

*it cannot have relied on the statement* and, consequently, cannot prove that the statement was the proximate cause of its injury.

*Tri-Plex Tech. Servs., Ltd.* v. *Jon-Don, LLC*, 241 N.E.3d 454, 462 (Ill. 2024) (emphasis added) (internal citations omitted).[22]

We therefore discern no error by the district court in its denial of certification to the Illinois classes' ICFA claims.

**D**

Plaintiffs next argue the district court erred in concluding individual questions predominated in their unjust-enrichment claims under Colorado, Florida, Illinois,[23] Massachusetts, Michigan, New Mexico, New York, North

---

[22] Plaintiffs also rely on two circuit court decisions, *Rikos* v. *Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) and *Vanzant* v. *Hill's Pet Nutrition, Inc.*, 934 F.3d 730 (7th Cir. 2019). These cases are unpersuasive. *First*, when applying a state's law, a "federal court must follow the most recent decisions of the state's highest court." *Wade* v. *EMCASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007); *Lawson* v. *Spirit AeroSystems, Inc.*, 135 F.4th 1186, 1203 n.3 (10th Cir. 2025) ("Decisions from . . . federal courts sitting in diversity . . . are of course—as a structural matter—incapable of definitively defining state law in their jurisdictions."). We find ample insight from the Illinois Supreme Court supporting the district court's sound conclusion. *Second*, the cases are distinguishable. *Rikos* relied on a district court decision citing cases predating *Oliveira*, *Shannon*, and *Avery*. *See* 799 F.3d at 514 (citing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 997–98 (C.D. Cal. 2015)). And *Vanzant* found significant that plaintiffs "saw the specific [deceptive representations] . . . when they made their purchases; that the [product] was something less than they expected; and that they suffered damages because they paid a higher price." 934 F.3d at 739.

[23] As Plaintiffs acknowledge, unjust-enrichment claims in Illinois "stand or fall with the related [ICFA] claim." *Cleary* v. *Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); Op. Br. at 39 n.12. Because we affirm the denial of the

Carolina, and Washington law. We agree only as to Washington, which we remand for reconsideration in light of our damages-model holding.

In general, "a party claiming unjust enrichment must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Menocal*, 882 F.3d at 923 (quoting *Lewis* v. *Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (*en banc*)). The district court resolved predominance under the third element—whether retaining the benefit was unjust—and stated,

> to determine whether the retention of the benefit resulting from a given purchase was unjust requires answering whether an individual consumer believed that a given label meant that Natural American cigarettes were safer or healthier or that menthol was not an additive, and whether that consumer purchased the cigarettes on that basis.

RV.52. "These individual inquiries," the district court concluded, "would overwhelm the common inquiries and thus tilt against a finding of predominance." RV.42. California was the exception. Under that state's law, unjust-enrichment claims are construed under a quasi-contract theory, making them suitable to common proof.

---

ICFA claim, we necessarily affirm the district court's denial of the Illinois unjust-enrichment claim as well.

Plaintiffs urge reversal, arguing all the unjust-enrichment classes should have been certified because "the law[s] of those [other] states [are] not materially different from California law." Op. Br. at 39. Plaintiffs cite case law from only three states—Colorado, New York, and Washington—yet ask us to reverse as to all nine. We see no support for such broad relief.

Plaintiffs first contend this court's decision in *Menocal* v. *GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018), compels reversal. There we held certification was appropriate under Colorado law when the "theory of unjustness" involves a "common course of conduct" by the defendant, rather than the "individualized circumstances" of class members. *Menocal*, 882 F.3d at 925. But *Menocal* specifically turned on "the facts and law involved in the matter at hand." 882 F.3d at 926 (internal quotation marks omitted). The defendants were accused of "paying extremely low wages to workers who were all detained, uniquely vulnerable as immigrants, and subject to [defendant]'s physical control." *Id.* at 925. The plaintiffs' "shared circumstances" served as classwide proof of unjustness because the very nature of the conduct in *Menocal* was alleged to be unjust. The district court correctly recognized *Menocal* "is not a blanket authorization to grant any unjust enrichment class certification motions." RV.41.

The unjust-enrichment claims here, as Santa Fe persuasively points out, "do not turn on 'common circumstances.'" Resp. Br. at 43 (citing RV.41–42).

Under the applicable law of the states at issue, the "unjust" element of the claims in part depends on "the reasons *why*" a consumer purchased NAS cigarettes. RV.77 (emphasis added).[24] Under these circumstances, the district court did not abuse its discretion in concluding the unjust-enrichment claims would require individualized inquiries.

Plaintiffs also cite to *Allegra* v. *Luxottica Retail North America*, 341 F.R.D. 373 (E.D.N.Y. 2022), arguing the *Allegra* court certified an unjust-enrichment class "under an 'overpayment' theory because the plaintiff's 'proof as to [the defendant's] deceptive practices and the resulting price premium will rise or fall together for all class members.'" Reply Br. at 21 (alteration in original) (quoting *Allegra*, 341 F.R.D. at 461). But that case does not help Plaintiffs. As Santa Fe observes, *Allegra* is inapposite because it "involved allegations of overpayment based on fraudulent omissions—meaning all consumers were denied the same information before purchase." Resp. Br. at 44 n.18; *see Jermyn* v. *Best Buy Stores, L.P.*, 256 F.R.D. 418, 435 (S.D.N.Y. 2009)

---

[24] According to Santa Fe, those states that Plaintiffs do not address have similar law suggesting individualized inquiries predominate in unjust-enrichment claims. Resp. Br. at 43 & n.17 (collecting cases). With the exception of Washington, we agree. *See* 1 MCLAUGHLIN ON CLASS ACTIONS § 5:60 (22nd ed.) ("The majority view is that unjust enrichment claims usually are not amenable to class treatment because the claim requires evaluation of the individual circumstances of each claimant to determine whether a benefit was conferred on defendant and whether the circumstances surrounding each transaction would make it inequitable for the Defendant to fail to return the benefit to each claimant.").

("[T]he allegation is one of omission, not an actual misrepresentation. In other words, the plaintiffs['] theory of injury was not based on individual issues[.]" (first alteration in original) (internal quotation marks and citation omitted)). Plaintiffs have failed to point us to a case under similar facts showing error by the court with respect to the New York classes.

Plaintiffs are more persuasive about the Washington class. The district court denied the Washington class based on its conclusion Plaintiffs' damages model failed to isolate consumers' belief that NAS cigarettes are healthier, requiring "individual inquiries into whether each consumer's purchase took place under unjust circumstances." RV.122. But, as we have explained, Plaintiffs' damages model provides common proof of both the causation and damages elements—*i.e.*, the misleading labels caused consumers to overpay, and the overpayment constitutes their damages. We must therefore reverse the district court's denial of certification to the Washington unjust-enrichment claims, insofar as that ruling was based on the court's erroneous conclusion about the damages model. We affirm the district court's conclusions as to the remaining states.

## E

Finally, we return to administrative feasibility—this time, to resolve Plaintiffs' final argument for reversal. As we explained, Rule 23(b)(3) lists four factors relevant to determining whether common questions "predominate over"

individual questions and whether the class mechanism is "superior to" other ways of resolving the controversy. FED. R. CIV. P. 23(b)(3)(A)–(D). The fourth factor, known as "manageability," broadly captures "the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3)(D); *see Eisen*, 417 U.S. at 164 (noting that Rule 23(b)(3)'s fourth factor is "[c]ommonly referred to as 'manageability'"). Administrative feasibility, or the difficulty of identifying class members, is an aspect of manageability under Rule 23(b)(3)(D). *See Cline*, 159 F.4th at 1196.

Invoking concerns about how the district court handled administrative feasibility, Plaintiffs urge reversal on two grounds. Neither is availing.

*First*, Plaintiffs argue "[t]he district court improperly considered questions of class-member identification in its predominance analysis." Op. Br. at 54 (heading format omitted). They insist that concerns about administrative feasibility "implicate only Rule 23(b)(3)'s superiority requirement and should not *also* be considered as part of Rule 23(b)(3)'s predominance requirement." Reply Br. at 43.

The text of Rule 23(b)(3) defeats this argument. *Cf. Wal-Mart*, 564 U.S. at 363 (rejecting an argument "that has no basis in the Rule's text"). "A class action may be maintained if . . . the court finds that the questions of law or fact . . . predominate . . . and that a class action is superior to other available methods[.]" FED. R. CIV. P. 23(b)(3). Rule 23 then states, "[t]he matters

pertinent to *these* findings include . . . likely difficulties in managing a class action." *Id.* (emphasis added). The phrase "these findings" plainly implicates predominance *and* superiority. The Supreme Court has confirmed as much: "Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance *and superiority* criteria." *Amchem*, 521 U.S. at 615 (emphasis added); *see* WRIGHT & MILLER, *supra* § 1780 (explaining Rule 23(b)(3)'s four factors guide "whether questions of law or fact common to the members of the class predominate *and whether a class action would be superior to other available adjudicatory methods*" (emphasis added)).

*Second*, Plaintiffs argue class-member identification falls outside the scope of the predominance inquiry because it does not bear on the elements of their claims. Recall, their statutory claims generally require proof of deception, causation, and actual damages. In Plaintiffs' view, predominance thus asks only whether common questions predominate as to deception, causation, and damages—not whether class members can be identified.

We also reject this argument. Rule 23 expressly says that predominance assesses the commonality of "questions of law *or* fact" among class members. FED. R. CIV. P. 23(b)(3) (emphasis added). The Rule's scope is not limited to the elements of a claim. Class-member identification is a "question[] of . . . fact" bearing on "the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3)(D). The predominance analysis *begins* with the elements of the

underlying cause of action, but the rule does not suggest the analysis *ends* there. *See Erica P. John Fund*, 563 U.S. at 809.[25]

Accordingly, we discern no error in the district court's consideration of administrative feasibility under both Rule 23(b)(3)'s superiority and predominance inquiries.[26]

---

[25] Our sister circuits have similarly analyzed manageability as one of several considerations under Rule 23(b)(3)(D). *See, e.g.*, *Jacks* v. *DirectSat USA, LLC*, 118 F.4th 888, 898 (7th Cir. 2024) (discussing "the manageability of a class action" as "a requirement for predominance under Rule 23(b)(3)(D)" (quoting *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006))); *Hamilton* v. *Wal-Mart Stores, Inc.*, 39 F.4th 575, 586 (9th Cir. 2022) ("[W]hen discussing the manageability of a class action, [the Ninth Circuit] ha[s] spoken of whether a class action is the superior method of adjudicating the controversy or whether individualized issues predominate over common issues[.]" (internal quotation marks, citations, and brackets omitted)); *see also Rensel*, 2 F.4th at 1369 ("Administrative feasibility may be relevant to the manageability criterion of Rule 23(b)(3)(D)[.]" (internal quotation marks omitted)); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018) ("The need to identify those individuals will predominate and render an adjudication unmanageable[.]"); *Klay*, 382 F.3d at 1260 (stating, in its predominance analysis, "when there are significant individualized questions going to liability . . . the need for individualized assessments of damages is enough to preclude 23(b)(3) certification. . . . [B]ut we emphasize that such cases rarely, if ever, come along").

[26] In briefing and at oral argument, Plaintiffs resisted the need to prove the identity of class members, arguing that "[w]hether an individual can ultimately demonstrate they are entitled to a portion of the class fund is irrelevant to the aggregate amount of damages[.]" Op. Br. at 57; *see* Oral Arg. at 8:58–9:09 ("This court has already held that a defendant does not have a right to challenge individual claimants' efforts to recover out of a common fund."). This argument was not presented to the district court. At most, Plaintiffs said in a footnote in their reply supporting class certification that "when plaintiffs seek to calculate a total damages amount for a class, a defendant's supposed concerns relating to the identification of class members

\* \* \*

In sum, as to Plaintiffs' appeal, we hold Plaintiffs' damages model satisfies the requirements of Rule 23 for the safer-cigarette theory. The district court's contrary conclusion requires reversal of its causation and damages holdings and its denial of the Washington unjust-enrichment class. We also conclude the district court erred by resolving the disclaimer's effectiveness on the merits at the class certification stage.

## V

We now turn to Santa Fe's remaining challenge to the district court's decision to certify the menthol classes.[27] Santa Fe argues, *first*, the district court should have rejected Plaintiffs' damages model for claims premised on the menthol theory because the model fails to account for the price premium associated with non-menthol additives. *Second*, the district court erred in

---

who will recover are simply not warranted." Reply Mot. Cert. at 12 n.9. But "[i]n civil cases . . . a party waives an issue in the district court if he waits to raise the argument until his reply brief." *United States* v. *Lee Vang Lor*, 706 F.3d 1252, 1256 (10th Cir. 2013). In any event, the district court never addressed the argument. *Tesone* v. *Empire Mktg. Strategies*, 942 F.3d 979, 992 (10th Cir. 2019) ("[A]ppellate courts can reach issues that were either pressed by the appellant before, or passed upon by, the lower court." (internal quotation marks omitted)). Neither do we.

[27] We already rejected Santa Fe's argument that the district court should have denied certification of all classes based solely on concerns surrounding class-member identification. *See supra* Section III.C. We now consider the remaining two arguments in Santa Fe's cross-appeal.

68

treating California unjust-enrichment claims differently from other states' claims when California law equally precludes common proof of injustice. We address these in turn.

## A

Santa Fe first challenges the district court's approval of Plaintiffs' damages model for the menthol theory. Santa Fe contends the district court "erred in failing to recognize that Plaintiffs' menthol theory violates *Comcast*" for the same reason "their safer-cigarette theory does: their proposed damages model does not 'measure *only* those damages attributable to [the operative] theory[] of liability.'" Resp. Br. at 61 (first alteration original) (quoting *Comcast*, 569 U.S. at 35). Recall, Plaintiffs' menthol theory is that the "100% Additive-Free" label on NAS cigarettes is false because the cigarette contains an additive, menthol. Santa Fe argues menthol is only one of many "chemical additives found in most other cigarettes," so the model violates *Comcast* by capturing value consumers attribute to the absence of non-menthol additives. Resp. Br. at 62–63.

We rejected this line of reasoning when we reversed the district court's *Comcast* determination for the safer-cigarette theory. *See supra* Section IV.A.3. The argument fares no better here. *Comcast* requires a damages model to "measure only those damages attributable to [the] theory" of liability, 569 U.S. at 35, and Plaintiffs' model does that by calculating the

price premium associated with the "100% Additive-Free" label. As Plaintiffs explain, Dr. Dubé's model "calculate[s] the price premium associated with the defendants' literally false label claim." Reply Br. at 33. The model sufficiently "translat[es]" the "*legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast*, 569 U.S. at 38. The claim that the model might overstate damages by failing to account for non-menthol additives is just like the claim about other meanings of "Natural": Both are "common to the claims made by all class members" and do not defeat predominance. *Black*, 69 F.4th at 1178 (quoting *Tyson Foods*, 577 U.S. at 457).[28] Challenges to a model's accuracy do not create individualized inquiries under Rule 23(b)(3) but "present class-wide rebuttal evidence" common to all class members. *See id.*

---

[28] In allowing Dr. Dubé's proposed model to serve as common proof of damages for the menthol theory, the court reasoned the model "align[ed] more closely" than it did with the safer-cigarette theory. RV.3. As to the menthol theory, the district court said, the model "d[id] not rely on the consumers' interpretation of the label such that the plaintiffs' damages model need[ed] to worry about different categories of harm." RV.3. We acknowledge an apparent tension between the district court's treatment of the two theories. The court required the model to disaggregate the various meanings of "Natural" for the safer-cigarette theory but imposed no similar requirement to disaggregate the value of menthol from other excluded additives for the menthol theory. As Santa Fe observes, the court "did not explain" how the model for the menthol theory is "an adequate fit." Resp. Br. at 64. Our reasoning in reversing the district court's conclusion for the safer-cigarette theory resolves any tension. Applying the same logic from that discussion compels us to affirm the district court's approval of the model for the menthol theory.

We accordingly affirm the district court's conclusion that the damages model satisfies *Comcast* for the menthol theory.

B

Finally, Santa Fe challenges the district court's conclusion that California law allows common proof for unjust-enrichment claims. Santa Fe contends California's unjust-enrichment law contains "no distinguishing features" that justify different treatment from the other states where the court denied certification. Resp. Br. at 61 (internal quotation marks omitted). We disagree.

As discussed, the district court denied class certification for all unjust-enrichment classes except California, concluding the other states required individual determinations of "whether the retention of the benefit resulting from a given purchase was unjust." RV.52. California, however, was different. The district court observed that California treats unjust-enrichment actions as "quasi-contract claims." RV.23 (quoting *Astiana* v. *Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013)). The district court reasoned "quasi-contract claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members." RV.23 (quoting *Astiana*, 291 F.R.D. at 505). Because the California classes "rel[ied] wholly on objective standards to determine whether [Santa Fe's]

labelling was deceptive," the court found "their claims are amenable to common proof and raise common legal issues." RV.23.

On appeal, Santa Fe contends *Astiana* does not apply because that case "did not involve an unjust enrichment claim." Resp. Br. at 60. They argue "California courts have squarely held that such claims should not be certified where the unjustness of a defendant's retention of a benefit will depend on individual circumstances." Resp. Br. at 60 (citing *Savaglio* v. *Wal-Mart Stores, Inc.*, 2003 WL 25676640, at *26 (Cal. Super. Ct. Nov. 6, 2003)).

We agree with Plaintiffs that *Astiana* "reflects well-established California law that claims for unjust enrichment be treated as quasi-contract claims." Reply Br. at 21 (citing *Astiana* v. *Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)). The Ninth Circuit's endorsement of *Astiana* confirms as much: "When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana*, 783 F.3d at 762 (quoting *Rutherford Holdings, LLC* v. *Plaza Del Rey*, 166 Cal. Rptr. 3d 864, 872 (Cal. Ct. App. 2014)); *see also Milos Prod. Tanker Corp.* v. *Valero Mktg. & Supply Co.*, 117 F.4th 1153, 1164 (9th Cir. 2024) ("Quantum meruit (or quasi-contract) is an equitable remedy implied by the law under which a plaintiff who has rendered services benefiting the defendant may recover the reasonable value of those services *when necessary to prevent unjust enrichment of the defendant*." (internal quotation marks omitted)).

72

The *restitution* here is the price premium which is susceptible to common proof through the damages model. Individualized inquiries for each purchaser are thus unnecessary. *See Beck-Ellman* v. *Kaz USA, Inc.*, 283 F.R.D. 558, 568 (S.D. Cal. 2012) ("[California] unjust enrichment claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members."). And Plaintiffs persuasively explain "courts have certified California unjust enrichment classes based on evidence of uniform conduct by the defendant and common proof of unjustness in the form of a price-premium model of damages." Reply Br. at 22 (citing *Broomfield* v. *Craft Brew All., Inc.*, 2018 WL 4952519, at \*14 (N.D. Cal. Sept. 25, 2018)).

We therefore discern no error in the district court's conclusion that the California unjust-enrichment claims are amenable to common proof.

## VI

In conclusion, we reverse in part and affirm in part the district court's order on certification. As to Plaintiffs' appeal, we reverse the district court's denial of class certification for classes premised on the safer-cigarette theory on three grounds: (1) the district court incorrectly concluded Plaintiffs' damages model violated *Comcast* and therefore failed to provide classwide evidence of damages and causation for Plaintiffs' consumer-protection claims;

73

(2) the district court prematurely reached the merits of the effectiveness of the disclaimer; and (3) the district court wrongly denied certification of unjust-enrichment claims in Washington to the extent its determination relied on its conclusion the damages model violated *Comcast*. We otherwise affirm, concluding the district court did not err by analyzing administrative feasibility under both predominance and superiority inquiries; by denying certification on the basis of predominance for claims brought under the ICFA; and by denying certification for unjust-enrichment classes for all states except California and Washington.

As to Santa Fe's cross-appeal, we affirm in full the district court's decision to certify the menthol classes. We conclude the district court properly performed its predominance analysis and acted within its discretion in determining administrative feasibility, without more, would not defeat predominance under the circumstances of this case. We also discern no error in the district court's conclusion that Plaintiffs' damages model for the menthol theory satisfied *Comcast*, and the California unjust-enrichment claims are amenable to common proof. We therefore remand for further proceedings consistent with this opinion.

On remand, the district court should determine whether Plaintiffs provided common proof of the disclaimer's ineffectiveness for the NAS classes. The court should then reweigh predominance—both in light of our

74

determination the Plaintiffs' damages model satisfies *Comcast* and consistent with the district court's other holdings, which we have affirmed. The court should also reconsider certification of the Washington unjust-enrichment class in light of our reversal of the damages-model conclusion.

23-2180/2181, *Dunn v. Santa Fe Natural Tobacco Company*

**TYMKOVICH**, Circuit Judge, dissenting.

Plaintiffs' certification motion suffers from a fatal flaw: their damages model does not pass muster under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The district court correctly held that this was true for the safer-cigarette class but erred in holding the opposite for the menthol class. As a result, in my view, neither class is certifiable for damages, and the district court's misapplication of *Comcast* for the menthol class was an abuse of discretion. *See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013). The majority concludes otherwise, so I respectfully dissent.

Further, while I agree with the majority's application of our precedent regarding administrative feasibility of the class action, I am convinced that our law collides with the Rules Enabling Act. I write separately to articulate my concerns and highlight the issue as one that likely warrants Supreme Court review.

## I.     The Damages Model and *Comcast*

As part of the Rule 23(b)(3) predominance inquiry, Plaintiffs must show "that damages are capable of measurement on a classwide basis." *Comcast Corp.*, 569 U.S. at 34. Otherwise, "[q]uestions of individual damages calculations will inevitably overwhelm questions common to the class." *Id.* This requirement flows from the "unremarkable premise" that plaintiffs are only entitled to damages that result from the defendant's proven harmful and illegal action. *Id.* at 35. Thus, "a

model purporting to serve as evidence of damages . . . must measure only those damages attributable" to the theory of liability.  *Id.*  Tailoring is key.

Start with the safer-cigarette class.  Plaintiffs argue the labels "Natural" and "100% Additive-Free" are misleading because they imply that Natural American Spirit ("Spirit") cigarettes are safer and healthier than other cigarettes, even though they are not.  So for the damages model to satisfy *Comcast,* it must measure only the price premium attributable to consumers' belief that those descriptors equate to increased safety and health.  *See id.*

Plaintiffs' proffered damages model falls short.  While their theory of liability turns on a specific interpretation of "Natural" and "100% Additive-Free," the damages model measures the price premium attributable to those terms writ large. As Santa Fe correctly observes, consumers may give value to the cigarettes being "natural" for reasons unrelated to health and safety, such as "quality, taste, [or] eco-conscious farming practices[.]"  Defs.' Opp'n to Mot. for Class Certification 75.  But by Plaintiffs' expert's own admission, the model does "not ma[ke] any assumptions about what people specifically believe when they read these descriptors."  Supp. App. Vol. I at 157.  In other words, the damages model does not isolate the price premium that resulted from consumers interpreting "Natural" and "100% Additive-Free" to mean safer and healthier.  That error is fatal.  After all, consumers may have many takeaways from the word "natural," but Plaintiffs' theory of liability objects to none of those beyond the implication that the cigarettes are safer and healthier.

2

*In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014), illustrates this point.  There, the plaintiffs argued that ConAgra Foods "deceptively and misleadingly marketed its Wesson brand cooking oils, made from genetically-modified organisms ("GMO"), as '100% Natural.'"  *Id.* at 547.  The court noted that "Plaintiffs' specific theory of liability in this case is that the '100% Natural' label misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients.  Under *Comcast,* therefore, [the damages expert] must be able to isolate the price premium associated with misleading consumers in that particular fashion."  *Id.* at 579.  The district court held the proffered damages model failed *Comcast* because it purported "merely to calculate the price premium attributable to use of the term '100% Natural' and *all of the meanings consumers ascribe to it*."  *Id.* (emphasis added).  In short, the model failed because it included all the possible meanings of the allegedly offensive descriptor and did not isolate the specific theory of deceit.

The same is true here.  Plaintiffs' damages model must isolate the price premium from the specific implication that "natural" and "additive-free" meant "safer" and "healthier," which is Plaintiffs' theory of liability.

Plaintiffs respond that they need not isolate the price premium behind "natural" and "additive-free," because damages models assume the truth of the liability theory.  In other words, the damages model assumes that Plaintiffs have already proven that a reasonable consumer could construe "natural" and "additive-free" to mean safer and healthier.  But even if we treat Plaintiffs' theory of liability

3

as true, that will not prove that "safer" and "healthier" are the only inferable meanings of the challenged labels.  Rather, it confirms that those meanings are *one* takeaway consumers could have after reading the labels at issue.  Like the faulty damages model in *ConAgra*, the Plaintiffs' proposed model does nothing to foreclose the various other takeaways that consumers might have that, in turn, caused the price premium.  As it stands, Plaintiffs' proposed damages model fails to "measure *only* those damages attributable to [their] theory."  *Comcast Corp.*, 569 U.S. at 35.

The majority counters that *ConAgra* is "unpersuasive" because it takes *Comcast* too far.  Majority Op. 47 n.15.  In support, it cites opinions from other district courts in the Ninth Circuit that allegedly break with *ConAgra*'s approach.  But I read most of those cases as consistent with *Comcast* and *ConAgra* because they determined the damages models need not isolate and test each possible interpretation of the allegedly deceptive terms *because the theory of liability was that the product did not satisfy the terms' meanings*.  For example, in *McMorrow v. Mondelez International, Inc.*, the plaintiffs challenged the defendant's labelling of its food products as "nutritious" despite their high sugar content.  No. 17-cv-2327-BAS-JLB, 2021 WL 859137, at *1 (S.D. Cal. Mar. 8, 2021).  The court said the "damages model need not isolate and test the various possible interpretations of the term 'nutritious.'"  *Id.* at *15.  That makes sense because if you assume that a high sugar content means the products are not nutritious, then consumers are paying a price premium based on their belief that a non-nutritious product is nutritious.  Thus, a damages model that tests the price premium for "nutritious" without isolating all the possible

4

interpretations of that term was unnecessary.  Isolation is unnecessary when the product does not align with the challenged term.  *See Gunaratna v. Dennis Gross Cosmetology LLC*, No. CV 20-2311-MWF (GJSx), 2023 WL 5505052, at *20 (C.D. Cal. Apr. 4, 2023) (holding a damages model that calculated the price premium paid for a product labelled "Made From Real Ginger" was sufficient where plaintiffs alleged a reasonable consumer would believe this meant the product contained ginger root rather than ginger extract).

This case is different because the safer-cigarette theory does not claim that the cigarettes are not "natural" or are not "additive-free."  If that was the theory, the proffered damages model—which measures the price premium for those terms— would be acceptable.  Instead, Plaintiffs allege that consumers will read those terms and glean that Spirit cigarettes are safer and healthier compared to other cigarettes. That extra inferential step severs the theory of liability from the damages model, which does not isolate the particular meaning upon which liability depends.

As part of its effort to distinguish *ConAgra*, the majority cites *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161 (10th Cir. 2023), for the proposition that "a defense common to the claims made by all class members does not destroy predominance."  Majority Op. 47 n.15 (citation modified).  That is an unobjectionable statement about common defenses to liability; but I do not see how it helps the majority's case.  If Santa Fe wants to defend against liability by asserting that no reasonable consumer could interpret "natural" as meaning safer and healthier, it may do so.  And that defense, regardless of its ultimate success or failure, would

5

not defeat predominance as to *liability*. *See Black*, 69 F.4th at 1178. But the issue here is not liability, it is the linkage (or lack thereof) between the damages model and Plaintiffs' theory of liability. That is a distinction the district court in *Black* correctly recognized when it denied certification of a damages class action because the "proposed damages model [did] not match the [plaintiff's] antitrust violation theory." *Deselms v. Occidental Petroleum Corp.*, No. 19-CV-0243-F, 2022 WL 20055630, at *11 (D. Wyo. Apr. 26, 2022). Instead, the court certified an issue class under Rule 23(c)(4) on the question of antitrust liability. The defendant appealed certification of the issue class, and we affirmed. In doing so, we noted that the plaintiffs' "proposed methodology for calculating *market power*," an essential part of their monopsony claim, was susceptible to a common defense of inaccuracy. *Black*, 69 F.4th at 1179 (emphasis added). That methodology was separate from the damages model, which *Black* had no occasion to address.

The majority's reliance on *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57 (2d Cir. 2020), is misplaced for a related reason. There, the Second Circuit approved a damages model that "purport[ed] to measure the price premium attributable to the 'flushable' label" on the defendant's toilet wipes. *Id.* at 62. The defendants had challenged the model which they claimed failed to consider other sources of the price premium. Once again, the theory of liability and model lined up because the claim was that consumers paid a price premium for wipes labeled as flushable that were not, in fact, flushable. The damages expert claimed that his model measured that price premium. The district court and Second Circuit correctly held that the model's

6

effort to isolate the premium attributable to that theory was sufficient for certification. But here, Plaintiffs' damages model does not line up with their safe-cigarette theory of liability because, they admit, the model does not try to measure the price premium based on the inference that Spirit cigarettes are safer and healthier.

In sum, I read the only cases addressing the issue in this circuit—the *Black* line of cases—as supporting my application of *Comcast* here. To the extent that the out-of-circuit cases bear on our analysis, I believe they support my reading as well. But most important—perhaps the only thing that matters in the end—*Comcast* itself commands that the damages model "measure *only* those damages attributable to [the theory of liability]." *Comcast Corp.*, 569 U.S. at 35. Plaintiffs' model measures more and fails as a result. The district court's rejection of the damages model for the safer-cigarette theory should therefore be affirmed.

Plaintiffs' damages model for their menthol theory suffers from the same defect. According to Plaintiffs, the "additive-free" label for Santa Fe's menthol cigarettes was misleading because menthol is an additive. The menthol cigarettes had no additives other than menthol, and the menthol resides in the cigarette's filter, not the tobacco itself. But according to Plaintiffs, the menthol migrates from the filter to the tobacco upon smoking, thereby making the "additive-free" label false.

The same analysis should play out here as it did for the safer-cigarette theory. Under *Comcast*, the damages model must show the price premium that resulted from the consumers' belief that menthol is *not* an additive, and that menthol does *not* move from the filter to the tobacco as they smoke. After all, this is Plaintiffs' theory of

7

liability.  But the proposed damages model does not do so.  Like the safer-cigarette

theory, the damages model measures the premium that resulted from the "additive-

free" label writ large.  It is not limited to the premium that resulted from consumers

not knowing that menthol is an additive, and the belief that menthol in the filter does

not migrate into the tobacco.  The damages model as currently designed goes beyond

this and would therefore amount to a windfall for Plaintiffs.

Contrary to Plaintiffs' claim, the menthol theory is not just a question of

whether the label, "additive-free," is false.  For this reason, Plaintiffs' cited cases are

distinguishable.  In each, the theory of liability did not depend on a specific

interpretation behind a challenged label.  Rather, the defendant made a specific

representation, and the plaintiffs were deprived of any benefit of the bargain because

the representation was untrue.  *See, e.g.*, *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977,

981 (11th Cir. 2016) (General Motors falsely represented that several of its cars "had

received perfect five-star ratings in three [safety] categories"); *Broomfield v. Craft

Brew All., Inc.*, No. 17-CV-01027-BLF, 2018 WL 4952519, at *14 (N.D. Cal. Sep.

25, 2018) (defendant packaged its beers as if they were brewed in Hawaii, but they

were not); *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17CV2335-GPC(MDD),

2018 WL 6300479, at *1 (S.D. Cal. Nov. 29, 2018) (defendant represented its juices

as having "no artificial flavors" even though they "contain[ed] artificial flavoring

chemicals"); *Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374,

382 (S.D.N.Y. 2016) (defendant represented that its products used only "high-quality

natural ingredients" even though they contained "synthetic, unnatural, and dangerous

ingredients"); *Gunaratna v. Dennis Gross Cosmetology LLC*, No. CV202311MWFGJSX, 2023 WL 5505052, at *2 (C.D. Cal. Apr. 4, 2023) (defendant falsely represented that its skincare products contained collagen); *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 328, 333 (D.N.H. 2017) (defendant falsely represented, among other things, that its soap "[k]ills 99.99% of Germs" and had "superior efficacy").

The menthol theory is narrower than the theories asserted in these cases because it posits that consumers were misled in a particular way. According to Plaintiffs, consumers would be surprised—and therefore damaged—to learn that the menthol in their menthol cigarettes is an additive, to which the cigarette's "additive-free" label applies, and that menthol migrates from the filter to the tobacco upon smoking. Otherwise, the menthol cigarettes were free of other additives, and consumers therefore received the full benefit of their bargain. In other words, the presence of menthol is the *only* damage that they suffered. Accordingly, Plaintiffs must "limit[] damages to the difference between the prices customers paid and the value of the [cigarettes] they bought—in other words, the 'price premium' attributable to [Santa Fe's "additive-free"] labels." *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534 (9th Cir. 2016). Plaintiffs' damages model does not do

9

so and therefore fails to "measure only those damages attributable to [the menthol theory]."[1] *Comcast Corp.*, 569 U.S. at 35.

The district court's failure to apply *Comcast* correctly to the proposed menthol class was therefore an abuse of discretion.

## II.   Administrative Feasibility and the Rules Enabling Act

Recent cases from our court have defined our circuit's approach to administrative feasibility. Critically, *Cline v. Sunoco, Inc. (R&M)* has established that administrative feasibility is not a required factor for class ascertainability and is, instead, a subfactor within Rule 23(b)(3)(D)'s manageability criterion. *See* 159 F.4th 1171, 1196 (10th Cir. 2025). *Cline* went even further and held that administrative feasibility "should not operate as a trump card that outweighs all other factors under Rule 23." *Id.* And in *Rider v. OXY USA, Inc.*, a panel of this court held that administrative difficulties with identifying class members, tracing ownership rights,

---

[1] Plaintiffs submitted a Rule 28(j) letter, in which they cite *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854 (9th Cir. 2025), *cert. denied,* No. 25-874, 2026 WL 1052179 (U.S. Apr. 20, 2026), as a recent case in which a court upheld a damages model even though the defendant argued that the challenged label lent itself to multiple interpretations. But *Noohi* is distinguishable. There, the plaintiffs' theory of liability did not turn on a specific interpretation of the challenged label. And that is important, since it is the plaintiffs' theory of liability that determines whether the damages model is adequately tailored. *See Comcast Corp.*, 569 U.S. at 35 ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case[.]"). Moreover, *Noohi* approved the damages model because the model already "bridged the difference between the cognizable and non-cognizable damage measurements." 146 F.4th at 866 (citation modified). Plaintiffs' model does no such thing. Rather, it sweeps in unobjectionable interpretations from the challenged labels that fall outside Plaintiffs' theory of liability and counts them as damages.

and other "damages issues," "do not affect the core question of Defendants' liability." 175 F.4th 1214, 1232 (10th Cir. 2026) (citing *Cline*, 159 F.4th at 1187–88).

Because these cases bind our panel, I agree with the majority's conclusion that the district court did not abuse its discretion in its analysis and application of administrative feasibility. That said, I write to express my concerns over how an approach that more-or-less precludes district courts from denying certification solely on administrative feasibility grounds can morph Rule 23's procedural rules into a substantive shortcut for plaintiffs to prove elements of their legal claims.

"Rule 23 is . . . fundamentally a *procedural* device." William B. Rubenstein, 1 *Newberg and Rubenstein on Class Actions* § 1:1 (6th ed. 2026). Although the Rules Enabling Act allows the Supreme Court to "prescribe general rules of practice and procedure . . . for cases" in the lower courts, it prohibits "[s]uch rules [from] abridg[ing], enlarg[ing] or modify[ing] any substantive right." 28 U.S.C. § 2072 (a)–(b). Rule 23 is no exception. Indeed, the Supreme Court has expressly stated that "the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any *substantive* right.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (emphasis added).

To fully appreciate how the Rules Enabling Act is implicated here, consider how Plaintiffs' claims would play out if they were brought in an individual suit. Suppose an individual plaintiff wanted to sue Santa Fe based on the same facts alleged here. That is, say a plaintiff wanted to sue Santa Fe because its "natural" and

11

"additive-free" labels imply that Spirit cigarettes are safer and healthier, even though they are not.  He also argues that Santa Fe's "additive-free" label on its menthol cigarettes is misleading because menthol is an additive, which migrates from the filter to the tobacco upon smoking.  To establish such a claim, a plaintiff would have to show that (1) he bought Spirit cigarettes, (2) Santa Fe's labels were misleading, (3) those misleading statements caused a price premium, and (4) he paid that price premium.  If he can satisfy all these elements, he will prevail.

None of these elements should change because the plaintiff brings a class action.  In fact, they cannot.  After all, a "class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010).  It "leaves the parties' legal rights and duties intact." *Id.*  Indeed, a class action is simply "a convenient procedural device" that serves as "a tool for the aggregation of claims." *Beamon v. Brown*, 125 F.3d 965, 969 (6th Cir. 1997) (quoting 3B James WM. Moore, et al., Moore's Federal Practice § 23.02 (2d ed. 1980)).  Rule 23 does not—and cannot— remove a substantive element required to prevail on a legal claim.  Otherwise, it would "abridge, enlarge, or modify" substantive rights, 28 U.S.C. § 2072 (b), and therefore violate the Rules Enabling Act.

Were it not for our recent administrative-feasibility precedents, this logic should lead us to deny certification for both the safer-cigarette and menthol classes. If the same elements are at play as if this were an individual suit, then proof of

12

purchase is a basic element of Plaintiffs' claims.  If a plaintiff did not buy Spirit

cigarettes, then he did not pay a price premium, and he did not suffer damages.  *See,*

*e.g.*, *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) (class

member would "need to show that he or she paid a premium for [defendant's

product] to be entitled to damages" under consumer protection law).  Nor did he

confer a benefit to Santa Fe that Santa Fe is unjustly keeping.  The purchase of Spirit

cigarettes is therefore directly relevant to the "underlying common issues of the

defendant's liability," which lie at the center of the predominance inquiry.  2

*Newberg and Rubenstein on Class Actions* § 4:53; *CGC Holding Co. v. Broad &*

*Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (Predominance requires "consideration

of how the class intends to answer factual and legal questions to prove its claim").

This tracks Rule 23(b)(3)'s text, which requires that "questions of law or fact

common to class members predominate over *any* questions affecting only individual

members."  Fed. R. Civ. P. 23 (b)(3) (emphasis added).  Proof of purchase is *a*

question that affects individual class members and would predominate across the

class.  As a result, and just like any other element of their legal claims, Plaintiffs

must show that resolving this element would not result in individualized inquiries

that would overwhelm "questions of law or fact common to class members."  *Id.*

Plaintiffs cannot do so here.  They concede there is no mechanism that can

readily identify who bought Spirit cigarettes and how many.  Santa Fe sold the

cigarettes to retailers—not to consumers—and neither Santa Fe nor the retailers have

13

any records of who bought them.[2]  Moreover, and as both parties recognize,

consumers are unlikely to keep receipts for low-dollar purchases like cigarettes.

As a result, there is no manageable way to identify who bought Spirit

cigarettes apart from individual consumers coming forth, one by one, and attesting

that they bought a pack potentially as far back as twenty-five years ago.  Santa Fe, in

turn, will have the chance to contest each claimant who comes forward and submits a

claim.  Plaintiffs concede as much in their briefs.[3]  But if this goes on for each

---

[2] One issue the panels in *Cline* and *Rider* found persuasive was that the defendants in each case either maintained the records, or had a duty to do so, that were critical to class-member identification.  *See Cline*, 159 F.4th at 1194–95; *Rider*, 175 F.4th at 1224–25.  The defendants' argument that identifying class-members and damages was not administratively feasible therefore fell flat.  Indeed, it would be perverse to allow class-action defendants to hide behind administrative-feasibility difficulties they created themselves, especially when their hands are further dirtied by violations of statutory duties to maintain records.

But that consideration is absent in a case like this one, where a product manufacturer has no direct interchange with the consumer.  It would be unreasonable to expect companies like Santa Fe to maintain any apparatus to track consumers who buy their products from intermediaries, when, from where, and in what quantity.  Even if such tracking were possible, the privacy implications would be staggering.  Ultimately, since the administrative feasibility concerns do not result from any malfeasance by Santa Fe, I would be inclined to give the factor more weight.  In fact, absent *Cline* and *Rider*, I would find it dispositive against certification.

[3] At oral argument, Plaintiffs took the opposite position.  Oral Arg. at 7:55–9:48.  Relying on *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1269 (10th Cir. 2014), Plaintiffs argued that Santa Fe would not have the right to contest class members' affidavits because Santa Fe "has no interest in the method of distributing the aggregate damages award among the class members." *Id.*  But in *Urethane Antitrust*, the damages amount was fixed, which is not the case here, and the only issue was damages distribution.  *Id.*  In this case, proof of purchase is not about distribution of damages from a fixed damages fund but proving up and showing entitlement to damages in the first place.  Moreover, the defendant in *Urethane*

14

claimant, it will inevitably result in individual mini trials that class actions were meant to prevent.[4] *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (Rule 23(b)(3) is meant to "select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently'" (alteration in original)); *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("Predominance of issues common to all class members, like the other requirements for certification of a suit as a class action, goes to the efficiency of a class action as an alternative to individual suits.").

Similar problems exist when a proposed class contains uninjured class members. This makes sense considering the close relationship between injury and damages. Certifying a class full of uninjured members would violate Rule 23 because no common injury would predominate, unless the injured can readily be separated from the uninjured. The D.C. Circuit has observed that absent a "winnowing mechanism" that is "truncated enough to ensure that common issues predominate," there is no "further way—short of full-blown, individual trials—to

---

*Antitrust* "never requested individualized findings on damages," which is also not the case here. *Id.*

[4] Plaintiffs argue that Santa Fe has supplied "no real-life example of a class action that [has] devolved into mini-trials" based on affidavits, and that this concern is overblown. Aplt. Resp. & Reply Br. at 52–53. Perhaps, but there is a good reason for the dearth of examples. Because "the possible consequences of a judgment to the defendant are so horrendous, these actions are almost always settled, making the class-certification order too often the main event." *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 324 (6th Cir. 2025) (en banc) (citation modified). So the lack of real-world examples provides little evidence in support of Plaintiffs' stance.

15

segregate the uninjured from the truly injured." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (citation modified).

Affidavits are no such "winnowing mechanism" if the defendant intends to contest the submitted affidavits. *Id.* The First Circuit has held the same, finding that "[t]he need to identify those individuals [who are uninjured] will predominate and render an adjudication unmanageable absent . . . some other mechanism that can manageably remove uninjured persons from the class in a manner that protects the parties' rights." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018). The court rejected the use of affidavits as such a mechanism because the defendant intended to rebut them. *Id.* at 52–53. As Justice Kavanaugh recently stated, "[a] damages class consisting of both injured and uninjured members does not meet [Rule 23's predominance requirement]" because "if there are members of a class that aren't even injured, they can't share the same injury with the other class members." *Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 332 (2025) (Kavanaugh, J., dissenting from dismissal of writ of certiorari as improvidently granted).

That reasoning carries over to this case. As I've covered, Plaintiffs have not offered any workable mechanism to identify who and how many consumers bought Spirit cigarettes. Without that information, Plaintiffs cannot establish damages, which they admit is a fundamental element of their claims.

Plaintiffs make an unconvincing argument in response. They say that the lack of consumer-purchase records does not matter because purchase of Spirit cigarettes is *not* an element of their claims and is therefore not a predominant question. Rather,

16

they argue that to prevail on their consumer-protection claims they need only show: (1) deception by Santa Fe, (2) causation, and (3) damages.  According to them, Rule 23 takes the class as defined, which already consists of consumers who bought Spirit cigarettes, and then runs that class through the predominance test by examining whether assessing each of the three elements above would result in individualized inquiries.  Plaintiffs maintain that it would not, and that proof of purchase is not relevant to damages because damages can be calculated aggregately by multiplying the number of cigarettes Santa Fe sold in a geographic region by the price premium.  Thus, they argue damages can be calculated no matter how many *individuals* bought Spirit cigarettes.

But that overly clever argument displays the very logic that conflicts with the Rules Enabling Act.  Even if we take the class as a given, proof of purchase would still be a required element for Plaintiffs to prevail.  Proof of purchase is not just a question about who falls within the class definition.  Rather, it is a question that cuts to the core of Plaintiffs' claims.  If a consumer did not buy Spirit cigarettes, then he did not pay a price premium, and he did not incur damages.  Plaintiffs concede that if this were brought as an individual suit, the plaintiff would have to prove purchase at the outset to establish a viable claim.  The same should be true in a class action.  After all, a class action cannot relieve a plaintiff from proving an essential element of his legal claim that he would have to prove up if brought in an individual suit.  *See Black*, 69 F.4th at 1174 ("[T]he court must not relax or shift the burden of proof to liberally construe Rule 23's requirements or resolve doubts in favor of

17

certification."). "Such a result would fly in the face of the core principle that class actions are the aggregation of individual claims, and do not create a class entity or re-apportion substantive claims." *In re Asacol Antitrust Litig.*, 907 F.3d at 56. So even if we take the class as defined, Plaintiffs will still have to show that proving purchase will not result in countless mini trials.

Still, Plaintiffs respond that proof of purchase is not required for damages because damages can be calculated in the aggregate. Relying on *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), Plaintiffs argue that damages can be calculated aggregately by multiplying the number of Spirit cigarettes sold in a geographic region by the price premium. In doing so, Plaintiffs claim they would be calculating Santa Fe's *total* liability no matter how many consumers make claims on the class fund.

This reasoning might work in some cases, but not in this one. "Aggregate damages [are] defined as the defendant's total liability to the full *class*," 4 *Newberg and Rubenstein on Class Actions* § 12:2 (emphasis added), and here, Santa Fe sold Spirit cigarettes to retailers, not consumers. Under Plaintiffs' reasoning, damages can be calculated on a per pack basis based on how many cigarettes were sold to retailers. But "aggregate damages must 'roughly reflect the aggregate amount owed to *class members*,'" *id.* (emphasis added) (quoting *Hickory Sec. Ltd. v. Republic of Argentina*, 493 F. App'x 156, 159 (2d Cir. 2012)), and Plaintiffs concede there is no way to trace any sales made by the retailers to consumers. As a result, merely multiplying the number of Spirit cigarettes that Santa Fe sold to retailers in a

18

geographic region does not accurately compute the damages that *class members* suffered. "[D]efendants cannot be held liable for damages beyond the injury they caused." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015).

The importance of all this cannot be overstated; inflated damage estimates can have significant consequences on the ground. Take this case, for example, where even if aggregate damages were allowed, most of the class fund will likely go unclaimed (after the lawyers get their cut) because very few consumers will retain receipts or be able to prove a small-dollar purchase made decades ago. *See, e.g.*, *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 661 (7th Cir. 2015) (noting that class members are "unlikely to have kept their receipts" for "a relatively inexpensive consumer good"). Thus, Santa Fe would be forced to pay out to a class fund even though most class members—the very people who were apparently harmed—will not care or be made whole.

So where would all these unclaimed "damages" go? Sometimes to charity, as provided by the *cy pres* doctrine. 4 *Newberg and Rubenstein on Class Actions* § 12:26 (explaining that if too few class members come forward "the monies recovered from the defendant are typically directed to one or more charities via a *cy pres*—or 'next best'—award"). And while this might sound all well and good in the abstract, it does not directly redress the injury that class members suffered, which is what damages are supposed to do and would do in an individual suit. As Justice Thomas has noted, "[w]hatever role *cy pres* may permissibly play in disposing of unclaimed or undistributable class funds, *cy pres* payments are not a form of relief to

19

the absent class members and should not be treated as such." *Frank v. Gaos*, 586 U.S. 485, 495 (2019) (Thomas, J., dissenting) (citation omitted). Chief Justice Roberts has also questioned "the use of such remedies in class action litigation." *Marek v. Lane*, 571 U.S. 1003 (2013) (Roberts, C.J., statement respecting denial of certiorari). And an expanding cohort of courts has expressed "increasing skepticism about whether *cy pres* provisions actually provide an indirect benefit to class members." *In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1124 (9th Cir. 2021) (Bade, J., concurring) (collecting cases). In short, in a case like this the defendant is punished by paying damages for consumers who were never injured, with no way to claw back the overage.

Thus, courts must be vigilant in ensuring that Rule 23 is not weaponized with classes that are overinflated or only theoretically exist. As Justice Kavanaugh recently observed, "[o]verbroad and incorrectly certified classes threaten massive liability" and "raise the stakes for businesses that are the targets of class actions." *Lab'y Corp. of Am. Holdings*, 605 U.S. at 333 (Kavanaugh, J., dissenting). Businesses cannot afford to roll the dice if they face potential damages in the hundreds of millions—even if the merits of the underlying claims are doubtful or the rightful class is small. Consumers feel the effect of this as well, since "coerced settlements substantially raise the costs of doing business." *Id.* "[C]ompanies in turn pass on those costs to consumers in the form of higher prices." *Id.*

All this only underscores the need for courts to "heavily scrutinize[] and strictly enforce[]" Rule 23's requirements. *CGC Holding Co.*, 773 F.3d at 1086. I

20

doubt whether Plaintiffs have met Rule 23's predominance demand because I suspect individualized questions about who bought Spirit cigarettes, and how many, will predominate and make a class action impractical. But our holdings in *Cline* and *Rider* effectively preclude us from finding an abuse of discretion under the circumstances.

That said, other circuits have decided differently and imposed a stricter administrative-feasibility requirement. The district court itself noted that, if it were writing on a clean slate, it would adopt the Third Circuit's stricter administrative-feasibility prerequisite for class ascertainability. District Ct. Op. 252 n.64. The disparity among the circuits regarding the proper role of administrative feasibility in the class-certification analysis creates confusion and will likely encourage forum-shopping by plaintiffs for certification-friendly courts. Resolution of that split by the Supreme Court, and clarity on how administrative feasibility applies to Rule 23's requirements—including ascertainability, predominance, and superiority—would mitigate these issues. And I suspect it would improve our compliance with the Rules Enabling Act and its mandate that class actions may not facilitate shortcuts around substantive issues.

## III.  Conclusion

Plaintiffs' proposed damages model violates *Comcast* because it measures damages exceeding their theories of liability. Its failure to isolate the price premium consumers paid based on the implication that the labels "natural" and "additive-free" imply greater safety and health is fatal to certification of the safer-cigarette class.

Similarly, the model does not identify the price premium consumers paid based on the implication that menthol is an additive that taints the tobacco during smoking. That failure dooms certification of the menthol-class.